IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| YELENA LEVITIN, and ) <br> CHICAGO SURGICAL CLINIC, an Illinois ) <br> Corporation, ) <br> ) <br>        Plaintiffs, ) <br> ) <br>   v. ) <br> ) <br> NORTHWEST COMMUNITY HOSPITAL, an ) <br> Illinois Not for Profit Corporation, ADVANCED ) <br> SURGICAL ASSOCIATES, S.C., an Illinois ) <br> Corporation, ALAN B. LOREN, WILLIAM D. ) <br> SOPER, AND DANIEL R. CONWAY, ) <br> ) <br>        Defendants. ) | NO. 13 C  5553 <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT FOR DECLARATORY JUDGMENT,
DAMAGES AND OTHER RELIEF**

Plaintiffs, Yelena Levitin and Chicago Surgical Clinic, ("Levitin", "CSC" or

"Plaintiffs"),

 by their attorney, Susan Bogart, Law Offices of Susan Bogart, as and for her Complaint against

Defendants in this action, alleges as follows:

**INTRODUCTION**

1. This is an action for declaratory, injunctive, and equitable relief; and liquidated,

compensatory and punitive damages, together with attorneys' fees, costs and disbursements,

sustained by Dr. Yelena Levitin as a result of a conspiracy among and between the defendants to

eliminate her from competition for providing general surgical medical services in the community

covered by Northwest Community Hospital and Advanced Surgical Associates through, <u>inter</u>

1

alia, a hostile work environment, a campaign of harassment and discrimination based upon gender, ethnicity and religion, and retaliation to rob her of her reputation, patients, referral business, and other existing and prospective business relations, and to defame and disparage her in the relevant medical communities in an attempt to damage her reputation and destroy her as a competitor.

2. Levitin has worked as a general surgeon at Defendant Northwest Community Hospital since 2000. In the 13 years that she has practiced there, she distinguished herself as a doctor and surgeon and earned an excellent reputation in the community. For most of that time, Levitin was the only female general surgeon, and the only Russian speaking general surgeon who was also Jewish.

3. Northwest Community is situated in Arlington Heights and attracts a large female, Russian speaking and elderly patient population. Due to the nature of the surgeries performed by general surgeons, female, Russian speaking and elderly patients have stated that they are more comfortable having surgeries performed by Dr. Levitin.

4. Prior to the events complained of herein, Plaintiffs' practice had steadily grown at NCH because of Levitin's professionalism, excellent outcomes, reputation for quality, compassionate empathetic and personalized care, general level of expertise in both complex and routine cases, her reliability and affability, her bed side manner, her ability to operate under pressure and stressful conditions, her sex, ethnic and religious background.

5. As a result of her professionalism, received referrals of patients from other physicians within and without of the NCH community, which patients were to be admitted at NCH. Prior to defendants conduct at issue here, approximately 94 % of CSC's revenues and at least 60% of

2

Levitin's surgical practice consisted of patients from the NCH community that she treated and admitted to NCH or were referred to her by NCH physicians. Following the events at issue in this case, the referrals Levitin received from physicians within the NCH community steadily declined, until she was receiving no referrals from NCH physicians and no patients from the NCH community as of filing this complaint.

6.   Beginning in or about November 2008 and continuing through the present, defendants have engaged in a conspiracy to eliminate Plaintiffs from competition in the community served by Northwest Community Hospital. The conspiracy is designed to increase the patients referred to and treated by defendants and to increase the revenue that flowed to Advanced Surgical Associates and to damage Plaintiffs' surgical practice.

7.   Defendants have furthered the conspiracy by, inter alia, arbitrarily excluding as a surgeon with clinical and staff membership privileges by the manner in which NCH's by-laws and internal rules and regulations are enforced.

8.   Defendants have furthered the conspiracy by systematically defaming plaintiff Levitin to family practitioners, internists, and other medical and surgical specialists so that such family practitioners, internists, physicians and specialists stopped referring their patients to Plaintiffs, and, instead, such referrals went to other NCH general surgeons including defendants.

9. Defendants have furthered the conspiracy by taking other steps to otherwise ruin plaintiff Levitin's medical career and drive her out of Northwest Community Hospital and the community to which it provides medical services.

10. In furtherance of the conspiracy, defendants created a double standard, whereby surgical audit, corrective action,  hospital peer review and quality assurance policies were used

to harass, retaliate against and damage Plaintiffs, as the only female, Russian and Jewish general surgeon on staff in the General Surgery Section of the Department of Surgery at Northwest Community, while similar, the same or more serious surgical events by male surgeons, including the individual defendants, who were also not Russian or Jewish, were swept under the carpet and not submitted for corrective action or peer review, their privileges were not adversely affected and no adverse action report was filed against them with the National Practitioner Data Bank. Not one of the male surgeons who were also not Russian or Jewish was, or has ever been, subjected to the same policies and practices, harassment, scrutiny or retaliation, despite having surgical events resulting in the death of patients, and in malpractice actions.

11.  In furtherance of the conspiracy, defendants initiated and participated in peer review proceedings in order to reduce competition from Plaintiffs rather than to improve patient care.

12.  In furtherance of the conspiracy, defendants corruptly impaired, impeded, obstructed,  and circumvented the process due a physician before their clinical privileges and staff membership can properly be revoked and terminated, by among other things, *sua sponte* revoking Dr. Levitin's clinical privileges at Northwest Community and filing an adverse action report with the National Practitioner Data Bank without undertaking the peer review process required under its by-laws, state laws and the Health Care Quality Improvement Act and in complete disregard of the decision of NCH's Judicial Review Committee, following its 2 year peer review process, that:

> *  Dr. Levitin is a well trained surgeon and technically competent;
>
> * Dr. Levitin did **not** pose a danger to patient safety and welfare;
>
> *  Dr. Levitin's privileges should **not** be reduced, restricted, suspended, revoked

or denied;

* Dr. Levitin **not** be assigned a proctor or required to obtain approvals
before rendering care;

* No report be or was required to be filed with the National Practitioner Data
Bank.

13.   In furtherance of the conspiracy, defendants terminated and revoked Dr. Levitin's

clinical privileges and staff membership at Northwest Community and filed an Adverse Action

Report with the National Practitioner Data Bank ("NPDB"), both professional review actions,  in

violation of the requirements of the Health Care Quality Improvement Act of 1986 as amended,

42 U.S.C. § § 11101-11152 ("HCQIA"), NCH's by-laws, and the Illinois Hospital Licensing

Act, 210 ILCS 85/10.4 because no prior written notice was given of the Board's adverse action,

no opportunity for a fair hearing before the Board was granted, and no professional review body

that engaged in the required professional review activity found such adverse actions warranted

based on Dr. Levitin's competence and professional conduct as defined under the HCQIA and

the Judicial Review Committee found the grounds relied on for the NPDB report unfounded,

unsubstantiated, contrary to the evidence and false.

14.   In furtherance of the conspiracy, defendants terminated and revoked Dr. Levitin's

clinical privileges and staff membership at NCH and filed an Adverse Action Report with the

NPDB for reasons unrelated to quality patient care but on the ground that Dr. Levitin

participated in and defended her professional competence and conduct during a 2 year peer

review process, which defense prevailed.

15.   In furtherance of the conspiracy, defendants, in terminating and revoking Dr.

Levitin's clinical privileges and staff membership and filing of an Adverse Action Report with

the NPDB, ignored and disregarded the results of the formal peer review process and relied on

the accusations brought by defendants ASA, Soper, Conway and NCH's Medical Executive

Committee ("MEC"), which accusations were specifically rejected by the Judicial Review

Committee, and found that the evidence did not support the MEC's contention that Dr. Levitin

was uncooperative during the 2 year long process consisting of an outside reviewer, 2

investigative committees and a hearing that took place on 9 days over the course of 9 months,

with approximately 15 witnesses, including experts, over 40 exhibits, over 1950 pages of

transcript and a 25 page report setting forth detailed findings of fact and conclusions of law.

    16. Also in furtherance of the conspiracy, defendants acted with actual malice and ill will

in willfully ignoring and deliberately disregarding its own peer review process that found in

favor of Plaintiff Levitin as they did not a) reasonably believe that their action was in furtherance

of quality health care; b) have facts supporting a finding that Plaintiff Levitin's professional

conduct was a danger to patient safety; c) have voting members of the Board with the requisite

expertise in the specialty involved in the Board's action; d) provide adequate notice to Levitin of

the proposed adverse action and the reasons for the action; e) provide the opportunity for a

hearing, including identifying the witnesses to be called, where Levitin could be represented by

counsel, the hearing would be recorded, the witnesses cross examined, evidence could be

presented, and a written report provided as required by HCQIA, state statute and Northwest

Community's by-laws; and f) have a reasonable belief that the action was warranted by the facts

known.

    17. In addition, beginning at least as early as 2008, NCH elected and its Board confirmed

ASA defendants to run and control sections within the Surgery Department, including the

Surgical Audit Committee, to sit on NCH's Board of Directors, to be members and officers of

NCH's Medical Executive Committee, to run the Surgery Department and the General Surgery

Section, in which positions defendants were in charge of enforcing NCH's by-laws, rules, and

regulations for the Surgery Department, General Surgery Section, Surgical Audit Committee,

and NSQIP and required to maintain continuing surveillance of the professional performance of

all individuals having clinical privileges in their department and to report regularly thereon to the

MEC, to be accountable for all professional and medical staff administrative activities within

their departments including approving and rejecting applications for privileges and corrective

and other disciplinary actions.

18.  It was further part of the conspiracy that defendants subjected Levitin and her

surgical cases to greater scrutiny than her similarly situated male, non-Russian and non-Jewish

surgeons.

19. In addition, beginning in or about 2008 and continuing through January 21, 2013

when NCH filed an adverse action report with the National Practitioner Databank (NPD),

defendants subjected Levitin to harassment based on her gender, female, ethnicity,

Russian/Eastern European and religion, Jewish that was sufficiently severe and pervasive to

create a hostile and abusive work environment.

20. Conway insulted Levitin, ridiculed her, yelled and screamed at her, embarrassed her

in front of hospital employees and other medical staff members, and patients, questioned her

professional judgment in an inappropriate tone of voice and in front of medical staff, NCH

employees and patients.  Conway threatened to sanction Levitin if she did not accede to his

personal demands as to how she treat emergency surgeries and treat her patients.

7

21. As part of his harassment, Conway violated patient confidentiality and HIPPA privacy rules and regulations by accessing the medical records of Levitin's patients to find grounds to second guess and question her professional competence and abilities without basis in front of surgery staff and patients. Conway who is at least 6 ft tall and compared to Levitin's 5' 6" would hover over her, and advance physically toward and tower over her, subjected to Levitin to intimidating and abusive behavior within the surgery area, which conduct threatened patient safety and Levitin's ability to perform her duties as a surgeon, including using offensive comments, a demanding condescending tone of voice, ridicule, unsubstantiated attacks on her and her professional abilities and competence in the presence of medical staff and employees and patients.

22. Beginning in or about the later part of 2008 and on multiple occasions thereafter, Levitin brought Conway's conduct to the attention of NCH's Medical Staff Office, which conduct violated NCH policies including but not limited to its Disruptive Physician policies prohibiting conduct that 1) disrupted the operation of the hospital, 2) negatively affected Levitin's ability and other medical staff to do their jobs, 3) created a "hostile work environment" for hospital employees and other medical staff members including Levitin, 4) interfered with an individual, including Levitin's, ability to practice competently; and 5) adversely affected patient's confidence in members of the hospital staff to provide quality patient care.

23. In furtherance of the conspiracy, on or about January 27, 2010, in retaliation for Levitin's protected activity in complaining about Conway's harassment, defendant Soper, defendants Conway and Loren's partner in ASA, provided a list of 31 surgical cases submitted by Conway from the Surgical Audit Committee he chaired and consisting of records going back

8

over a 6 year period, and other NSQIP data provided by defendant Loren as Chair. Defendant

Soper, writing on behalf of ASA, submitted the list of over 30 cases and events to the Medical

Executive Committee ("MEC"), on which committee he, defendant Soper, was a member,

requesting in that it "review the activities of Dr. Yelena Levitin". At the time of this letter,

defendant Soper was also Chair of the Department of Surgery, defendant Conway was the Chief

of the General Surgery Section and Chair of the Surgical Audit Committee.

24.  It was further part of the conspiracy that defendants, ASA, Conway and Soper did

not initiate the peer review process for patient safety reasons but rather to eliminate CSC and

Levitin as competitors, whose practice at the time received 94% of their revenues from NCH.

25. It was further part of the conspiracy that defendants ASA, Soper and Conway falsely

alleged that there were "concerns" and "complaints" going back five years concerning Levitin's

practice, and that Dr. Levitin was an "outlier" in the National Surgical Quality Improvement

Project ("NSQIP") data base for DVT and wound infection rates, NSQIP, being an organization

in which NCH participated and was at all times relevant being run by defendant Alan B. Loren,

defendants Conway and Soper's partner,.

26. Defendant, Northwest Community Hospital participated in the hostile work

environment to which defendants Conway, Soper and Loren subjected Levitin, and, despite

having knowledge of Conway's conduct not only did not intervene to prevent further harassment

from occurring, but retaliated against Levitin for raising complaints about Conway by requiring

her to raise her complaints about Conway with Conway's partner, defendant Soper.

27. Defendants NCH, Conway and Soper subjected Levitin to further harassment

resulting in a hostile work environment by retaliating against her and subjecting Levitin to a peer

review process involving over 31 of her cases which occurred over a 6 year period preceding the renewal of her privileges on or about January 25, 2010 for the two year period until January 31, 2012. The peer review process extended over a 2 year period, a process to which no male surgeon was subjected despite having engaged in similar, identical and more egregious conduct. Defendants knew or should have known of the harassment and hostile work environment and failed and refused to take remedial action. Said defendants engaged in a pattern of conduct which allowed, promoted, and encouraged said hostile work environment and harassment based on gender, ethnicity and religion to occur against Levitin.

28.  Further, as defendants' well knew and intended, their conduct toward Levitin constituted hostile work environment, discrimination based upon Levitin's gender, female, ethnicity, Russian and religion, Jewish and retaliation  interfered with Levitin's employment, profession and livelihood.

29. In furtherance of the conspiracy, NCH arbitrarily and maliciously used its credentialing process to eliminate competition to other staff and employed physicians by denying and curtailing the scope of service other female, Jewish Russian physicians were permitted to provide to patients admitted to NCH.

30. As a result of the acts described in this complaint, Levitin has suffered and will continue to suffer severe emotional, physical and financial injury. Defendants' continuing conduct threatens Levitin's career, causing her irreparable injury, including humiliation, embarrassment, damage to her reputation, and severe emotional and physical distress and financial injuries. Further, defendant's conduct increases the cost to the public of obtaining general surgical services and denies the public access to the only female general surgeon, who is

10

also Jewish, Russian, and fluent in Russian in the area.

## THE PARTIES

31.  Plaintiff, Yelena Levitin ("Levitin" or "Plaintiff"), is an individual residing in
Northbrook Illinois. Levitin is a physician licensed to practice medicine in the State of Illinois
and has been so licensed since March 18, 1998. Levitin has been in practice for 13 years and
began her practice as a general surgeon in the Chicago metropolitan area in 2000. Plaintiff's
medical license is in good standing and it has never been revoked, she has never been disciplined
prior to the revocation of privileges by defendant NCH, and she has never been the subject of a
malpractice action. Dr. Levitin's gender is female, her ethnicity is Russian and her religion is
Jewish and as such she is a member of classes protected by Title VII.

32. Plaintiff is a principal in the practice known as Chicago Surgical Clinic, Ltd.
("CSC"), an Illinois Corporation, which has  its principal place of business located at 201 E.
Strong Ave, Suite 7, Wheeling, IL CSC's  license is and was at all times  in good standing.  In
addition to Dr. Levitin, CSC employs or employed two other Eastern European surgeons, Drs.
Kokocharov and Roginsky.

33.   Defendant, Northwest Community Hospital ("NCH") is an Illinois not for profit
Corporation doing business in County of Cook, Illinois with its principal place of business
located at 800 West Central Road, Arlington Heights, IL and with locations also in Buffalo
Grove and Palatine, Illinois, within the Northern District of Illinois, Eastern Division in
Northbrook, IL. Northwest Community Hospital is licensed pursuant to the Illinois Hospital
Licensing Act, 210 ILCS 85/1 *et seq.* Northwest Community Hospital ("NCH") is an "employer"

11

within the meaning of 42 U.S.C. § 2000e (b) in that Northwest Community is engaged in an industry affecting commerce and, at all times relevant, has employed 15 or more employees.

34.   Defendant, Advanced Surgical Associates ("ASA") is an Illinois Corporation doing business in Cook County, Illinois with its principal place of business within the Northwest Community Hospital facilities at 880 West Central Road, Suite 3800, Arlington Heights, IL and with an office located in Elk Grove Village Illinois. Advanced Surgical Associates has approximately 7 surgeons in its practice including Alan B. Loren, William D. Soper, Robert Rao, Sean P. Barnett, William D. Soper, David E. Mahon, and Malcolm M. Bilimoria. During all times relevant hereto, ASA surgeons have been members and officers of NCH's Surgery department and its general surgery section and surgical audit committee, NCH's credentialing committee, NCH's Medical Executive and Quality Committees, NCH's Board of Directors, and NCH's ACS NSQIP, including Alan B. Loren, William D. Soper, Daniel R. Conway, David E. Mahon and Sean P. Barnett.

35. Defendant, Alan B. Loren ("Loren") is licensed to practice medicine in the State of Illinois and has been so licensed since approximately 1982. Loren has practiced in the area of general surgery. At all times relevant hereto, Loren has practiced with Advanced Surgical Associates which has its principal offices located within Northwest Community Hospital facilities. During times relevant to the instant case, Loren has served as the Chief and Vice Chief of defendant NCH's Department of Surgery, as a member of NCH's Surgical Audit Committee and as head of NCH's NSQIP Quality Advisor.

36. Defendant, William D. Soper ("Soper")  is licensed to practice medicine in the State of Illinois and has been so licensed since approximately 1973. Soper has practiced in the area of

general surgery. At all times relevant hereto, Soper has practiced with Advanced Surgical Associates which has its principal offices located within Northwest Community Hospital facilities. During times relevant to the instant case, Soper has served on NCH's Board of Directors, Quality Committee, as the President, Vice President and Secretary/Treasurer of its Medical Staff/Medical Executive Committee, as Chief of defendant NCH's Department of Surgery and as a member of NCH's Surgical Audit Committee.

37. Defendant, Daniel R. Conway is licensed to practice medicine in the State of Illinois and has been so licensed since approximately 1987. Conway has practiced in the area of general surgery. Conway has practiced with Advanced Surgical Associates which has its principal offices located within Northwest Community Hospital facilities. During times relevant to the instant case, Conway has served as the Section Chief for general surgery and as Chairman of NCH's Surgical Audit Committee.

## JURISDICTION AND VENUE

38. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(4), 15 U.S.C. §§ 4, 15, and 26, 28 U.S.C. § 1367, and 28 U.S.C. § 2202.

39. In addition, Levitin's action is brought to remedy discrimination on the basis of gender, ethnicity and religion under Title VII of the Civil Rights Act of 1964, as amended, 42, U.S.C. § 2000 *et seq.*, (as amended 1972)("Title VII");  the Civil Rights Act of 1991; the Illinois Human Rights Act , 775 ILCS 5/1-101 *et seq.*

40.  Plaintiff, Levitin, filed charges of discrimination against defendants Northwest Community Hospital (Charge No. 440-2013-02336) and Advanced Surgical Associates (Charge No. 440-2013-02343) with the Equal Employment Opportunity Commission ("EEOC") on or

about February 28, 2013 complaining of hostile work environment, acts of discrimination on the basis of gender, female; ethnicity, Russian; and religion, Jewish and retaliation alleged herein. See Attached **Exhibits A-1 and A-2**, respectively.

41. On or about May 6, 2013, the EEOC issued Levitin notices informing her of her right to sue defendants Northwest Community Hospital and Advanced Surgical Associates in federal court. See Attached **Exhibits B-1 and B-2**, respectively.

42. Venue is proper in this district under 15 U.S.C. § 22 and 28 U.S.C. § 1391 in that a substantial portion of the events giving rise to plaintiffs' claims occurred within this district, and the plaintiffs and defendants reside in and/or have their principal places of business in this district.

**FACTUAL BACKGROUND**

**Levitin's Qualifications**

43. Dr. Levitin has been and is a practicing physician and surgeon in the Chicago, Illinois community for the past 13 years.

44. Levitin received her medical license in Illinois in 2000, after completing her medical degree at Northwestern University Medical School and her residency at Rush Presbyterian St. Luke's Medical Center.

45. Levitin began practicing medicine and general surgery in 2000.

46. At all times relevant hereto, Levitin's Illinois medical and controlled medicine licenses have been and are current, in good standing and have not been the subject of disciplinary action by the state of Illinois.

47. Since 2001, Levitin has been board certified in general surgery and was recertified in

14

2011 and is a fellow in the American College of Surgeons.

48. Levitin's surgical practice, Chicago Surgical Clinic, Ltd. is located at 201 E. Strong St. Ste. 7 in Wheeling IL, and is in good standing in the state of Illinois.

49. Levitin has never had a malpractice suit brought against her.

50. Levitin has maintained full staff and clinical privileges at various other hospitals including the Condell, Alexian Brothers and Resurrection hospital groups.

**Northwest Community Hospital's Organizational Structure**

51. The Board of Directors ("Board") of NCH is the controlling and governing body of the hospital.

52. The Medical Staff is an association of physicians that are granted clinical privileges at NCH by the Board of Directors and is regulated by the Medical Staff Bylaws as approved by the Board of Directors and as required by the Illinois Hospital Licensing Act, 210 ILCS 85/10.4.

53. One of NCH's Standing Committees is the Medical Executive Committee of ("MEC") a committee of the Medical Staff, which oversees the functions and duties of the Medical Staff. It is empowered to act for the Medical Staff and to coordinate all activities and policies of the Medical Staff, its Departments and Committees. The MEC reports directly to the Board and the Chief Executive Officer of NCH.

54. The Medical Staff Bylaws ("Bylaws") form a contract between NCH and the individual physicians on the Medical Staff, including Dr. Levitin.

55. The Clinical Departments of the medical staff included the Surgery Department, including the Section of general surgery which Levitin, and defendants Loren, Soper, and Conway were a part. The Surgery Department was required to establish its own criteria for the

15

recommendation of clinical privileges, establish a medical care evaluation committee, consisting of at least three members, which conducts ongoing peer review based upon defined criteria as developed by the committee for all members of the department, adopt rules and regulations consistent with Article XIV of the Medical Staff By-laws and perform other duties set forth in Article X, Section 4(a) of the By-laws.

56.     The Surgical Audit Committee was the Surgery Department's medical care evaluation committee.

57.     The General Surgery Section was required to establish its own criteria for the recommendation of clinical privileges, to adopt rules and regulations as provided in Article XIV and perform those duties identified in Article X, Section 4(b) of the By-laws.

58.     Pursuant to the By-laws, the Surgery Department and General Surgery Section were required to elect Chiefs and Vice Chiefs who were required to be confirmed by NCH's Board pursuant to Article X, Section 7 (b) and (c) of the By-laws.

59.     Pursuant to Article X, Section 10 (a) of the By-laws, each Department Chief was required to be  accountable to his department and the MEC,

> (1) maintain continuing surveillance of the professional performance of all individuals having clinical privileges in their department, and report regularly thereon to the MEC,
>
> (2) give guidance on the overall medical policies of the hospital and make specific recommendations and suggestions regarding his own department to the MEC to assure quality patient care,
>
> (3) be responsible within his department for enforcement of the hospital bylaws, the

medical staff bylaws, and medical staff and departmental rules and regulations and policies,

(4) be responsible for departmental implementation of actions taken by the medical executive committee,

(5) transmit to the credentials committee his department's recommendations concerning the delineating of clinical privileges for all practitioners in his department,

(6) have the overall responsibility for teaching, education, and research programs in His department,

(7) participate in every phase of administration of his department and the hospital administration in matters affecting patient care,

(8) participate jointly with the hospital administration in preparing annual reports, budgets as required by the MEC, CEO or Board of NCH,

(9) submit written and in person reports at least annually to the Board concerning the activities of his department.

60.     Pursuant to Article X, Section 10 (b) of the By-laws, each Department Vice Chief was required to

(1)  Have such duties and responsibilities as the Chief determines with a view to insuring that the vice-chief, if he is required to assume the duties of the chief, will be adequately prepared to assume the functions of that office; and

(2)  Have the powers and duties of the chief in the absence of the chief.

61.     Pursuant to Article X, Section 11 (a) of the By-laws, each Section Chief

was required to be accountable to the Chief of his department for all professional and medical

staff administrative activities within the Section and subject to the overall authority of the chief

of the department and to,

> (1) maintain continuing surveillance of the professional performance of all
>
> individuals having clinical privileges in his section, and report regularly thereon to
>
> the Chief of the Department,
>
> (2) give guidance on the overall medical policies of the hospital and make specific
>
> recommendations and suggestions regarding his own department to the Chief of the
>
> Department to assure quality patient care,
>
> (3) be responsible within his section for enforcement of the hospital bylaws, the
>
> medical staff bylaws, and medical staff and departmental rules and regulations and
>
> policies,
>
> (4) be responsible for section implementation of actions taken by the medical
>
> executive committee or the department,
>
> (5) transmit to the chief of the department his section's recommendations concerning
>
> the delineation of clinical privileges for all practitioners in his section,
>
> (6) have the overall responsibility for teaching, education, and research programs in
>
> his section,
>
> (7) participate in every phase of administration of his section and the hospital
>
> administration in matters affecting patient care,
>
> (8) participate jointly with the hospital administration in preparing annual reports
>
> pertaining to his department and section, including budgets as required by the MEC,

18

CEO or Board of NCH,

(9) submit written and in person reports at least annually to the Chief concerning the activities of his section.

**Levitin and her Practice Met All of Northwest Community Hospital's Requirements for Credentialing and Full Attending Staff Membership and Clinical Privileges**

62. Immediately upon beginning her medical and general surgery practice in 2000, Levitin obtained staff and clinical privileges at Northwest Community Hospital ("NCH" or "Northwest Community").

63. Levitin was continuously granted full clinical staff and membership privileges at Northwest Community until the events that are at issue in this case resulted in the revocation of her privileges on January 18, 2013.

64. Levitin's Northwest Community clinical and staff membership privileges were granted by NCH and were renewed every two years after approvals by the Surgery Section Chief, the Surgery Department Chief, the Credentials Committee, the Medical Executive Committee, and the Board of Directors.

65. Per NCH policies and practices, Levitin's privileges were granted and renewed only after the Department of Surgery Chief and General Surgery Section Chief had evaluated the status of her state license, state controlled substance license, current DEA registration, current liability insurance, NPI number, payment of Medical Staff Dues and Assessments, Board Certification and Recertification, Advanced Cardiac Life Support Certification ("ACLS"), basic cardiac life support ("BCLS"), and advanced trauma life support certification ("ATLS"), National Practitioner Data Bank/ and Lawsuit filings, PPD Test Results, Medical Necessity

19

Form, CME, Release of Information form. In addition, the Department and Section Chief evaluated Levitin's Clinical Profile consisting of Utilization Review, Risk Management, Medical Record Review, QA Review, Volume Review, Privileges Review for recommended action, and Health Status.

66. NCH's grant of clinical privileges is based on the physician's education, training, experience, demonstrated competence and judgment, clinical performance, documented results of patient care, other appropriate quality review and monitoring, and other relevant information, including applicable department's specific recommendation to the credentials committee.

67. Defendant Conway and Soper evaluated Levitin's clinical profile, determined that the required data such as the status of her licenses was current and rated her "acceptable" in all areas, the highest rating available, recommended "No Change" in her privileges, and recommended that she be reappointed to the staff .

68. On October 26, 2009, defendant Conway, in his capacity as Chief of the General Surgery Section, signed off as approving the renewal of Levitin's attending staff privileges with no changes.

69. On November 11, 2009, defendant Soper signed off as approving the renewal of Levitin's privileges in his capacity as Chief of the Department of Surgery.

70. On November 19, 2010, the Credentials Committee Approved Levitin's reappointment; on January 5, 2010, the Medical Executive Committee approved her reappointment and on January 25, 2010 NCH's Board approved her reappointment.

71. On January 25, 2010, Leighton B. Smith, NCH's Vice President of Medical Affairs advised Levitin that her application for reappointment had been approved and Levitin was

20

reappointed to NCH"s Medical Staff as a voting attending staff member through 1/31/12.

72. On January 27, 2010, as is set forth in more detail below herein, ASA by Dr. Soper requested that the MEC initiate corrective action against Dr. Levitin. At that time, Dr. Soper was Dr. Conway's partner, served as Chair of the Surgery Department and was on the MEC and Board of Directors.

73. On or about December 16, 2011, NCH's MEC, on which Dr. Soper sat, recommended that Levitin's staff privileges at NCH be terminated based upon the corrective action and peer review process initiated by Dr. Soper that was still ongoing.

74. On October 8, 2012, at the conclusion of the peer review process initiated two years earlier on January 27, 2010, the Judicial Review Committee, after a 9 day hearing occurring over a 9 month period at which approximately 15 witnesses were called by the MEC and Dr. Levitin, including expert witnesses, receiving over 40 exhibits, and receiving closing submissions from the MEC, NCH and Dr. Levitin and her attorneys, their attorneys and following a 9 day hearing that lasted over a 9 month period, decided that Dr. Levitin's privileges should not be terminated and that the MEC's evidence was insufficient to support termination of her privileges, and decided that no NPDB adverse report should be filed.

75. On January 18, 2013, NCH's Board *sua sponte* and without process or a basis in law or fact and contrary to its JRC's findings and decision, terminated Dr. Levitin's NCH privileges and filed a NPDB adverse action report.

76. At all times relevant hereto, Dr. Levitin was the only board certified female general surgeon at NCH.

77. At all times relevant hereto, Dr. Levitin was the only Russian speaking general

surgeon at Northwest.

**NCH Had the Right to the Behavior of its Physicians and Surgeons and to Control and Direct The Work Levitin Performed, The Scheduling, Manner And Methods for Performing Her Work, The Results to Be Achieved, The Details by Which those Results Were Achieved, To Discipline Levitin and to Take Adverse Actions Against Her Privileges, Including Filing with the National Practitioner Data Bank**

78. As a condition to receiving medical staff and clinical privileges at NCH, Levitin agreed to appear for interviews with respect to her application and authorized NCH, its medical staff and representatives to consult with administrators and members of medical staffs of other hospitals or institutions with which she had been associated and with others, including past and present malpractice carriers who may have information bearing on her professional competence, character, and ethical qualifications.

79. As further condition of Levitin's medical staff and clinical privileges, NCH required that she grant it, its medical staff and its representatives consent to inspect all records and documents, including medical records at other hospitals that may be material her to her professional qualifications and competence to carry out the clinical privileges as well as her moral and ethical qualifications for staff membership.

80. As a further condition to receiving staff privileges at NCH, Levitin agreed to be bound by the terms of all of NCH's medical staff bylaws, rules and regulations and to provide continuous care for patients, including but not limited to the control of the Chiefs and Vice Chiefs of the Department of Surgery, Section of General Surgery and Surgical Audit Committee who among other things as described in more detail in paragraphs 55 through 61 above,

22

subjected Levitin and her practice to continuing surveillance of her professional performance.

81. Additionally, Levitin was required to be bound by NCH's bylaws and internal rules and regulations including rules and regulations for Attending staff privileges to 1) perform all duties incident to elective or appointed offices if they served as an officer of the medical staff or any department, section or committee of which he is a member; 2) perform all reasonable duties, including outpatient services and emergency and disaster plan duties, when specifically assigned by the medical executive committee; 3) pay all dues and special assessments levied by the medical staff prior to April 1st of each calendar year; 4) serve when elected or appointed to one committee (may refuse second committee assignment in any given year; 5) report to the hospital regarding final judgments or settlements in professional liability actions and supply to the department chief within thirty (30) days of receipt a copy of any report or proposed report submitted to the National Practitioners Data Bank on behalf of such member.

82. Levitin's privileges extended to the use of the hospital's facilities, including equipped operating rooms, pre op holding rooms, recovery rooms, outpatient and inpatient beds.

83. NCH provided pharmacy services, endoscopy, surgical instruments, laparoscopic and endoscopic equipment, fluoroscopy, implants and devices, blood products, IV and IV antibiotics, anesthesia medications, all fluids, intubation equipment, intraoperative ultrasound, compression boots, catheters for body fluids and explorations and x-rays, sterile drapes, CT and MRI equipment, radiology, pathology and laboratory services, surgical lights, monitoring services, which was vital to her practice and quality patient care because of the equipment's prohibitive cost and immobility.

84. NCH also employed or was affiliated with support personnel, sterile supplies

personnel, nursing, anesthesia, on site radiologists and pathologists, critical care support, transport services, and other physician consultants, hospitalists, and mid-level providers, surgical assistants, and technicians that were crucial in providing Levitin's practice referrals, as well as assisting in treating and caring for her patients.

85. Levitin was required to use the services of the hospital's anesthesia, nursing and support staff in her care and treatment of patients at the hospital and was required to schedule surgeries and equipment according to their availability as prescribed by NCH subject to emergency surgeries and on call requirements which took priority.

86. While Levitin had admitting privileges for and was able to admit and treat her own patients at NCH, she was also required to treat NCH patients and to handle "call", including be on a roster for call with the Emergency Department and to continue to treat and care for patients admitted to NCH that she cared for while on call as their consulting and/or attending physician.

87. Northwest Community exercised control over important aspects of Levitin's duties as a physician and surgeon at Northwest, including which general surgeries she would be permitted to perform by means of Article V, section 6 and Article V, Section 7 of the By-laws and as prescribed by NCH in the letters renewing her privileges and reappointing her to the medical staff.

88. NCH could determine which NCH patients Levitin was to treat and operate on, assigned Levitin the surgery rooms and staff to be used in performing general surgeries, determined scheduling for Levitin's and CSC's patients who she referred to Northwest in addition to Northwest patients referred to her by Northwest through the Emergency Department call roster, supplied with the equipment necessary for performing surgeries.

89. NCH monitored Levitin's work hours, assigned her weekday and weekend call when she was expected to be available 24/7 to see, treat and operate on Northwest Community patient population referred to her through the Emergency Department call roster.

90.  NCH also prescribed which surgeons it would allow to take trauma call and excluded Levitin and CSC surgeons from this call, while permitting defendants ASA and its  surgeons to take the call.

91. NCH monitored Levitin's performance through the Surgical Audit Committee, through Hospital by-laws, Medical Staff by-laws and other employment procedures and policies and monitored her compliance with its general rules and regulations of the Medical Staff, the Department of Surgery, the Surgical Pavilion Committee, the Section of General Surgery and with ACS NSQIP.

92. NCH prescribed the form, content and deadlines of documentation Levitin was required to prepare for each patient, dictated to whom Levitin could give medication orders, monitored Levitin's performance through the corrective action and peer review process, disciplined Levitin and terminated her staff membership and clinical privileges, and thus her ability to attend to and treat patients at Northwest or within the Northwest Community that sought to be admitted to Northwest. At all times relevant hereto, Leighton Smith was the Northwest Community Vice President of Medical Affairs that interacted with the Surgical Department and Section Chiefs on behalf of the Northwest Community.

93. Levitin like the similarly situated male general surgeons was allowed to maintain privileges at other hospitals and she did so, although the "vast majority" of her practice was at NCH.  By 2009, 94 % of Plaintiffs CSC and Levitin's practice revenues were earned at NCH. As

25

a result of defendants conduct at issue here, those practice revenues dropped steadily beginning in 2010 when the corrective action process was initiated and falling to approximately 38% in 2013 derived from Dr. Kokocharov, who was employed as a physician at CSC.

94. As part of this agreement, Levitin authorized NCH to obtain documents and records from these other hospitals concerning her privileges, surgeries and other work related matters.

95. NCH did not pay Levitin's salary, wages, or benefits but it did pay disbursements to Levitin and CSC based upon her participation in the NCH physician cooperative entity and investing in the Cyberknife purchase.

96. NCH also paid distributions to Levitin on the capitated surgical program for the HMO patients called PODS program for her participation in NCH's PHO.

97. At all times relevant, NCH had in place a Disruptive Physician policy approved and overseen by the MEC that provided in pertinent part that the objective of the policy was to ensure optimum patient care by promoting a safe, cooperative, and professional health care environment, and to prevent or eliminate conduct that:

      *       disrupts the operation of the hospital

      *       negatively affects the ability of others to do their job

      *       creates a "hostile work environment" for hospital employees or other medical staff members

      *       interferes with an individual's ability to practice competently

      *       adversely affects the community's confidence in the hospital's ability to provide quality patient care

98. Under the terms of this policy, a single egregious incident or repeated incidents may

26

Initiate an investigative action. Corrective action could include written censure, reduction, suspension or termination of privileges pending the investigative process.

99. Unacceptable disruptive conduct included but was not necessarily limited to:

1) Attacks—verbal and physical, including sexual touching, leveled at other medical staff members, hospital personnel, patients, or visitors, that are personal, irrelevant, or beyond the bounds of professional conduct. Disruptive or offensive language, inappropriate nonverbal behavior or gestures.

2) Impertinent and inappropriate comments (or illustrations) made in patient medical records or other official documents, or attacking particular physicians, nurses or hospital personnel.

3) Non constructive criticism that is addressed to its recipient in such a way as to intimidate, undermine confidence, belittle, or imply stupidity or incompetence.

100. The policy specifically recognizes the rights of physicians and licensed providers to have certain personal and professional issues, including performance problems and concerns about competence, dealt with in a professional and confidential manner. When seeking to air complaints or resolve conflicts, the medical staff member shall seek proper and objective arenas in which to deal with these issues.

**NCH Delegated to ASA The Right to Evaluate And Approve Levitin's Credentials and Privileges, To Enforce NCH's By-Laws, Including Medical Staff Bylaws and NCH's Internal Rules and Regulations Government the Hospital, the Department of Surgery and The General Surgery Section.**

101. The enforcement of Northwest Community's rules and regulations and the rules and regulations of Northwest's Department and Section of Surgery was delegated to the Surgery Department and its Chief/Chair and the Chief of the surgeon's section, i.e. Chief of General

27

Surgery as is more fully described in paragraphs 59 through 61 above.

102. Among other things, these Chief's have the power to evaluate and approve a surgeon's requests for reappointment, approve and reject a requests by a surgeon to perform certain procedures, required that Northwest surgeons forward tissue removed at an operation to its pathology department which in term determined what examinations if any were necessary to perform.

103. The Chief of the Department of Surgery, NCH Operating Room management and NCH Rules can dictate the circumstances under which a NCH surgical assistant will be present, dictates the scope of a surgeon's duties and responsibilities for patients admitted or assigned to them for surgeries, dictates the qualifications a surgeon must have, including board certifications, to be on staff.

104. In addition, the Chiefs of the Department of Surgery and Section of General Surgery oversees the Surgical Audit Committee, which monitors surgeons quality of care within the department and reports to the Department Chief, and the QMI Conference as is more fully described in paragraphs 59 and 61 above.

105. The Section Chiefs monitor a surgeon's attendance and timeliness for surgeries and discipline surgeons who do not arrive on time.

106. The Chief of the Surgery Department held positions on and/or were members of NCH's Medical Executive Committee, Quality Committee and Board of Directors.

107. At all times relevant hereto, one of Advanced Surgical Associates partners, Loren, Soper, Conway, Barnett and Mahon held the positions on the Board of Directors, Medical Executive Committee, as Chair and Vice Chair of the Department of Surgery, Chief and Vice

28

Chief of the General Surgery Section, Chief and members of the Surgical Audit Committee, and Chief of ACS NASQIP, which reported surgical outcomes and quality of care information to healthcare consumers as part of a joint effort among the American College of Surgeons (ACS) and the Centers for Medicare and Medicaid Services (CMS).

108. During all times relevant, NCH revoked, conditioned and restricted the privileges of other Jewish, Russian and Eastern European surgeons and physicians including but not necessarily limited to CSC surgeon Dr. Kokocharov, Dr. Shevelev, Dr. Roginsky, Dr. Kanev, Dr. Garibashvillie, and Dr. Kern for acts and practices which, when performed by similarly situated non- Russian, non-Eastern European and Jewish physicians, did not result in the revocation, curtailment, or conditioning of their privileges.

**Levitin is Subjected to a Hostile Work Environment, Was Singled Out for Treatment Different Than Her Similarly Situated General Surgeons Based Upon Her Sex, Female, Ethnicity, Russian and Religion, Jewish and Was Retaliated Against for Protesting Harassment by Dr. Conway**

109. Levitin's difficulties at NCH began at least as early as November 2008 and continued through January 25, 2013 when one of her competitors at ASA, Dr. Conway, who was also the Chairman of the Surgical Audit Committee and Chief of the Section of General Surgery began to subject her to frequent, severe, and offensive conduct, including heightened scrutiny of her surgeries, linked to her sex, ethnicity and religion which created a hostile work environment.

110.  The hostility was generally demonstrated through a pervasive discrete cumulative acts of harassment based on her gender, ethnicity and religion. Dr. Conway verbally attacked her and physically intimidated and threatened her, made demeaning and disparaging remarks about her and her professional abilities and competence in the presence of NCH hospital staff and patients, second guessed her professional judgment and expertise, opinions and diagnoses,

29

including in the presence of NCH staff and patients in an effort to cause patients to change to him as their surgeon.

111. Dr. Conway singled Levitin out for belittling remarks, demeaning comments and intimidating behavior based upon her gender, female, ethnicity, Russian and religion Jewish which disruptive behavior and bullying treatment was different than her similarly situated male general surgeons

112. All of Dr. Conway's unwanted attention, verbal and physical intimidation took place within the Surgery Room suite and in and around other hospital facilities such as patient floors and doctors' lounge area at NCH in the presence of NCH nurses, staff and patients and where Levitin performed her procedures and saw her patients.

**NCH Failed To Take Reasonable Steps to Prevent and Correct Conway's Harassment Of Levitin And, Instead, Participated In and Facilitated A Campaign of Retaliation Directed At Levitin Which Exacerbated the Hostile Work Environment.**

113. Levitin complained about Dr. Conway's harassment, the hostile work environment, the heightened scrutiny and differing terms and conditions to which she was subjected compared to her similarly situated male, non-Jewish and non-Russian male surgeons. She made these complaints to NCH's Chief Executive Officer, Bruce Crowther, to Vice President of Medical Affairs, Leighton Smith, to members and Chairman of NCH's Board of Directors and others at NCH.

114. On or about December 24, 2008, Levitin sent a letter to the Medical Staff Office, concerning the fact that defendant Conway had singled her out for verbal attacks including yelling and screaming at her, embarrassing her and questioning her medical professional judgment in front of other hospital employees and staff and engaging in other disruptive conduct

directed at her and creating a hostile work environment.

115. On or about January 20, 2009, Dr. Cynthia Valukas, then President of NCH's Medical Staff, Dr. Leighton Smith, Vice President of NCH's Medical Affairs, Levitin and defendant Conway met at NCH at which time Smith and Valukas warned Conway to leave Levitin alone. Instead of addressing Conway's behavior pursuant to NCH's Disruptive Physician policy and referring him for investigation, NCH told Levitin she had to contact defendant Soper, Conway's partner and a member of defendant ASA if she had any further problems and, upon information and belief, took no action against defendant Conway.

116. On or about July 13, 2009, Levitin wrote to Leighton Smith, NCH Vice President of Medical Affairs and Bruce Crowther, CEO and President of NCH to report continued unwelcomed, disruptive and harassing conduct by defendant Conway. Specifically, Levitin reported that on July 1, 2009, Conway falsely stated to one of Levitin's patients that she had had two disastrous complications in the operating room and the patient should not allow Levitin to operate on her. Levitin reported that as a result of Conway's disruptive behavior and false accusations concerning Levitin's competence, Conway persuaded the patient to change to him for surgery. NCH did not respond.

117. On or about August 6, 2009, Levitin, through counsel, wrote to Leighton Smith, Vice President of NCH Medical Affairs, requesting information as to how NCH was going to respond to cause defendant Conway to cease his disruptive and harassing behavior. Levitin's counsel requested that NCH legal counsel become involved. Levitin's counsel did not receive a response.

118. On or about September 2, 2009, Levitin, through counsel, again wrote to Leighton

31

Smith, Vice President of Medical Affairs requesting a response from defendant NCH relating to Levitin's complaints of Conway's harassment and assurance that Conway's harassment would be remediated.

119. On or about September 15, 2009, NCH through Leighton Smith assured Levitin's counsel that he, Smith, had told defendant Conway in very strong terms not to be involved with Levitin at all. However, upon information and belief, neither Smith nor NCH took any action against Conway pursuant to the Disruptive Physician policy.

120. Instead, NCH required that Levitin address her issues with defendant Conway with his partner defendant Soper. Smith acknowledged that he was aware that Conway used an improper tone of voice with Levitin and Smith warned Conway to stop this behavior. Smith also stated that he had spoken to Conway's senior partner, either defendant Soper or Loren, to control him.

121. On or about January 27, 2010, rather than refer defendant Conway for investigation pursuant to NCH's disruptive physician policy, defendant Soper, one of Conway's senior partner, acting on behalf of defendant Advanced Surgical Associates ("ASA") retaliated against Levitin for complaining about Conway by filing a false and unfounded request for corrective action in his capacity as Chair of the Surgery Department against Levitin with the Medical Executive Committee.

122. Defendant Soper attached to that request as support, information generated about Levitin's cases going back 6 years by defendant Conway, as Chair of the Surgical Audit Committee and information generated by defendant Loren in his position as Chair of the NSQIP.

123. The corrective action request was not initiated out of a concern for patient safety but

in retaliation for Levitin's complaints against Conway and in order to interfere with her medical and surgical practice as a competitor of defendants ASA, Soper, Loren and Conway.

124. In his January 27, 2010 request for corrective action, Dr. Soper, cited unfounded, anonymous "complaints" and "concerns" "over the past five years or so" about Dr. Levitin's practice of surgery. As to the request for corrective action, the Judicial Review Committee found:

> Following her troubles with Dr. Conway, she is asked to defend 31 cases and abnormally high DVT and infection rate allegations. Dr. [the outside reviewer] and the 2010 Investigative Committee found no concern with 26 of the cases. The 2010 Investigative Committee found the DVT allegation inapplicable and the infection rate allegations to be without substantiation. It appears there was little or no prescreening before these 31 cases, some more than 6 years old, were cited as grounds for corrective action.

125. Defendants' request for corrective action, and their influence and participation on the Medical Executive Committee that prosecuted the corrective action against Levitin, started in motion a 2 1/2 year peer review process that lasted through January 2013 and consisted of a review of her surgical cases going back over 6 years by 1) an outside reviewer; 2) a 2010 Investigative Committee; 3) a 2011 Investigative Committee; and 4) a nine (9) day contested hearing before a 5 member Judicial Review panel that occurred over a 9 month period, involved the testimony of approximately 15 witnesses including experts, the receipt of 40 exhibits, over 1950 pages of transcript and a 25 page written decision of the Judicial Review Committee (JRC).

126. The harassing and retaliatory nature of that 2 1/2 year process is in part illustrated by the findings of the JRC as follows:

> \*     There was little or no prescreening before these 31 cases, some more than 6 years old, were cited as grounds for corrective

33

action.

\*     The outside reviewer received 29 cases and immediately determined there were no issues with 23 of the cases and requested additional information as to the others;

\*     Of the 31 cases referred in the corrective action request and as to the abnormally high DVT and infection rate allegations made by defendant Soper in the corrective action request, the 2010 Investigative Committee found no concern with 26 of the cases. The 2010 Investigative Committee found the DVT allegation inapplicable and the infection rate allegations to be without substantiation.

\*     The concerns with Dr. Levitin's practice should have been handled informally and should never have reached the point of a Judicial Review Committee.

\*     Actual, friendly mentoring would have worked to resolve the concerns raised by the corrective action, in contrast to the mentoring offered by defendant Dr. Soper on September 9, 2009 during which time Dr. Levitin was complaining about Dr. Soper's partner, Dr. Conway.

.

127. As to the double standard and stricter scrutiny to which defendants subjected

Levitin, one NCH male surgeon and physician stated:

> I am alarmed by what I see as several "run of the mill"
> or typical clinical issues or complications many of us
> have had during our careers, that have prompted such
> draconian disciplinary measures . . . .I myself
> have spent many years on the surgical audit committee
> at this institution and several others and have chaired
> them as well. I have reviewed cases over the years
> I would consider much more egregious where the response
> was more in line with educational adjustments or
> "following trends" than what I hear is happening.

**NCH Violates Levitin's Rights Under Its By-Laws and Under the Health Care Quality Improvement Act ("HCQIA") In Terminating Her Privileges and Filing An Adverse Action With the National Practitioner Data Bank ("NPDB") And Therefore NCH and Defendants  ASA, Soper, Conway and Loren Are Not Immune From Civil Suit <u>For Their Actions in the Various Peer Review Processes</u>**

128. A Study Committee was formed, pursuant to Article VII, Section 3(a)(2) of the Bylaws to gather additional information on the request for corrective action and report to the Medical Executive Committee. p. 47.

129.    An Investigative Committee (hereinafter referred to as the "2010 Investigative Committee") was formed pursuant to Article VII, Section 3(b)(2) of the Bylaws. p. 49. Based on Dr. Levitin's complaints of harassment and bias, the Hospital hired an outside expert, Dr. Douglas Aach, to review the 30 cases attached to Dr. Soper's request for corrective action. Dr. Aach also reviewed one additional case of Dr. Levitin's that was not attached to the request for corrective action.  However, no investigation was initiated into defendant Conway's conduct.

130.    On June 23, 2010, the 2010 Investigative Committee issued its report dated June 23, 2010. The Committee recommended that no adverse corrective action be taken against Dr. Levitin, but recommended that Dr. Levitin's cases be subject to quarterly prospective review through January 2012. Importantly, the Committee recommended that the physicians associated with Dr. Conway's group (Advanced Surgical Associates) not participate in the prospective review of Dr. Levitin's cases.

131.    On July 6, 2010, the MEC adopted the 2010 Investigative Committee's Report in its entirety, but rejected the recommendation that members of Dr. Conway's group not participate in prospective reviews of Dr. Levitin's cases without explanation.

132.    From July 2010 to August 2011, a period of 13 months, Dr. Levitin continued to practice general surgery at NCH without incident.

133.    After performing an upper endoscopy on August 11, 2011, an occurrence report was filed against Dr. Levitin by Nurse Marilyn Schram, alleging that Dr. Levitin began an upper endoscopy before the patient was properly sedated.

134.    On September 8, 2011, almost one month later, Dr. Kirsten Lee, the anesthesiologist, was told to write the case up due to Nurse Schram's occurrence report.

135.    As a result, on September 27, 2011, Dr. Francis Lamberta, Medical Staff President, submitted a request that the 2010 Investigative Committee reconvene to review the August 11, 2011 procedure.

136.    However, a month later, on October 28, 2011, Dr. Levitin was notified that a new Investigative Committee had been appointed to review the procedure (hereinafter referred to as the "2011 Investigative Committee"). The 2011 Investigative Committee consisted of only one of the same members of the 2010 Investigative Committee.

137.    On December 1, 2011, the 2011 Investigative Committee issued its report to the MEC recommending that corrective action be taken against Dr. Levitin. Dr. Levitin filed objections to the 2011 Investigative Committee's report.

138.    On December 12, 2011, the 2011 Investigative Committee reconvened and filed an addendum to its original report of December 1, 2011.

139.    On December 16, 2011, the MEC notified Dr. Levitin that it voted to terminate her Medical Staff membership and clinical privileges at NCH. At that time, defendant Soper was a member and Vice President of the Medical Executive Committee and Secretary/Treasurer of the Medical Staff at that time. Defendant Loren was Vice Chief of General Surgery and Chief of NSQIP, and other surgeons at defendant ASA, Dr. Mahon was Chief of the General Surgery

Section and Dr. Barnett was Vice Chief of General Surgery. Defendant Soper also sat on the Board for NCH and on the Quality Committee.

140. On December 20, 2011, Dr. Levitin requested a hearing pursuant to Article VIII, Section 3(b) of the Bylaws. p. 57.

141. On January 30, 2012, Dr. Levitin received a pre-hearing notice, which identified the cases in questions, a list of witnesses expected to testify at the hearing, and the members of the Judicial Review Committee ("JRC").

142. Under Article VIII, Section 3(d) of the Bylaws, the JRC is a committee recommended by the MEC and appointed by the Board to act as a hearing panel and render a decision based upon the evidence presented at the hearing. p. 58.

143. The hearing on the MEC's recommendation commenced on April 26, 2012, with the last date of hearing occurring on July 31, 2012. In total, the hearing consisted of nine days, eight (8) days of which had live witness testimony and evidence.

144. Prior to the hearing, Dr. Levitin made several requests for documents and information relevant to the MEC's charges and pursuant to her right to rebut evidence presented against her under Article VIII, Section 4(a)(2) and (d) of the Bylaws. p. 60-61.

145. One of Dr. Levitin's requests for documents specifically requested information related the MEC's claim that she engaged in a "pattern of practice" as compared to that of other physicians at NCH. The MEC did not produce any information in response to Dr. Levitin's request.

146. At the first day of the hearing on April 26, 2012, Dr. Soper testified that one of the reasons he felt the corrective action against Dr. Levitin was warranted was because he

"didn't know of any other general surgeon that has had as many cases brought before the committee [Surgical Audit Committee Chaired by defendant Conway]." Dr. Levitin objected to this line of questioning on the grounds that it was prejudicial and irrelevant, as Dr. Levitin had previously requested comparative data from the MEC, which would substantiate the MEC's position that Dr. Levitin was an outlier in terms of the number of her cases that were reviewed by the Surgical Audit Committee.

147.    The hearing officer ruled that if the MEC opened the door to having Dr. Soper testify that Dr. Levitin is different from others, then he would allow leeway to Dr. Levitin to review documents to rebut Dr. Soper's testimony. The MEC did not withdraw its question and opened the door for Dr. Levitin to review the comparative information.

148.    Dr. Levitin submitted another request for the comparative data on May 21, 2012. On May 23, 2012, the hearing officer issued a ruling that the comparative data was relevant and permissibly part of Dr. Levitin's defense.

149.    Dr. Levitin reiterated her request for comparative data on June 7, 2012, June 12, 2012, and June 19, 2012.

150.    On June 20, 2012, Dr. Levitin filed a Motion to Compel Production of Comparative Data.

151.    The MEC never produced the comparative data that was requested by Dr. Levitin, and instead produced 12 redacted letters from the Surgical Audit Committee, from 2007 to 2011, which allegedly signified that the Surgical Audit Committee had reviewed a case that resulted in a preventable or possibly preventable adverse outcome.

38

152. By not producing the comparative data, NCH violated Dr. Levitin's Bylaw right to obtain all information relevant to the MEC's charges and her right to rebut evidence presented against her under Article VIII, Section 4(a)(2) and (d) of the Bylaws. p. 60-61

153. During the hearing, the MEC introduced the conclusions, opinions, and findings of Dr. Douglas Aach, the physician who performed an outside review of Dr. Levitin's cases following defendant Soper's retaliatory request for corrective action. The MEC did not present Dr. Aach as a witness at the hearing and Dr. Levitin was denied the opportunity to cross-examine Dr. Aach in violation of Article VIII, Section 4(d) of the Bylaws. p. 61.

154. At the April 24, 2012 pre-hearing conference, Dr. Levitin objected to the inclusion of Dr. Aach's conclusions, opinions and findings in the hearing record due to her inability to cross-examine Dr. Aach at the hearing. Over Dr. Levitin's objections, Dr. Aach's conclusions, opinions and findings were introduced at the hearing.

155. Post-hearing briefs were filed after the last hearing date. Dr. Levitin's post hearing brief documented the numerous conflicted individuals involved in the investigation against Dr. Levitin and objectionable actions on the part of NCH throughout the process.

156. In the afternoon on July 27, 2012, Dr. Levitin's counsel learned of the existence of a recruitment package involving Dr. Malcolm Billamoria, NCH, and defendant ASA, and that as part of the recruitment package certain financial arrangements were made by NCH to benefit ASA.

157. Dr. Levitin further learned that the recruitment package preceded defendant Soper's request for corrective action. Upon information and belief, under the recruitment package, NCH guaranteed to make up any deficiency in income for ASA due to its increased

39

overhead from paying Dr. Billamoria. Dr. Levitin immediately made a request, on July 27, 2012, for all documents related to the recruitment of Dr. Billamoria. This information was directly relevant to Dr. Levitin's claim because, if true, the information would be additional evidence of Dr. Levitin's claim that physician members of Advanced Surgical, Dr. Conway and Dr. Soper, had financial incentive to have her removed from the Medical Staff at NCH. The MEC denied this request for information.

158.    Following the conclusion of the hearing, but before the JRC had rendered its final decision, NCH administrators and physicians learned that Dr. Levitin was one of the primary applicants and investors in an Ambulatory Surgical Center that NCH publicly opposed. In fact, NCH administrators filed a formal objection to the Ambulatory Surgical Center with the Illinois state board and are expending considerable legal and financial resources in an attempt to have licensing to the facility denied. NCH claims the license should be denied because the facility is an economic competitor that could negatively damage NCH, which is already losing millions of dollars and has had to lay off hundreds of employees.

159.    On October 8, 2012, the JRC issued a comprehensive Decision and Report, finding and/or recommending as follows:

a.      The MEC did not meet its burden of proving by a preponderance of the evidence that its December 16, 2011 recommendation to revoke Levitin's privileges was reasonable and warranted;

b.      Dr. Levitin's privileges should  not be reduced, restricted, suspended, revoked or denied nor should any action be taken against her that would require a National Practitioner Data Bank report;

     c.      The cases at issue, standing alone or considered together, did not reasonably justify the conclusion that there is a pattern of a lack of professional practice;

     d.      Dr. Levitin is a well-trained surgeon and professionally and technically competent;

     e.      Dr. Levitin's continued practice at NCH would not be detrimental to patient safety or to the delivery of quality patient care; and

     f.      The MEC's belief that Dr. Levitin has not and will not learn and improve in the future is not warranted, nor was their contention that Dr. Levitin's conduct in defending herself before the JRC reflective of any adverse professional judgment.

160.     On October 19, 2012, Wendy Rubas, Vice President and General Counsel to NCH, sent a letter to Dr. Levitin and Dr. Longo purporting to explain the "Appeals Procedure" contemplated in Article IX, Section 4(j) of the Bylaws.

161.     The Appeals Procedure provided that either Dr. Levitin or the MEC could appeal the decision of the JRC to the Quality Committee and that the appealing party had to show that the JRC's decision was not supported by "substantial evidence" based on the "hearing record, including any external reviews and timely responses from the practitioner and any internal peer review committee."

162.     The By-Laws did not contain the ad hoc Appeals Procedure Rubas forwarded to Levitin, the Appeals Procedure was not written in the Bylaws and was not adopted as a rule or amendment to the Bylaws, in accordance with Article XIV and Article XV of the By-laws. p. 97-100.

163.    On October 24, 2012, Dr. Levitin sent a letter to Rubes pre-emptively objecting to the right of the MEC to appeal the decision of the JRC.

164.    Dr. Levitin also objected to the use of a Quality Committee, as an intermediary step to the Board, as it was composed of conflicted members and completely tainted for the following reasons:

a.      Not composed entirely of Board members as required by Article VIII, Section 4(j) of the Bylaws;

b.      Three members of the committee were directly involved in the investigation of Dr. Levitin;

c.      Dr. Super was a member of the Quality Committee and he was the one who initiated corrective action against Dr. Levitin;

d.      One member of the committee had taken a public stance in opposition to Dr. Levitin; and

e.      Two members of the committee are under contract with NCH.

165.    Furthermore, the existence of the recruitment package between Dr. Billamoria, NCH and defendant ASA is further proof of the conflicted nature of the Board, and as the governing body of the hospital, the Board has the same financial incentive as NCH to have Dr. Levitin removed.

166.    The Appeals Procedure did not allow Dr. Levitin to appeal the final decision of the Board, even if it was adverse, contrary to the requirements of state and federal law and NCH's By-laws and the HCQIA for taking adverse action against a physician's privileges which action is subsequently reported to the NPDB.

42

167.    On October 26, 2012, the MEC submitted a Notice of Appeal from the Decision of the JRC.

168.    On November 2, 2012, the MEC submitted a memorandum in support of its appeal, with supporting exhibits.

169.    On November 9, 2012, Dr. Levitin submitted a Response to the MEC's Appeal from the Decision of the JRC, with a supporting exhibit.

170.    On November 12, 2012, Dr. Levitin submitted an Addendum to her Response the MEC's Appeal.

171.    On November 19, 2012, the Quality Committee issued its one page decision on the MEC's Appeal from the 24 page Decision of the JRC issued based on 8 days of live testimony, voting to reverse the decision of the JRC and adopt the December 16, 2011 recommendation of the MEC to terminate Dr. Levitin's Medical Staff membership and privileges at NCH

172.    On November 20, 2012, the Board issued its final decision affirming the decision of the Quality Committee to reverse the decision of the JRC and adopt the December 16, 2011 recommendation of the MEC to terminate Dr. Levitin's Medical Staff membership and privileges at NCH.  Nowhere in the Board's letter or NCH's By-laws is there provision for the Board to reverse the JRC decision and revoke a practitioner's license without providing procedural safeguards of a notice and fair hearing as required under NCH's By-laws for taking adverse action and under the HCQIA before adverse action can be taken against a practitioner's privileges and be reported to the NPDB.

173.    The letter informing of the Board's decision expressly states that, "The report of the Quality Committee…was shared with the Board and discussed at length at the meeting."

174.    Nowhere in the letter does it state the Board reviewed the decision of the JRC or any of the documents in the administrative record.

175.    On November 21, 2012, Dr. Levitin filed a Complaint for Declaratory and Injunctive Relief and an Emergency Motion for Temporary Restraining Order and Preliminary Injunction against NCH in the Circuit Court.

176.    On November 27, 2012, NCH and Dr. Levitin entered an Agreed Order whereby NCH agreed to not report the termination of Dr. Levitin's privileges to the NPDB until December 20, 2012.

177.    On December 17, 2012, the Circuit Court entered a preliminary injunction against NCH finding that NCH had violated its Bylaws and the Illinois Hospital Licensing Act in allowing the MEC to appeal the decision of the JRC concerning Dr. Levitin and enjoined NCH from reporting the termination of Dr. Levitin's privileges to the NPDB and reinstated Dr. Levitin's Medical Staff membership and clinical privileges at NCH. The Order directed the JRC's decision to be given directly to the Board for consideration.

178.    On December 21, 2012, Bruce Crowther, President and CEO of NCH, submitted a memorandum to the Board of Directors of NCH regarding a special meeting scheduled for January 12, 2013 at 7:30 a.m. The Memorandum set forth that members of the Quality Committee would be recused from the process and would not participate in the Board's deliberations on January 12, 2013.

179.    On January 11, 2013, Dr. Levitin submitted a letter from Dr. James Kane, Jr., a general surgeon on staff at NCH, volunteering to serve as Dr. Levitin's mentor and work with the Board of Directors to implement an appropriate mentoring and proctoring program.

180.    On January 11, 2013, Dr. Levitin submitted numerous letters of support from physicians associated with NCH for review and consideration by the Board of Directors.

181.    On January 12, 2013, the Board of Directors met a second time to consider the JRC's decision and voted once again to terminate Dr. Levitin's Medical Staff membership and clinical privileges based not on evidence before the JRC nor the findings of the JRC following a 8 day evidentiary hearing but on the basis of the MEC accusations against Levitin which were rejected by the JRC.  The Board did not provide notice to Levitin nor an opportunity for a fair hearing in connection with its revocation decision as required under NCH By-laws and the HCQIA.

182.    Contrary to NCH's representation that no members of the Quality Committee would be present at the special Board meeting because they were recused from the process, defendant Dr. Soper – the physician who initiated charges against Dr. Levitin, who also belonged to the prosecutorial MEC that pursued charges against her, and who is also an economic competitor of Dr. Levitin - was present at the Board meeting on January 12, 2013.

183.    The Board's January 12, 2013 decision violates the Bylaws, as it was not based on the standard of review set forth in Article VIII, Section 4(j) of the Bylaws for reviewing final action on the JRC's decision. See **Exhibit B**, p. 63. In fact, the Board's decision did not set forth any standard of review on which it based its decision.

184.    The Board's decision was based, in part, on accusations made by the MEC some of which had been rejected by the JRC and some of which were not raised by the MEC as allegations against Dr. Levitin at the outset of the hearing. Accordingly, Dr. Levitin was not provided with notice of these allegations and had no opportunity to respond to these issues as required by the Bylaws. p. 57.

185.    The Board's decision of January 12, 2013 was tainted by the MEC's unlawful appeal of the JRC's decision and the unlawful, intervening participation of the Quality Committee, which reviewed the JRC's decision and issued its own decision to the Board before the Board voted to terminate Dr. Levitin's clinical privileges for the first time on November 20, 2012.

186.    On January 17, 2013, the Circuit Court entered an Order dissolving the preliminary injunction but staying enforcement of the Order until January 18, 2013 at 4:00 p.m.

187.    On January 31, 2013, Dr. Levitin submitted a request for hearing following NCH's decision to revoke her privileges pursuant to Article VIII. p. 63. The request was sent via e-mail and U.S. mail to Bruce Crowther, CEO, Max Brittain, Chairman of the Board and Stephan Scogna, the successor to Crowther. NCH denied Dr. Levitin's request for hearing.

188.    NCH chose not to follow the Bylaws and Illinois law in creating unlawful appellate procedures that were implemented during the hearing of Dr. Levitin.

189.    Dr. Levitin was denied her rights to a fair hearing as set forth in the Bylaws and as required under Illinois and federal law prior to any action adversely impacting a practitioner's credentials.

46

190.    The Board's decision of January 12, 2013, was not in furtherance of quality healthcare and was rather intended to punish Dr. Levitin a competitor of ASA, Soper, Conway and Loren and for challenging Dr. Conway's harassment and the hostile work environment created by him.

191.    As defendants knew, the final decision of the Board revoking Levitin's privileges was immediately reportable to the National Practitioner Data Bank ("NPDB"), the goal defendants, Levitin's competitors sought to achieve from the outset.

192.    On January 21, 2013, NCH issued an adverse action report to the NPDB concerning the termination of Dr. Levitin's clinical privileges at NCH.

193.   NCH's termination decision and report to the NPDB was based upon accusations by the MEC which the  JRC specifically rejected as contrary to the evidence; to wit: the MEC's contentions that Dr. Levitin's privileges should be terminated due to concerns about patient safety as evidenced by her actions, conduct and behavior during the peer review process of defending her professional competence and conduct. It further rejected the contention that Dr. Levitin did not demonstrate an ability to accept and comply with peer review and quality management policies. NCH has failed and refused Levitin's June 12, 2013 request that it retract and void its report because, inter alia, it was not properly filed and was based upon false and unfounded allegations.

194. In fact, the JRC noted:

> Whether or not Dr. Levitin's responses to the peer review process were appropriate depends in part on the validity of the charges. . . . Following her troubles with Dr. Conway, she is asked to defend 31 cases and abnormally high DVT and infection rate allegations. Dr. Aach [the outside reviewer] and the 2010 Investigative Committee found no concern with 26 of the cases. The 2010 Investigative Committee found

47

> the DVT allegation in applicable and the infection rate
> allegations to be without substantiation. It appears there
> was little or no prescreening before these 31 cases, some
> more than 6 years old, were cited as grounds for corrective
> action.

195. The JRC noted that 2010 Investigative Committee also made note of the harassment by Drs. Soper and Conway and recommended that retrospective reviews of Dr. Levitin's future surgeries be by physicians not associated with Drs. Conway and Soper.

196. The JRC found:

> . . . that the MEC's finding in this regard is contrary
> to the 2010 Investigative Committee finding that Dr.
> Levitin was cooperative and receptive and appeared to
> have learned throughout the process. We accept the finding
> of the 2010 Investigative Committee that her responses
> to that investigation were appropriate. . . .The MEC's
> charge, therefore, rests upon Dr. Levitin's response in the
> Laryngospasm Case.
>
> We do not agree with the 2011 Investigative Committee's
> assessment that Dr. Levitin's defenses to the allegations
> were distractions meant to shift blame. Dr. Levitin has
> a right to defend herself vigorously and we do not want to
> chill that right. . . . In conclusion, we have concerns with
> Dr. Levitin's responses but we do not feel they rise to the
> level of requiring corrective action. Collegial peer review
> and mentoring are required, nor termination of medical
> staff privileges.

197. NCH and its Board disregarded entirely the evidence adduced at the 8 day hearing before the JRC, ignored and disregarded Dr. Levitin's competence and professional qualifications, ignored and disregarded the fact that Dr. Levitin did not have any pending malpractice or other licensure issues, ignored and disregarded the fact that Dr. Levitin participated in a peer review process that lasted over 2 years, that constituted a review of over 6

48

years of her surgeries and involved over 31 cases and other unfounded and unsubstantiated events and adopted without evidentiary basis the MEC accusations that Dr. Levitin's defense of her professional conduct and competence rendered her a danger to patient safety because it constituted evidence she could not cooperate with and accept and comply with  NCH's peer review and quality management policies.

198.  NCH and its Board in revoking Levitin's privileges and filing a NPDB Report on this basis violated its own by laws and the statutory rules and regulations of the HCQIA requiring that any adverse action taken against a physician's clinical privileges and staff membership including the filing of a NPDB Adverse Action Report be preceded by a "professional review action". NCH and its Board violated these requirements because:

> 1) The January 12, 2013 Board action revoking Dr. Levitin' NCH clinical privileges was **not** the result of a required professional review *action* that meets the HCQIA's requirements. The Board did not provide Dr. Levitin with prior "adequate notice and hearing procedures" as to the grounds on which her privileges were revoked because of "[c]oncerns about patient safety as evidenced by Dr. Levitin's judgment, conduct and behavior during the peer review process."

> 2) No notice stating the grounds on which the Board intended to revoke Dr. Levitin's privileges was provided to her after the JRC's decision but prior to its January 12, 2013 action or after;

> 3) No notice stating the reasons for the proposed revocation was provided to Dr. Levitin after the JRC decision and before January 12, 2013 or after;

> 4) No notice was provided to Dr. Levitin stating that she had a right to request a hearing within 30 days or more on the Board's proposed action of revocation;

> 5) No notice that summarized Dr. Levitin's rights at a hearing before the Board was given.

199.  NCH and its Board cannot demonstrate a) that it had a "reasonable belief" that its revocation action would restrict incompetent behavior or protect patients, b) that it made a

reasonable effort to obtain the facts of the matter, c) that there was adequate notice and an opportunity for a hearing afforded to Dr. Levitin, and d) was otherwise in good faith within the scope of the review process as required under the HCQIA. 42 U.S.C. § 11112(a).

200. NCH's and its Board's bad faith and malice are evidenced by, among other reasons:

* the composition of the Board, the MEC, the General Surgery Department leadership and the Surgical Audit Committee all had partners of Dr. Conway (Advanced Surgical Associates), or Dr. Conway as members and had conflicts of interest as these surgeons were competitors of Dr. Levitin;[1]

* the voting board members on January 12 did not include a general surgeon; in fact, only one voting member was a physician as the other physicians had been disqualified and the January 12 meeting lasted a matter of hours not days;

* failed to reasonably rely on the review committee's recommendations with no basis to render that reliance unwarranted;

* there was no consideration of facts previously unknown to the review committee;

* the Board willfully ignored relevant facts pertinent to its review as well as facts not previously considered including NCH's failure and refusal to address Dr. Conway's harassment of Dr. Levitin based upon gender, ethnicity and religion and condoning and participating in Dr. Conway's and Dr. Soper's retaliation including double standards, stricter scrutiny and initiation of corrective action processes against Levitin not initiated against other surgeons for the same, similar actions or for their professional conduct that threatened patient safety;

* the JRC, which found insufficient basis to revoke Dr. Levitin's privileges, was composed of a hearing officer and 5 physicians, all of whom were surgeons, sat for 9 hearing days, heard the testimony of approximately 15 witnesses, including experts, reviewed the in excess of 40 exhibits, and heard and reviewed the submission of all parties including Dr. Levitin.

* the Board violated NCH's own by-laws which required the Board to affirm the JRC's decision where, as here, it was supported by substantial evidence (*See NCH Medical Staff By-laws (April 2012), Article VIII (4)(j))*;

---

[1]The bad faith of these surgeons is further evidenced in the sexual harassment and gender discrimination claims being brought by Dr. Levitin against NCH and these physicians and their practice.

*the Board violated NCH's own by-laws which required that where, as here, the Board's action was one adverse to the practitioner's privileges, including termination of medical staff membership (Article VIII, Section 2(e)) and involuntary termination of all clinical privileges (Section 2 (i)), because in violation of Section 5, it did not provide "(b) notice of its proposed action", (c) an opportunity for a hearing, (d) time and place for a hearing, (e), or the other due process set out in Section 5 (e)-(I). *See NCH Medical Staff By-laws (April 2012), Article VIII (5))*;

* NCH violated the Illinois Hospital Licensing Act, 210 ILCS 85/10.4(b)(requiring that all hospitals licensed under the Act comply with the medical staff by laws of the hospital with respect to the limiting or denying of medical staff membership and clinical staff privileges and to include written notice of all adverse decisions, an explanation of the rationale behind the decision, the right to request a fair hearing regarding the adverse decision, and the right to be represented by a personal attorney);

*NCH violated the Illinois Administrative Code § 250.310;

* By its decision to conspire with, act in concert with and acquiesce in the actions of their co-conspirators defendants ASA, Loren, Soper, and Conway to treat Levitin differently than her similarly-situated male, non-Jewish and non-Eastern European general surgeons, to harass and retaliate against her and to subject her to stricter scrutiny, without basis.

*Dr. Soper's presence during Board's deliberative process on January 12, 2013, despite court's order that he and other members of the Board who sat on the Quality Committee stay away from that board's meeting.

*No surgeon was among the members of the Board authorized to participate in Special meeting held on January 12, 2013 at which the Board revoked Levitin's privileges and authorized an NPDB adverse action filing.

**There Was No Active Supervision by State Officials of NCH's Hospital Privileges Decisions to Determine Whether Its Decisions Comport with State Regulatory Policy Nor to Correct Its Abuses.**

201. Illinois has a strong and clearly mandated public policy of promoting the

unhampered growth of commerce and industry throughout the State and prohibiting restraints of

trade which are secured through monopolistic or oligarchic practices and which act or tend to act

51

to decrease competition between and among persons engaged in commerce and trade including

in the services industries and related for profit pursuits. Illinois also has a strong and clearly

mandated public policy of preserving the freedom of consumers to buy in the open market place

and to maintain freedom of competition.

202. NCH is a private hospital and its hospital privileging decisions are not subject to

review by state officials to determine whether such decisions comport with state regulatory

policy nor to correct abuses. Thus, there is no realistic assurance that NCH's anticompetitive

conduct in administering corrective actions and in making credentialing decisions promotes state

policy to maintain freedom of competition and to preserve the freedom of consumers to have

access to the physicians and surgeons of their choice, rather than, as here, promote the individual

interests of defendants ASA, Loren, Soper and Conway.

## COUNT I-VIOLATION OF THE SHERMAN ACT
### (RESTRAINT OF TRADE)

203. Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 202,

inclusive, as if fully set forth herein.

204. As described herein, the conspiracy among all defendants and the acts in

furtherance thereof constitute an unreasonable attempt to restrain trade by eliminating Plaintiffs

as general surgeons at NCH, in violation of the Sherman Act.

205. As a result of defendants' conspiracy and their actions taken in furtherance of the

conspiracy, plaintiffs have been damaged in an amount in excess of $250,000.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their

favor and against defendants as follows:

   A.  Defendants' unlawful combination, contract or conspiracy as alleged in

this Complaint be declared and adjudicated a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.     Plaintiffs recover damages against Defendants and their co-conspirators, jointly and severally, in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. § 15(a);

C.     Defendants, their affiliates, successors, transferees, assignees and the officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner continuing, maintaining, or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose and effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

D.     Plaintiffs be awarded expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law;

E.     Plaintiffs be awarded pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

F.     Plaintiffs be awarded such other relief as the Court may deem proper.

## COUNT II-VIOLATION OF THE SHERMAN ACT
### (ATTEMPT TO MONOPOLIZE)

206.  Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 202, inclusive, as if fully set forth herein.

207. As described herein, by their conspiracy and their concert of actions in furtherance

thereof, defendants have attempted to monopolize the distribution, allocation and commerce of general surgery services in the community serviced by Northwest Community Hospital in violation of the Sherman Act.

208. As a result of these agreements, plaintiffs has been damaged in an amount in excess of $250, 000.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against defendants as follows:

A.      Defendants' unlawful combination, contract or conspiracy as alleged in this Complaint be declared and adjudicated a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.      Plaintiffs recover damages against Defendants and their co-conspirators, jointly and severally, in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. § 15(a);

C.      Defendants, their affiliates, successors, transferees, assignees and the officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner continuing, maintaining, or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose and effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

D.      Plaintiffs be awarded expenses and costs of suit, including reasonable

attorneys' fees, to the extent provided by law;

E.      Plaintiffs be awarded pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

F.      Plaintiffs be awarded such other relief as the Court may deem proper.

### COUNT III-VIOLATION OF THE SHERMAN ACT
### (CONSPIRACY TO MONOPOLIZE)

209.  Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 202, inclusive, as if fully set forth herein.

210.  As described herein, by their conspiracy and their concert of actions in furtherance thereof, defendants have conspired to monopolize the distribution, allocation and commerce of general surgery services in the community serviced by Northwest Community Hospital in violation of the Sherman Act.

211. As a result of these agreements, plaintiffs have been damaged in an amount in excess of $250, 000.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against defendants as follows:

A.      Defendants' unlawful combination, contract or conspiracy as alleged in this Complaint be declared and adjudicated a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.      Plaintiffs recover damages against Defendants and their co-conspirators, jointly and severally, in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. § 15(a);

C.      Defendants, their affiliates, successors, transferees, assignees and the

55

officers, directors, partners, agents and employees thereof and all other

persons acting or claiming to act on their behalf, be permanently enjoined and

restrained from, in any manner continuing, maintaining, or renewing the

contract, combination or conspiracy alleged herein, or from engaging in any

other contract, combination or conspiracy having a similar purpose and effect,

and from adopting or following any practice, plan, program or device having a

similar purpose or effect;

D.      Plaintiffs be awarded expenses and costs of suit, including reasonable

attorneys' fees, to the extent provided by law;

E.      Plaintiffs be awarded pre-judgment and post-judgment interest at the

highest legal rate to the extent provided by law; and

F.      Plaintiffs be awarded such other relief as the Court may deem proper.

## COUNT IV-VIOLATION OF THE SHERMAN ACT
## (MONOPOLY)

212.  Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 202,

inclusive, as if fully set forth herein.

213.  As described herein, by their conspiracy and their concert of actions in furtherance

thereof, defendants have monopolized the distribution, allocation and commerce of general

surgery services in the community serviced by Northwest Community Hospital in violation of

the Sherman Act.

214. As a result of these agreements, plaintiffs  have been damaged in an amount in

excess of $250, 000.

WHEREFORE,  Plaintiffs respectfully request that this Court enter judgment in their

favor and against defendants as follows:

G.    Defendants' unlawful combination, contract or conspiracy as alleged in this Complaint be declared and adjudicated a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

H.    Plaintiffs recover damages against Defendants and their co-conspirators, jointly and severally, in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. § 15(a);

I.    Defendants, their affiliates, successors, transferees, assignees and the officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner continuing, maintaining, or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose and effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

J.    Plaintiffs be awarded expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law;

K.    Plaintiffs be awarded pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

L.    Plaintiffs be awarded such other relief as the Court may deem proper.

**COUNT V-HOSTILE WORK ENVIRONMENT
CLAIM IN VIOLATION OF TITLE VII**

215.  Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 202,

inclusive, as if fully set forth herein.

216.  Beginning at least as early as the Fall 2008 and continuing until her clinical and Medical Staff privileges were revoked, Levitin was subjected to a severe and pervasive pattern of discriminatory and unwelcome harassing conduct by her supervisors and co-workers, defendant Conway, Chief of the General Surgery Section and Chair of the Surgical Audit Committee and general surgeon and defendant Soper, Chief of Surgery, officer of the Medical Staff (Secretary/Treasurer) and co-worker general surgeon because of her gender, female, religion, Jewish and ethnicity, Russian/European and in retaliation for her engaging in protective activity, to wit: complaining of the verbal abuse and physical intimidation designed to and effectively interfering with the terms and conditions of her work as a surgeon at NCH.

217.  Defendant Conway singled Levitin out as the sole female, Eastern European, Jewish physician for verbal attack and abuse, offensive, demeaning and belittling remarks, questioning and challenging Levitin's skill and judgment as a surgeon and falsely accusing her of having disastrous outcomes in the presence of Levitin's patients, co-workers, staff and patients in the surgery department  to such a degree that it interfered with Levitin's ability to safely perform her work as a surgeon and caused at least one patient to switch to Conway for surgery instead of having the surgery proceed with Levitin.

218. Defendant Conway singled Levitin out for physical threats and intimidation designed to interfere with Levitin's practice as a general surgeon at NCH and to cause Levitin to give up surgical rooms to him that were scheduled for Levitin's emergency surgeries.

219. The incidents of harassment began as early as November 2008 and continued through and including January 2013 and consisted of:

a) subjecting Levitin's surgeries and performance of her duties to stricter scrutiny than her similarly situated male co-workers without basis and the in face of evidence that Levitin's co-worker's conduct threatened patient safety whereas Levitin's did not;

b) subjecting Levitin to verbal abuse in the presence of her patients, staff and co-workers in the surgery department;

c) subjecting Levitin to demeaning and humiliating comments;

d) criticizing and questioning Levitin's professional judgment in the presence of staff, patients and co-workers;

e) physically intimidating and threatening Levitin in attempt to get her to alter her surgery schedule and not proceed with emergency surgeries in advance of less serious surgeries;

f) falsely criticizing Levitin's abilities and surgeries and falsely accusing her of having disastrous results for the purpose and with the intent of getting a patient to drop Levitin as their surgeon and proceed with defendant Conway;

g) subjecting Levitin to repeated baseless peer review processes so as to interfere with her ability to practice medicine and surgery without basis and failing to subject Levitin's male, non-Jewish and non-Eastern European co-workers to the same scrutiny despite their having outcomes that threatened patient safety;

h) ignoring and rejecting the numerous peer review outcomes in favor of Levitin and initiating new peer review processes in order to obtain a final decision to revoke Levitin's clinical privileges and medical staff privileges.

220. A reasonable person would find defendant Conway's harassment, demeaning and belittling remarks and physically intimidating actions to be offensive and in fact staff and nurses

59

advised Levitin of their fear for safety after witnessing his conduct.

221. NCH Board and the Vice President of the Medical Staff was aware of Conway's harassment and admitted that Conway's tone with Levitin was improper and should stop.

222. NCH failed to take the steps necessary to halt Conway's conduct despite the fact that NCH had a policy specifically prohibiting Conway's conduct under its disruptive physician policy and requiring an investigation be conducted.

223. NCH failed to conduct an investigation and was negligent in delegating to Conway's partner, defendant Soper, responsibility for remedying Conway's offensive and harassing conduct.

224. Instead of submitting Conway for investigation, Soper, then Levitin's supervisor as Chief of Surgery and partner of Conway, subjected Levitin to further harassment in retaliation for complaining about Conway's conduct. Specifically, Soper initiated a corrective action process on the basis of false and unfounded claims about her performance, which process was not concerned with patient safety but rather with punishing Levitin and driving her out as a competitor.

225. NCH condoned, participated in and encouraged Soper's actions and the bad faith peer review process which subjected Levitin to a 2 ½ year process during which Levitin was exonerated after an 8 day hearing but which the MEC, on which defendant Soper sat as an officer—Secretary/Treasurer, and certain members of the Board ignored and substituted the accusations of the MEC in order to revoke Levitin's privileges and subject her to an adverse action report before the NPDB.

226. NCH failed and refused to take reasonable steps to discover and rectify Conway's

and Soper's harassment and retaliation directed at Levitin and knew that referring Levitin to Conway's partner and competitor to resolve the conflict with Conway, also her competitor would not remedy the situation but rather escalate the harassment and hostile work environment.

227. By virtue of the 2 ½ year peer review processes to which Levitin was subjected by Defendants her practice at NCH dropped from being 94% of the practice revenues in 2009 to 38% of the revenues in 2013. Further, Levitin experienced severe emotional and physical distress and incurred substantial legal fees and costs for a process defendants never intended to abide by if, as happened, the JRC did not revoke Levitin's privileges and refer her for reporting to the NPDB.

228. Ultimately, the harassment of defendants resulted in Levitin losing her privileges at NCH and having an adverse action report filed against her.

WHEREFORE, Plaintiffs respectfully request for entry of judgment in their favor and against Defendants as follows:

    A.    Awarding them an amount sufficient to compensate for lost revenues to the practice and lost income to Levitin, including lost distributions by NCH and other pecuniary damages attributable to defendants unlawful conduct;

    B.    Awarding Plaintiffs such other compensatory damages to which they may be entitled, including compensation to Levitin for emotional, physical, and psychological impairment and suffering, humiliation and embarrassment, disruption of personal and professional relationships, damage to Levitin's and CSC's reputation, and other injuries attributable to Defendants' unlawful conduct;

      C.      Awarding Plaintiffs punitive damages;

      D.      Awarding Plaintiffs attorneys' fees and costs incurred in bringing and

prosecuting this action;

      E.      Enjoining Defendants from subjecting Levitin to further unlawful

discrimination, harassment or retaliation in the future and granting such other

injunctive or equitable relief as may be just and proper; and

      F.      Awarding Plaintiffs such other and further relief as the law allows.

## COUNT VI-BREACH OF CONTRACT

229.  Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 121, as if fully set forth herein.

230. The Bylaws form a contract between Dr. Levitin and NCH and her medical staff privileges constitute protectable property interests.

231. Dr. Levitin, as a member of the Medical Staff, performed all of her obligations and duties in accordance with the By-laws.

232. NCH violated Dr. Levitin's rights under the Bylaws as follows:

      a.      The Illinois Hospital Licensing Act provides that a hearing committee

must have "independent authority" to report directly to the Board of Directors.

210 ILCS 85/10.4(b)(2)(C). However, the Bylaws state that the JRC

recommendation can be appealed to the hospital/medical staff affairs

committee of the Board. Article VIII, Section 4(j), p. 63. NCH violated the

Illinois Hospital Licensing Act and the Bylaws by not presenting the JRC's

decision directly to the Board for consideration and by allowing an appeal to the Quality Committee of the Board.

b.      The Bylaws only provide the practitioner the right to appeal the decision of the JRC. Article VIII, Section 4(j), p. 63. Furthermore, the Illinois Hospital Licensing Act does not provide a hospital with the right to appeal an adverse hearing committee decision. 210 ILCS 85/10.4(b)(2)(C). The MEC violated Dr. Levitin's Bylaw rights by unlawfully appealing the decision of the JRC.

c.      The written appeal procedures were imposed unilaterally by counsel for NCH, Wendy Rubas, and were not adopted as rules or amendments to the Bylaws as part of part of Articles XIV or XV of the Bylaws.

d.      The Board's January 12, 2013 decision violates the Bylaws, as it was not based on the standard of review set forth in Article VIII, Section 4(j) of the Bylaws for review and final action on the JRC's decision. The Bylaws state that the standard to be applied on review of the JRC decision is as follows: "If the decision is supported by substantial evidence following the procedures herein, the committee shall affirm the decision of the judicial review committee and recommend it to the board as the final action." See Article VIII, Section 4(j), p. 63. In fact, the Board's decision did not set forth any standard of review on which it based its decision.

e.      The Board's decision was based, in part, on issues that were not before the JRC and were not raised by the MEC as allegations against Dr. Levitin at the outset of the hearing. Accordingly, Dr. Levitin was not provided with notice

of these allegations and had no opportunity to respond to these issues as required by the Bylaws. Article VIII, Section 3(a), p. 57.

f.    NCH violated Dr. Levitin's Bylaw right to obtain all information relevant to the MEC's charges and her right to rebut evidence presented against her under Article VIII, Section 4(a)(2) and (d) of the Bylaws by refusing to produce the comparative data that Dr. Levitin repeatedly requested. *Id.* p. 60-61.

g.    Article VIII, Section 4(d) give the parties the right to cross-examine witnesses at the hearing. Dr. Aach's written conclusions, opinions and findings were included in the hearing record, over Dr. Levitin's objection, thereby denying Dr. Levitin's bylaw right to cross-examine witnesses. See *Id.* p. 61.

233. The actions set forth in Paragraph 232 (a)-(g) violated the Bylaws of NCH for the reasons set forth in Paragraph 232 (a)-(g) above.

234. As a direct and proximate result of the breach of the Bylaws set forth in Paragraphs 232 (a)-(f) above, Dr. Levitin's professional reputation has been forever destroyed as the unlawful termination of her privileges has been reported to other hospitals, managed care providers, insurers, and all current and potential employers.

235. Dr. Levitin has sustained damages by the unlawful termination of her clinical privileges at NCH.

236. Hospitals must consult the NPDB following a request for credentialing or re-

64

credentialing and also engage in ongoing monitoring of physician credentialing status through use of the NPDB.

237. The adverse action taken by NCH in terminating Dr. Levitin's clinical privileges will preclude Dr. Levitin from obtaining clinical privileges at any other hospital or with any other medical entity.

238. The adverse action taken by NCH in terminating Dr. Levitin's clinical privileges has jeopardized her privileges at other Illinois hospitals at which she has privileges.

239. Dr. Levitin is a general surgeon and the majority of her surgeries are performed in the hospital operating room. Without hospital privileges, Dr. Levitin will not be able to practice as a general surgeon at NCH.

240. A general surgery practice is based primarily on referrals from primary care and attending physicians within a hospital. Dr. Levitin relies on these referrals to get new patients.

241. Without hospital privileges at NCH, Dr. Levitin has lost a significant referral network of primary care and attending physicians on the hospital staff at NCH which she has served since 2000.

242. Every two years, every health maintenance organization, preferred provider organization, independent physician association, and all other managed care providers, along with Medicare and Medicaid and all private insurers, re-credential participating physicians. Re-credentialing requires disclosure of all disciplinary actions taken by hospitals at which a physician has privileges.

243. In addition, health maintenance organizations, preferred provider organizations,

independent physician associations, and all other managed care providers engage in ongoing monitoring of provider credentialing statuses.

244. As a direct result of the adverse action report made by NCH, Dr. Levitin's participation with Advocate Physician Partners ("APP") was immediately suspended on January 25, 2013. Suspension by APP triggered suspension of Levitin's participation as a provider with Humana, Cigna and other insurance companies. As a result of the suspension, Dr. Levitin was required to refer her patients to other providers within the network or cause her patients to pay out of network fees and costs.

245. As a direct result of the adverse action report made by NCH, Dr. Levitin's participation with Northwest Community Health Partners PHO were terminated without cause on January 24, 2013.

246. As a direct result of the adverse action report made by NCH, Dr. Levitin was required to report the termination of her privileges at NCH to the Illinois Department of Financial and Professional Regulation, which will result in an investigation by the Department into the basis of NCH's action and may also result in disciplinary action by the Department.

247. Dr. Levitin and her family rely entirely upon her income as a general surgeon for support. As a result of the unlawful termination of Dr. Levitin's privileges at NCH, Dr. Levitin has sustained damages in the form of lost income due to the loss of referrals and the decrease in the volume of her patients resulting in a loss of revenue to CSC.

248. The damages from the termination of Dr. Levitin's privileges in general surgery at

NCH will be ongoing. The report to the NPDB and the disclosures by NCH to any credentialing inquiries will be ongoing and permanent such that Dr. Levitin will not be able to practice medicine in the same manner and to the same extent again.

249. The damage to Dr. Levitin's professional reputation and medical practice is permanent and ongoing.

WHEREFORE, Dr. Levitin respectfully requests that the Court award her the following relief:

A. Declaratory finding that the termination of Dr. Levitin's Medical Staff membership and clinical privileges at NCH violated the Bylaws;

B. An order vacating the decision of the Board of Directors to terminate Dr. Levitin's Medical Staff membership and clinical privileges;

C. A permanent injunction prohibiting NCH, through its governing council, or any of its agents, employee or affiliates, from enforcing or reporting to any person or third party the decision to terminate Dr. Levitin's Medical Staff membership and clinical privileges; and

D. An award of economic damages for the loss of revenue to CSC and resulting loss of income during the time Dr. Levitin could not practice at NCH;

E. An award of economic damages for the loss of revenue to CSC and resulting loss of income Dr. Levitin will sustain due to the unlawful termination of her privileges by NCH;

F. An award of all consequential damages;

G. An award of punitive damages and attorneys' fees for the willful and wanton conduct of NCH in terminating Dr. Levitin's privileges;

H. All other relief this Court deems equitable and just.

## COUNT VII-TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONS

250. Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 202, inclusive, as if fully set forth herein.

251. The Bylaws form a contract between Dr. Levitin and NCH and her staff privileges constitute protectable property interests.

252. Dr. Levitin, as a member of the Medical Staff, performed all of her obligations and duties in accordance with the Bylaws.

253. NCH violated Dr. Levitin's rights pursuant to the Bylaws and the Illinois Hospital Licensing Act, 210 ILCS 85/10.4, as set forth in Count I and Count II.

254. In violating Dr. Levitin's rights as set forth in Count I and Count II, NCH terminated Dr. Levitin's clinical privileges in direct violation of the Bylaws and Illinois law.

255. Dr. Levitin is a general surgeon. Surgeries are performed at a hospital. Without hospital privileges, Dr. Levitin is unable to practice surgery.

256. A surgical practice is based entirely upon referrals from primary care and attending physicians within a hospital. The termination of Dr. Levitin's privileges at NCH precludes all physicians within the hospital from referring patients to Dr. Levitin. As a result, Dr. Levitin is not able to take advantage of recent referrals, she cannot receive future referrals from referring physicians at NCH, and her medical practice has been destroyed.

257. Dr. Levitin's ongoing patients are unable to see the physician of their choice and

68

Dr. Levitin has lost significant number of patients at NCH.

258.    NCH terminated Dr. Levitin's privileges with the knowledge that this would sever the contract between NCH and Dr. Levitin through the Bylaws, would end Dr. Levitin's ability to practice surgery in the community, would preclude all existing physician referrals within the hospital, and all existing patients of Dr. Levitin at NCH would have to be referred to another physician.

259.    The direct and proximate result of the termination of Dr. Levitin's privileges by NCH at the present time exceeds $250,000.

260.    The actions of NCH were taken for a malicious purpose and punitive damages and attorneys' fees should be awarded to Dr. Levitin and against NCH.

WHEREFORE, Dr. Levitin respectfully requests that the Court enter a judgment in her favor and against Defendants and:

A.    Award Levitin all compensatory damages resulting from Defendants' breaches of the By-laws and termination of her medical staff privileges;

B.    Award CSC all economic damages and lost revenue flowing from the breach of the By-laws and Levitin's  privileges for the period of time that Levitin could not practice at NCH due to the unlawful breach of the By-laws and termination of Levitin's privileges on November 20, 2012;

C.    Award CSC all economic damages and lost revenue flowing from the breach of the By-laws and Levitin's  privileges for the period of time that Levitin could not practice at NCH due to the unlawful breach of the By-laws and termination of Levitin's privileges on January 12, 2013;

D. Award Levitin economic damages for the tortious interference of her contract with NCH and protectable property interests in her privileges in an amount not less than $250, 000.00;

E. Award all consequential damages;

F. An Award of punitive damages and attorneys' fees for the willful and wanton conduct of NCH in terminating Levitin's privileges on November 20, 2012 and January 12, 2013;

G. Disgorge the profits of ASA;

H. All further relief that the Court deems just and proper.

## COUNT VIII

## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS OPPORTUNITIES
### (Against ASA and the Individual Defendants)

261. Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 202, inclusive, as if fully set forth herein.

262. Since 2000, Dr. Levitin had medical staff privileges to practice as a general surgeon at NCH.

263. Dr. Levitin developed a reputation as a general surgeon whereby other physicians referred patients directly to Dr. Levitin for admission and treatment at NCH because of her excellent reputation.

264. Dr. Levitin had an ongoing expectation to continue to receive referrals of patients from physicians for admission and treatment at NCH with whom she had a long-term relationship as their general surgeon of choice.

70

265.    Between October 30, 2000 and January 12, 2013, Dr. Levitin performed all obligations and duties as a member of the Medical Staff in accordance with the Bylaws.

266.    NCH unlawfully terminated Dr. Levitin's clinical privileges on November 20, 2012 and January 12, 2013.

267.    Dr. Levitin is a general surgeon and as such must perform surgeries of NCH patients at NCH. Without hospital privileges, Dr. Levitin cannot practice general surgery and treat NCH patients and patients referred to her by NCH physicians or for admission to NCH.

268.    A surgical practice is based entirely upon referrals from primary care and attending physicians within a hospital. The termination of Dr. Levitin's privileges at NCH precludes all physicians within the hospital from referring patients to Dr. Levitin. As a result, Dr. Levitin has lost all future referrals from NCH physicians and/or patients for admission to NCH which has had and will continue to have a significant adverse impact on her medical practice, the revenues flowing to CSC and compensation paid to Levitin.

269.    Dr. Levitin's ongoing NCH patients and her patients who wish to return for follow-up or further treatment at NCH cannot see their physician of choice. Dr. Levitin has lost all patients who she would see at NCH.

270.    NCH terminated Dr. Levitin's Medical Staff membership and clinical privileges with the knowledge that this would sever the contract that existed between NCH and Dr. Levitin through the Bylaws, would end Dr. Levitin's ability to practice surgery in the NCH community, would preclude all physician referrals within the hospital, and all returning and new patients would not be able to use Dr. Levitin at NCH.

271. Every two years, all managed care providers, both Medicare and Medicaid, and all

private insurers re-credential participating physicians. Re-credentialing requires a disclosure from NCH of disciplinary actions taken against Dr. Levitin. Managed care providers, governmental programs, or private insurers are unlikely to re-credential Dr. Levitin by virtue of NCH's termination of her Medical Staff clinical privileges at NCH and no physician can practice medicine without participating in managed care programs, governmental programs, or private insurance programs. Dr. Levitin's ability to practice medicine will be significantly curtailed if not destroyed.

272. In addition, all managed care providers, both Medicare and Medicaid, and all private insurers engage in ongoing monitoring of provider credentialing statuses.

273. NCH terminated Dr. Levitin's Medical Staff membership and clinical privileges with the knowledge that the termination would lead to a denial of re-credentialing or would otherwise cause her participating status to be suspended and/or terminated and knowing that the effect would be to significantly damage and impair Dr. Levitin's practice and reputation and potentially preclude Dr. Levitin from practicing medicine.

274. As a direct and proximate result of the termination of Dr. Levitin's privileges by NCH, CSC has sustained damages in the form of lost referrals to and lost patients of Levitin, which loss of revenues will exceed $250,000 at the present time.

275. The actions of NCH were taken for a malicious purpose and punitive damages and attorneys' fees should be awarded to Dr. Levitin and against NCH.

WHEREFORE, Dr. Levitin respectfully requests that this Court enter judgment in her favor, and against Defendants as follows:

A.  Award economic damages for the loss of revenue flowing to CSC and lost income to Dr. Levitin for the time Dr. Levitin could not practice at NCH due to the unlawful termination of her privileges on November 20, 2012;

B.  Award economic damages for the lost revenues to CSC and lost income to Dr. Levitin as a result of the termination of her privileges by NCH on January 12, 2013;

C.  Award economic damages to CSC for the loss of referrals and loss of patients to Levitin which at the present time exceeds $250,000;

D.  Award all consequential damages;

E.  Award punitive damages and attorneys' fees for the willful and wanton conduct of NCH in terminating Dr. Levitin's privileges on November 20, 2012 and January 12, 2013;

F.  All other relief this Court deems just and proper.

### COUNT IX-DEFAMATION *PER SE*

276.  Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 202, inclusive, as if fully set forth herein.

277. As set forth more fully above, Defendants maliciously defamed Levitin by making false statements to third parties, including but not limited to other doctors and medical practices, patients, staff, hospitals, and the medical community at large.

278.  Examples of the false statements Defendants' made, which statements constitute defamation *per se* are:

279.     On or about July 1, 2009, in the presence of Levitin and her patient, defendant Conway falsely stated to Levitin's patient that Levitin had had two disastrous complications in the operating room and should not be operating on the patient, which statement Conway knew to be false or acted with reckless disregard of its truth or falsity;

280.     On or about January 27, 2010, defendants ASA and Soper, one its members, and in his capacity as Chairman of the Department of Surgery forwarded a request for corrective action against Levitin to NCH's Medical Executive Committee on which Soper sat, pursuant to Article VII, Section 2 of NCH's Medical Staff Bylaws.

281.     Defendant Soper provided false and unsubstantiated grounds in support of the request for corrective action.

282.     Defendant Soper's specific false statements are attached hereto as **Exhibit C** being filed **Under Seal** pursuant to Motion.

283.     Each of these statements was false when made.

284.     Defendants knew that each of these statements was false when made, or acted with reckless disregard of the falsity of the statements.

285.     Defendants NCH, ASA and Soper repeated and caused to be repeated these false statements in written and oral presentations during the investigations initiated by ASA, Soper and the MEC including during the 2010 outside review of Levitin's cases, during the 2010 investigation of Levitin's cases, during the 2011 investigation of Levitin's cases and during the 2012 Judicial Review hearing and thereafter, on or about November 13, 2012 at a Quality Committee meeting, on or about November 19, 2011 and January 12, 2012 at NCH Board meetings.

286.     On or about January 25, 2013, defendants submitted false and unfounded

74

information in an adverse action report to the National Practitioner Data Bank ("NPDB") concerning Levitin;

287. NCH's false statements in the adverse action report are more specifically identified in **Exhibit D** being filed **Under Seal** pursuant to Motion.

288. Each of these statements was false and unfounded.

289. Defendant NCH knew that each of these statements was false when made or acted with reckless disregard of the falsity of the statements.

290. As Defendant NCH well knew, the Data Bank was set up primarily to combat medical malpractice, and to encourage doctors to report truthful information concerning the incompetent, dangerous, or medically damaging performance of their peers, and/or information concerning fraud on the Medicaid and Medicare programs, so that incompetent and criminal professionals would be prevented from continuing in their profession and risking further danger and damage to patients and to the Medicaid and Medicare programs.

291. As Defendant NCH also well knew, the existence of an adverse report filed with the NPDB concerning a physician gives rise to an impression that the physician is not qualified to perform his professional duties or has engaged in fraudulent or criminal misconduct impacting Medicaid or Medicare.

292. Given the very serious nature of such allegations, federal law places restrictions on hospitals and medical practices that wish to report a doctor to the NPDB.

293. In order to qualify to file and adverse report with the NPDB against a physician, a medical practice must maintain a formal peer review process as that term is defined in the NPDB regulations. In accordance with the Code of Federal Regulations at 45 CFR § 60.3, a formal peer

review process is defined as "the conduct of professional review activities through formally adopted written procedures which provide for adequate notice and an opportunity for a hearing." In addition, such a hearing must afford minimum procedural protections to the reported physician, including having the hearing recorded, affording a neutral decision maker, permitting legal representation at the hearing, identifying witnesses and exhibits to be introduced by defendants, providing the physician an opportunity to cross-examine the evidence , and provide a final, written decision.

294. NCH's adverse action report filed against Levitin stated that it permanently revoked Levitin's clinical privileges implying that the decision was made in the context of a professional review action. Accordingly, the adverse action report filed with the NPDB concerning Levitin signified not only that she was found unfit and unqualified to practice, but that this determination was made based upon a formal, qualified peer review process consisting of notice, an opportunity to be heard, a reasonable investigation into the facts, a full evidentiary hearing and by a neutral decision maker who was not a competitor of Levitin's, all of which impressions were not true.

295. By its very nature, then, as defendants well knew, the adverse action report filed against Levitin with the NPDB was likely to be and was seriously damaging to her professional reputation.

296. NPDB reports are available to a broad group of members in the medical community. Among other individuals and entities, insurance companies, hospitals, licensing and credentialing organizations, dividend paying surgi centers, physician groups and professional societies may query the NPDB for adverse reports filed about physicians seeking or reapplying

for staff privileges at a hospital and/or surgical group and centers and/or applying to be a preferred provider for an insurance carrier, all of which are necessary for a doctor's practice of medicine.

297. An adverse action report filed with the NPDB can result in the denial of privileges at hospitals, an increase in insurance premiums, an outright denial of malpractice insurance coverage, a denial of a listing as a preferred provider, and the loss of medical and surgical licenses.

298. At the time they filed their report, Defendants owed a legal duty to Levitin to supply correct information about Levitin's performance as a physician and surgeon as properly determined by a formal professional review activity and peer review process that complied with the NPDB guidelines and regulations and NCH's own by-laws concerning adverse actions taken against a physician's privileges and did not, as was the case here, report the unfounded accusations of the MEC, which accusations were lodged by Levitin's competitors and were specifically rejected by the judicial review committee;

299. At the time they filed their report, Defendant NCH knew understood and intended that filing a report with the NPDB would greatly damage Levitin's professional reputation and practice, particularly if the report alleged albeit falsely that Levitin's clinical privileges were revoked following a formal peer review action, indicating that she was and had been found to be a danger to patients, which was false.

300. As a result of the false, unfounded and improperly filed adverse action report, Levitin has suffered damage in the form of having her participation with various insurance providers of her patients revoked and/or suspended; loss of referral business from NCH

77

physicians and staff; denial of privileges at Lutheran General, loss of reputation in the

community, loss of outpatient referrals from NCH Emergency Room, loss of referrals from

physicians on staff at NCH at other hospitals where they are also on staff with Levitin, including

Condell, Resurrection Medical Center, St. Alexius and Our Lady of Resurrection, which

damages are ongoing.

301.    As a result of these blatantly false and defamatory statements, Levitin suffered,

and continues to suffer damages, including injuries to her business and reputation as a physician

and surgeon.  Furthermore, these statements have caused, and will continue to cause, Levitin to

suffer humiliation and emotional and physical distress.

WHEREFORE, Levitin respectfully requests that the Court enter a judgment in her favor

and against Defendants and:

A.    Award Levitin all compensatory damages resulting from the injuries to her good

name, reputations and business as a result of Defendants' defamatory statements;

B.    Award Levitin damages for the humiliation and emotional distress that she has

suffered and will continue to suffer as a result of the defamatory statements;

C.    Award Levitin punitive damages because of the malicious and willful nature in

which the defamatory statements were made;

D.    Disgorgement of profits; and

E.    Order all further relief that the Court deems just and proper.

### COUNT X-DEFAMATION *PER QUOD*

302.  Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 202,

inclusive, as if fully set forth herein.

303.   To the extent the defamatory statements in Count IX are, or any of them, are not considered *per se* defamation, Levitin brings this Count X for defamation *per quod* in the alternative to Count IX and incorporates all allegations in Count IX herein.

304. Specifically, defendants made statements to third parties including patients of Levitin, physicians who referred cases to Levitin and to staff and employees of NCH that:

305. On or about July 1, 2009, in the presence of Levitin and her patient, defendant Conway falsely stated to Levitin's patient that Levitin had had two disastrous complications in the operating room and should not be operating on the patient, which statement Conway knew to be false or acted with reckless disregard of its truth or falsity;

306.   On or about January 27, 2010, on behalf of defendant ASA, defendant Soper, in his capacity as Chairman of the Department of Surgery, forwarded a request for corrective action against Levitin to NCH's Medical Executive Committee on which Soper sat, pursuant to Article VII, Section 2 of NCH's Medical Staff Bylaws.

307.    Defendant Soper provided false and unsubstantiated grounds in support of the request for corrective action. Defendant Soper's specific false statements are set forth on **Exhibit C** filed **Under Seal.**

308.   Each of these statements was false when made.

309.   Defendants knew that each of these statements was false when made, or acted with reckless disregard of the falsity of the statements.

310.   Defendants NCH, ASA and Soper repeated and caused to be repeated these false statements in written and oral presentations during the investigations initiated by ASA, Soper

79

and the MEC including during the 2010 outside review of Levitin's cases, during the 2010 investigation of Levitin's cases, during the 2011 investigation of Levitin's cases and during the 2012 Judicial Review hearing and thereafter, on or about November 13, 2012 at a Quality Committee meeting, on or about November 19, 2011 and January 12, 2012 at NCH Board meetings.

311.    On or about January 25, 2013, defendants submitted false and unfounded information in an adverse action report to the National Practitioner Data Bank ("NPDB") concerning Levitin. Defendant NCH's specific false statements are set forth in **Exhibit D** filed **Under Seal.**

312. Each of these statements was false and unfounded.

313.  Defendant NCH knew that each of these statements was false when made or acted with reckless disregard of the falsity of the statements.

314.  As Defendant NCH well knew, the Data Bank was set up primarily to combat medical malpractice, and to encourage doctors to report truthful information concerning the incompetent, dangerous, or medically damaging performance of their peers, and/or information concerning fraud on the Medicaid and Medicare programs, so that incompetent and criminal professionals would be prevented from continuing in their profession and risking further danger and damage to patients and to the Medicaid and Medicare programs.

315.  As Defendant NCH also well knew, the existence of an adverse report filed with the NPDB concerning a physician gives rise to an impression that the physician is not qualified to perform his professional duties or has engaged in fraudulent or criminal misconduct impacting Medicaid or Medicare.

316. Given the very serious nature of such allegations, federal law places restrictions hospitals and medical practices that wish to report a doctor to the NPDB.

317. In order to qualify to file and adverse report with the NPDB against a physician, a medical practice must maintain a formal peer review process as that term is defined in the NPDB regulations. In accordance with the Code of Federal Regulations at 45 CFR § 60.3, a formal peer review process is defined as "the conduct of professional review activities through formally adopted written procedures which provide for adequate notice and an opportunity for a hearing." In addition, such a hearing must afford minimum procedural protections to the reported physician, including having the hearing recorded, affording a neutral decision maker, permitting legal representation at the hearing, identifying witnesses and exhibits to be introduced by defendants, providing the physician an opportunity to cross-examine the evidence , and provide a final, written decision.

318. NCH's adverse action report filed against Levitin stated that it permanently revoked Levitin's clinical privileges implying that the decision was made in the context of a professional review action. Accordingly, the adverse action report filed with the NPDB concerning Levitin signified not only that she was found unfit and unqualified to practice, but that this determination was made based upon a formal, qualified peer review process consisting of notice, an opportunity to be heard, a reasonable investigation into the facts, a full evidentiary hearing and by a neutral decision maker who was not a competitor of Levitin's, all of which impressions were not true.

319. By its very nature, then, as defendants well knew, the adverse action report filed

against Levitin with the NPDB was likely to be and was seriously damaging to her professional reputation.

320. NPDB reports are available to a broad group of members in the medical community. Among other individuals and entities, insurance companies, hospitals, licensing and credentialing organizations, dividend paying surgi centers, physician groups and professional societies may query the NPDB for adverse reports filed about physicians seeking or reapplying for staff privileges at a hospital and/or surgical group and centers and/or applying to be a preferred provider for an insurance carrier, all of which are necessary for a doctor's practice of medicine.

321. An adverse action report filed with the NPDB can result in the denial of privileges at hospitals, an increase in insurance premiums, an outright denial of malpractice insurance coverage, a denial of a listing as a preferred provider, and the loss of medical and surgical licenses.

322. At the time NCH filed the report, Defendants owed a legal duty to Levitin to supply correct information about Levitin's performance as a physician and surgeon as properly determined by a formal professional review activity and peer review process that complied with the NPDB guidelines and regulations and NCH's own by-laws concerning adverse actions taken against a physician's privileges and did not, as was the case here, report the unfounded accusations of the MEC, which accusations were lodged by Levitin's competitors and were specifically rejected by the judicial review committee;

323. At the time they filed their report, Defendant NCH knew, understood and intended that filing a report with the NPDB would greatly damage Levitin's professional reputation and practice, particularly if the report alleged albeit falsely that Levitin's clinical privileges

82

were revoked following a formal peer review action, indicating that she was and had been found to be a danger to patients.

324. As a result of the false, unfounded and improperly filed adverse action report, Levitin has suffered damage in the form of having her participation with various insurance providers of her patients revoked and/or suspended; loss of referral business from NCH physicians and staff; denial of privileges at Lutheran General, loss of reputation in the community, loss of outpatient referrals from NCH Emergency Room, loss of referrals from physicians on staff at NCH at other hospitals where they are also on staff with Levitin, including Condell, Resurrection Medical Center, St. Alexius and Our Lady of Resurrection, which damages are ongoing.

325. As a result of these blatantly false and defamatory statements, Levitin suffered, and continues to suffer damages, including injuries to her business and reputation as a physician and surgeon. Furthermore, these statements have caused, and will continue to cause, Levitin to suffer humiliation and emotional and physical distress.

WHEREFORE, Levitin respectfully requests that the Court enter a judgment in her favor and against Defendants and:

A. Award Levitin all compensatory damages resulting from the injuries to her good name, reputations and business as a result of Defendants' defamatory statements;

B. Award Levitin damages for the humiliation and emotional distress that she has suffered and will continue to suffer as a result of the defamatory statements;

C.    Award Levitin punitive damages because of the malicious and willful nature in which the defamatory statements were made;

D.    Disgorgement of profits; and

E.    Order all further relief that the Court deems just and proper.

## COUNT XI-FALSE LIGHT

326.  Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 202, paragraphs 276 through 325 above, as if fully set forth herein.

327.  Defendants maliciously placed Levitin in a false light before the public through their actions described in paragraphs 276 through 325 above.

328. The false light would be highly offensive to a reasonable person because it impugned Levitin's competence, fitness and integrity in the performance of her profession and business.

329. Defendants acted with actual malice.  As set forth above, at the time Defendants made their statements, they knew their statements were false, or recklessly disregarded the truth or falsity of their statements.

330. Defendants' placing Levitin in a false light has greatly damaged her business and good name and reputation in the general public and, particularly, in the medical community in which she practices. Furthermore, placing Levitin in a false light has caused, and will continue to cause, Levitin to suffer humiliation and emotional and physical distress.

WHEREFORE, Levitin respectfully requests that the Court enter judgment in her favor and against Defendants and:

A.    Award Levitin all compensatory damages resulting from the injuries to Levitin's

good name, reputation and business as a result of Defendants' actions;

B.   Award Levitin damages for the humiliation and emotional distress that she has suffered and will continue to suffer as a result of the Defendants' actions;

C.   Award consequential damages;

D.   Award Levitin punitive damages and attorneys' fees because of the malicious and willful nature of Defendants' actions;

E.   Disgorgement of profits of ASA; and

F.   Order all further relief that the Court deems just and proper.

### COUNT XII-VIOLATION OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT, 805 ILCS 510/1 E *ET SEQ*

331.  Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 202, inclusive, as if fully set forth herein.

332. Defendants have violated the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, by making the following false and misleading representations disparaging the services and business of Levitin which representations were made to a buyer or potential buyer of Levitin's medical services:

333.   On multiple occasions including but not limited to in or about July 2008, July 1, 2009, and on other occasions in the presence of Levitin and her patients, defendant Conway falsely stated to Levitin's patients that Levitin was not a good surgeon, had had two disastrous complications in the operating room and should not be operating on patients and comparable words, which statements Conway knew to be false or acted with reckless disregard of its truth or falsity.

334. In addition to the NPDB report, on information and belief, Defendants continue to disseminate by other means false and disparaging representations about the services and business of Levitin.

**WHEREFORE**, Levitin respectfully requests that the Court enter a judgment in her favor and against Defendants and:

A.     Temporarily, preliminarily and permanently enjoin Defendants from continuing to disseminate their false and disparaging statements regarding Levitin;

B.     Order Defendants to provide a signed letter to each of the doctors, patients and any other third parties to whom Defendants made defamatory statements specifically retracting each of the false and disparaging statements that they made regarding Levitin;

C.     Order Defendants to retract each of the false statements made in their report to the NPDB;

D.     Award Levitin her reasonable attorney fees and costs incurred in connection with Defendants' violations of the Illinois Uniform Deceptive Trade Practices Act; and

E.     Order all further relief that the Court deems just and proper.

### COUNT XIII-VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT, 805 ILCS 505/1 E *ET SEQ.*

335.  Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 202, inclusive, as if fully set forth herein.

336. Defendants' conduct that violates the Illinois Uniform Deceptive Trade Practices Act also gives rise to a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, which provides that it is unlawful to engage in "unfair or deceptive acts or

86

practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act."" 815 ILCS 505/2.

337. Specifically, defendants made the following false, deceptive, misleading and disparaging statements concerning Levitin's services and abilities as a physician:

338. On multiple occasions including but not limited to in or about July 2008, July 1, 2009, and on other occasions in the presence of Levitin and her patients, defendant Conway falsely stated to Levitin's patients that Levitin was not a good surgeon, had had two disastrous complications in the operating room and should not be operating on patients and comparable words, which statements Conway knew to be false or acted with reckless disregard of its truth or falsity.

339. In addition to the NPDB report, on information and belief, Defendants continue to disseminate by other means false and disparaging representations about the services and business of Levitin.

340. Defendants intended that the recipients of each of the above identified false and misleading statements rely upon those statements in awarding business to them that should otherwise have gone to Levitin, or in denying Levitin business in competition with Defendants.

341. Each of the above identified false and misleading statements were made in the course of conduct involving Defendants' and Levitin's profession, trade and commerce and the delivery of medical and surgical services within the State of Illinois.

WHEREFORE, Levitin respectfully requests that the Court enter a judgment in her favor and against Defendants and:

A.     Temporarily, preliminarily and permanently enjoin Defendants from continuing to disseminate their false and disparaging statements regarding Levitin;

B.     Order Defendants to provide a signed letter to each of the doctors, patients and any other third parties to whom Defendants made defamatory statements specifically retracting each of the false and disparaging statements that she made regarding Levitin;

C.     Order Defendants to retract each of the false statements made in their report to the NPDB;

D.     Award Levitin all actual damages resulting from Defendants' violations of the Illinois Consumer Fraud and Deceptive Business Practices Act;

E.     Award Levitin punitive damages for Defendants' deliberate, malicious and willful violations of the Illinois Consumer Fraud and Deceptive Business Practices Act;

F.     Award Levitin her reasonable attorney fees and costs incurred in connection with Defendants' violations of the Illinois Consumer Fraud and Deceptive Business Practices Act;

G.     Disgorgement of Profits; and

H.     Order all further relief that the Court deems just and proper.

**COUNT XIV-NEGLIGENT MISREPRESENTATION**

342.  Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 202, inclusive, as if fully set forth herein.

343.   On or about January 27, 2010, defendants ASA and Soper, one its members, and in his capacity as Chairman of the Department of Surgery forwarded a request for corrective

action against Levitin to NCH's Medical Executive Committee on which Soper sat, pursuant to Article VII, Section 2 of NCH's Medical Staff Bylaws.

344.    Defendant Soper provided false and unsubstantiated grounds in support of the request for corrective action. Defendant Soper's specific false statements are attached hereto as **Exhibit C Under Seal**.

345. Each of these statements was false and unfounded.

346. Defendants Soper, Conway and NCH knew that each of these statements was false when made or acted with negligent disregard of the falsity of the statements.

347. As Defendants Soper , Conway and NCH well knew, these statements would affect the valid functioning of NCH's corrective action process, its investigative committees as well as Levitin's process in responding to the peer review process.

348.    Defendant Soper, NCH's Medical Staff and NCH's MEC owed a legal duty to Levitin to supply correct information about Levitin's performance as a physician and surgeon in connection with any corrective action process;

349. As defendants well knew and intended at the time that these statements were made, the Medical Staff Bylaws provided that corrective actions could lead to the reduction, restriction, suspension, or revocation of a physician's clinical privileges and staff membership.

350.    As a result of the false, unfounded and unsubstantiated information provided by Defendants, Levitin was subjected to multiple investigations occurring over a two (2) year period, including a review by an  outside physician, a 2010 Investigation, a 2011 Investigation and a judicial review hearing that lasted over a nine (9) month period;

351. As a result of the false, unfounded and unsubstantiated information provided by

89

Defendants, Levitin's ability to perform her medical and surgical duties was interfered with, her ability to treat and care for patients was interfered with, the revenues she was able to generate for her practice were diminished which in turn diminished her earnings and she incurred substantial costs and expenses in the form of attorneys' fees, costs and the costs of expert witnesses in order to defend herself;

352. Despite the fact that NCH's judicial review committee found in favor of Levitin and against the MEC, on or about January 25, 2013, defendants submitted false and unfounded information in an adverse action report to the National Practitioner Data Bank ("NPDB") concerning Levitin. Defendant NCH's specific false statements are attached hereto as **Exhibit D Under Seal.**

353. Each of these statements was false and unfounded.

354. Defendant NCH knew that each of these statements was false when made or acted with negligent disregard of the falsity of the statements.

355. As Defendant NCH well knew, the Data Bank was set up primarily to combat medical malpractice, and to encourage doctors to report truthful information concerning the incompetent, dangerous, or medically damaging performance of their peers, and/or information concerning fraud on the Medicaid and Medicare programs, so that incompetent and criminal professionals would be prevented from continuing in their profession and risking further danger and damage to patients and to the Medicaid and Medicare programs.

356. As Defendant NCH also well knew, the existence of an adverse report filed with the NPDB concerning a physician gives rise to an impression that the physician is not qualified to Perform his professional duties or has engaged in fraudulent or criminal misconduct impacting

Medicaid or Medicare.

357. Given the very serious nature of such allegations, federal law places restrictions hospitals and medical practices that wish to report a doctor to the NPDB.

358. In order to qualify to file and adverse report with the NPDB against a physician, a medical practice must maintain a formal peer review process as that term is defined in the NPDB regulations.  In accordance with the Code of Federal Regulations at 45 CFR § 60.3, a formal peer review process is defined as "the conduct of professional review activities through formally adopted written procedures which provide for adequate notice and an opportunity for a hearing." In addition, such a hearing must afford minimum procedural protections to the reported physician, including having the hearing recorded, affording a neutral decision maker, permitting legal representation at the hearing, identifying witnesses and exhibits to be introduced by defendants, providing the physician an opportunity to cross-examine the evidence , and provide a final, written decision.

359. NCH's adverse action report filed against Levitin stated that it permanently revoked Levitin's clinical privileges implying that the decision was made in the context of a professional review action. Accordingly, the adverse action report filed with the NPDB concerning Levitin signified not only that she was found unfit and unqualified to practice, but that this determination was made based upon a formal, qualified peer review process consisting of notice, an opportunity to be heard, a reasonable investigation into the facts, a full evidentiary hearing and by a neutral decision maker who was not a competitor of Levitin's, all of which impressions were not true.

360. By its very nature, then, as defendants well knew, the adverse action report filed

against Levitin with the NPDB was likely to be and was seriously damaging to her professional reputation.

361. NPDB reports are available to a broad group of members in the medical community. Among other individuals and entities, insurance companies, hospitals, licensing and credentialing organizations, dividend paying surgi centers, physician groups and professional societies may query the NPDB for adverse reports filed about physicians seeking or reapplying for staff privileges at a hospital and/or surgical group and centers and/or applying to be a preferred provider for an insurance carrier, all of which are necessary for a doctor's practice of medicine.

362. An adverse action report filed with the NPDB can result in the denial of privileges at hospitals, an increase in insurance premiums, an outright denial of malpractice insurance coverage, a denial of a listing as a preferred provider, and the loss of medical and surgical licenses.

363. At the time they filed their report, Defendants owed a legal duty to Levitin to supply correct information about Levitin's performance as a physician and surgeon as properly determined by a formal professional review activity and peer review process that complied with the NPDB guidelines and regulations and NCH's own by-laws concerning adverse actions taken against a physician's privileges and did not, as was the case here, report the unfounded accusations of the MEC, which accusations were lodged by Levitin's competitors and were specifically rejected by the judicial review committee;

364. At the time they filed their report, Defendant NCH knew understood and intended that filing a report with the NPDB would greatly damage Levitin's professional reputation and practice, particularly if the report alleged albeit falsely that Levitin's clinical privileges

were revoked following a formal peer review action, indicating that she was and had been found to be a danger to patients.

365. As a result of the false, unfounded and improperly filed adverse action report, Levitin has suffered damage in the form of having her participation with various insurance providers of her patients revoked and/or suspended; loss of referral business from NCH physicians and staff; denial of privileges at Lutheran General, loss of reputation in the community, loss of referrals of outpatients for NCH Emergency Room, loss of referrals from physicians on staff at NCH at other hospitals where they are also on staff with Levitin, including Condell, Resurrection Medical Center, St. Alexius and Our Lady of Resurrection, which damages are ongoing.

WHEREFORE, Levitin respectfully requests that the Court enter a judgment in her favor and against Defendants and:

A.      Temporarily, preliminarily and permanently enjoin Defendants from continuing to disseminate their false and disparaging statements regarding Levitin;

B.      Order Defendants to provide a signed letter to each of the doctors, patients and any other third parties to whom Defendants made defamatory statements specifically retracting each of the false and disparaging statements that they made regarding Levitin;

C.      Order Defendants to retract each of the false statements made in their report to the NPDB;

D.      Award Levitin all actual damages resulting from Defendants' misrepresentations of fact concerning Levitin's performance as a physician and surgeon;

E.      Award Levitin punitive damages for Defendants' deliberate, malicious, willful and negligent misrepresentations of fact;

F.      Disgorgement of Profits as against ASA; and

H.      Order all further relief that the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs request a trial by jury for all non-equitable claims alleged herein.

Respectfully Submitted,

YELENA LEVITIN

BY: /s/ <u>Susan Bogart</u>
        Her Attorney

Susan Bogart
Law Offices of Susan Bogart
70 West Madison St., Ste. 1400
Chicago, IL 60602
Tele: 312-214-3271
Fax: 866-567-1199
sbogart514@aol.com

94