UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| YELENA LEVITIN and CHICAGO SURGICAL CLINIC, LTD., an Illinois corporation, | ) ) ) | |
| | ) | 13 C 5553 |
| Plaintiffs, | ) | |
| | ) | Judge Feinerman |
| vs. | ) | |
| | ) | |
| NORTHWEST COMMUNITY HOSPITAL, an Illinois not-for-profit corporation, ADVANCED SURGICAL ASSOCIATES, S.C., an Illinois corporation, ALAN B. LOREN, WILLIAM D. SOPER, and DANIEL R. CONWAY, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Yelena Levitin and Chicago Surgical Clinic, Ltd. ("CSC"), bring federal antitrust claims,

a hostile work environment claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e *et seq.*, and several state law claims against Northwest Community Hospital ("NCH"),

Advanced Surgical Associates, S.C. ("ASA"), Alan B. Loren, William D. Soper, and Daniel R.

Conway.  Doc. 1.  Defendants have moved to dismiss the suit under Federal Rule of Civil

Procedure 12(b)(6).  Doc. 15.  The motion is granted in part and denied in part.

**Background**

In considering the motion to dismiss, the court assumes the truth of the complaint's

factual allegations, though not its legal conclusions.  *See Munson v. Gaetz*, 673 F.3d 630, 632

(7th Cir. 2012).  The court also must consider "documents attached to the complaint, documents

that are critical to the complaint and referred to in it, and information that is subject to proper

judicial notice," along with additional facts set forth in Plaintiffs' brief opposing dismissal, so

long as those facts "are consistent with the pleadings."  *Geinosky v. City of Chicago*, 675 F.3d

743, 745 n. 1 (7th Cir. 2012).  As required on a Rule 12(b)(6) motion, the following facts are set

forth as favorably to Plaintiffs as those materials allow.  *See Gomez v. Randle*, 680 F.3d 859, 864

(7th Cir. 2012).  In so doing, the court is not vouching for the accuracy of those facts.  *See Jay E.*

*Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010).

Levitin is a female, Jewish physician of Russian descent who has been licensed to

practice medicine in Illinois since 2000.  Doc. 1 at ¶ 31.  She was board certified in general

surgery in 2001 and has been practicing as a general surgeon in the Chicago metropolitan area

since then.  *Id*. at ¶¶ 31, 43, 45, 47.  Levitin's Illinois medical licenses are in good standing and

have never been revoked, she has not been sued for malpractice, and, prior to NCH's revocation

of her staff privileges (of which more later), she had not been the subject of any disciplinary

action.  *Id*. at ¶¶ 31, 46, 49.  Levitin is a principal of CSC, her surgical practice.  *Id*. at ¶¶ 32, 48.

CSC employs or employed two other surgeons of Eastern European descent, Drs. Kokocharov

and Roginsky.  *Id*. at ¶ 32.

NCH is a hospital licensed under the Illinois Hospital Licensing Act, 210 ILCS 85/1 *et*

*seq*.  Doc. 1 at ¶ 33.  NCH is located in Arlington Heights, Illinois, with additional locations in

Buffalo Grove and Palatine, Illinois.  *Ibid*.  NCH's Board of Directors ("Board") is its controlling

and governing body.  *Id*. at ¶ 51.  The NCH Medical Staff is an association of physicians granted

clinical privileges by the Board and regulated by the Medical Staff bylaws, which govern the

relationship between NCH and the individual physicians on the staff.  *Id*. at ¶¶ 52, 54.  NCH

bases its grant of clinical privileges on the physician's education, training, experience,

demonstrated competence and judgment, clinical performance, documented results of patient

care, other appropriate quality review and monitoring, and other relevant information, including

the applicable department's recommendation to the Credentials Committee.  *Id*. at ¶ 66.  The

Medical Executive Committee ("MEC") is a standing committee at NCH that oversees the Medical Staff's functions and duties, is empowered to act for the staff, and coordinates the staff's activities, policies, departments, and committees. *Id*. at ¶ 53. The MEC reports directly to the Board and to NCH's chief executive officer. *Ibid*.

The Department of Surgery is a clinical department at NCH; it includes the General Surgery Section, in which Levitin, Loren, Soper, and Conway practiced. *Id*. at ¶ 55. The Department of Surgery is required to establish a Surgical Audit Committee consisting of at least three members to conduct ongoing peer review, and both the Department and the General Surgery Section are required to set criteria for recommending clinical privileges, to adopt rules and regulations consistent with the Medical Staff bylaws, and to perform other duties set forth in the bylaws. *Id*. at ¶¶ 55-57, 104.

The Medical Staff bylaws require the Department of Surgery and the General Surgery Section to elect Chiefs and Vice Chiefs to be confirmed by NCH's Board. *Id*. at ¶¶ 58-59. NCH delegates enforcement of its rules and regulations to the Chiefs of each department or section, who are responsible for, among other things: (1) monitoring the professional performance of all medical staff in their department or section, and reporting regularly thereon to the MEC; (2) making specific recommendations and suggestions regarding the department or section to the MEC to assure quality patient care; (3) enforcing hospital bylaws, Medical Staff bylaws, and departmental rules and regulations; (4) implementing actions taken by the MEC; (5) transmitting to the Credentials Committee the department's or section's recommendations concerning clinical privileges for its practitioners; (6) overseeing teaching, education, and research programs in the department or section; (7) participating in the administration of the department or section and the hospital; (8) participating jointly with the hospital administration in preparing annual reports and

budgets as required by the MEC, the CEO, or the Board; and (9) submitting written and in-person reports at least annually to the Board concerning the department or section. *Id*. at ¶¶ 59, 61, 101.

The Chief of the Department of Surgery holds positions on and/or is a member of the MEC, the Quality Committee, and the Board, and the Chiefs of both the Department of Surgery and the General Surgery Section oversee the Surgical Audit Committee and have the power to evaluate and approve a surgeon's requests for reappointment and to approve or reject a surgeon's requests to perform certain procedures. *Id*. at ¶¶ 102, 104, 106. The Chief of the General Surgery Section also monitors surgeons' attendance and timeliness. *Id*. at ¶ 105. Vice Chiefs are responsible for such duties and responsibilities as the Chief determines and for handling the Chief's powers and duties in the Chief's absence. *Id*. at ¶ 60. At all relevant times, Leighton Smith, the NCH Vice President of Medical Affairs, interacted with the Department of Surgery and its section Chiefs on behalf of NCH. *Id*. at ¶ 92.

Advanced Surgical Associates ("ASA"), which operates (in both senses of the term) at NCH, has several surgeons in its practice, including Loren, Soper, Conway, Sean P. Barnett, and Davie E. Mahon. *Id*. at ¶ 34. At all relevant times, Loren, Soper, and Conway (who, as noted above, are defendants in this case and who at times will be referred to collectively as the "individual defendants") have been licensed physicians and general surgeons practicing with ASA. *Id*. at ¶¶ 35-37. At least as early as 2008, NCH elected and the Board confirmed the individual defendants to run and control sections within the Department of Surgery (including the General Surgery Section and Surgical Audit Committee), to sit on the Board, and to be MEC members and officers. *Id*. at ¶ 17. In these positions, the individual defendants were in charge of enforcing NCH's bylaws, rules, and regulations; monitored the performance of all individuals

with clinical privileges in their respective departments; reported regularly to the MEC; and were responsible for all administrative activities within their departments, including approving and rejecting applications for privileges and corrective or other disciplinary actions. *Ibid*. At all relevant times, ASA surgeons, including the individual defendants, Mahon, and Barnett, have been members and officers of the Department of Surgery, the General Surgery Section, the Surgical Audit Committee, the Credentials Committee, the MEC, the Quality Committee, the Board, and the ACS National Surgical Quality Improvement Project ("NSQIP"), which reports surgical outcomes and quality of care information to health care consumers. *Id*. at ¶¶ 17, 107, 200. For example, Loren served as Chief and Vice Chief of the Department of Surgery, as a member of the Surgical Audit Committee, and as head NSQIP quality advisor, *id*. at ¶ 35; Soper served on the Board, the Quality Committee, and the Surgical Audit Committee, as the President, Vice President, and Secretary/Treasurer of the MEC, and as Chief of the Department of Surgery, *id*. at ¶ 36; and Conway served as Chief of the General Surgery Section and as Chair of the Surgical Audit Committee, *id*. at ¶ 37.

Upon commencing her medical and general surgery practice in 2000, Levitin obtained staff and clinical privileges at NCH, and her privileges were renewed every two years after approvals by the Chief of the General Surgery Section, the Chief of the Department of Surgery, the Credentials Committee, the MEC, and the Board. *Id*. at ¶¶ 62, 64. As a condition of receiving privileges at NCH, Levitin agreed to appear for interviews regarding her application and she authorized NCH and its representatives to consult with administrators and medical staff members of other hospitals and institutions with which she had been associated, and also with past or present malpractice carriers who may have information bearing on her professional competence, character, and ethical qualifications. *Id*. at ¶ 78. NCH also required Levitin to

consent to NCH inspecting all records and documents, including medical records at other hospitals, that could be material to evaluating her professional qualifications and competence to carry out clinical privileges and her moral and ethical qualifications for staff membership. *Id*. at ¶¶ 79, 94. Levitin also agreed to be bound by the terms of all of NCH's Medical Staff bylaws, rules, and regulations; to provide continuous care for patients; and to allow the continued surveillance of her professional performance by the Chiefs and Vice Chiefs of the Department of Surgery, the General Surgery Section, and the Surgical Audit Committee. *Id*. at ¶ 80. Under NCH's bylaws and internal rules and regulations, Levitin was required to: (1) perform all duties incident to elected or appointed offices if she served as an officer of the Medical Staff or of any department, section, or committee; (2) perform all reasonable duties, including outpatient services and emergency and disaster plan duties, when specifically assigned by the MEC; (3) pay all dues and special assessments levied by the Medical Staff; (4) serve when elected or appointed to a committee; (5) report to the hospital any final judgments or settlements in professional liability actions; and (6) supply to the Department Chief a copy of any report or proposed report submitted to the National Practitioner Data Bank ("NPDB") on her behalf. *Id*. at ¶ 81.

Levitin's privileges allowed her to use NCH's facilities, including equipped operating rooms, pre-op holding rooms, recovery rooms, and outpatient and inpatient beds. *Id*. at ¶ 82. NCH also provided Levitin with various services and equipment—including pharmacy, radiology, pathology, laboratory, endoscopy, fluoroscopy, intraoperative ultrasound, and monitoring services; surgical, laparoscopic, endoscopic, intubation, IV, CT, MRI, and intraoperative ultrasound equipment; implants and devices; blood products; IV antibiotics; anesthesia medication; all fluids; compression boots; catheters; sterile drapes; and surgical lights—that were vital to her practice and patient care. *Id*. at ¶ 83. NCH employed or was

affiliated with support personnel, sterile supplies personnel, nurses, anesthesia personnel, on-site radiologists and pathologists, critical care support, transport services, surgical assistants, technicians, and other physician consultants, hospitalists, and mid-level providers who were crucial in providing practice referrals to Levitin and in assisting her in the treatment of her patients. *Id*. at ¶ 84. Levitin was required to use NCH's anesthesia, nursing, and support staff services in the care and treatment of her patients at NCH and was required to schedule surgeries and equipment usage as prescribed by NCH. *Id*. at ¶ 85.

Although Levitin had admitting privileges for her own patients at NCH, she was also required to treat other NCH patients and to handle "call," and for that purpose she was included on a roster for calls within the Emergency Department and was required to continue treating NCH patients for whom she had cared while on call. *Id*. at ¶ 86. NCH prescribed which surgeons would be allowed to take trauma call, excluded Levitin and CSC surgeons from this call, and permitted ASA and its surgeons to take the call. *Id*. at ¶ 90. The Chief of the Department of Surgery and Operating Room Management could dictate the qualifications a surgeon must have to be on staff, the scope of a surgeon's duties and responsibilities for patients admitted or assigned to them for surgeries, and the circumstances under which a surgical assistant would be present. *Id*. at ¶ 103. Under the bylaws and the terms of the letters renewing Levitin's privileges, NCH also exercised some control over which general surgeries Levitin was permitted to perform, determined which NCH patients she was to treat and/or operate on, assigned and supplied her the surgery rooms, equipment, and staff to be used in performing general surgeries, determined scheduling for her and CSC's patients referred to NCH and NCH patients referred to her through the Emergency Department call roster, monitored her work hours, assigned her weekday and weekend call, monitored her performance and compliance with

hospital rules and regulations, prescribed the form, content, and deadlines of documentation she was required to prepare for each patient, and dictated to whom she could give medical orders. *Id*. at ¶¶ 87-89, 91-92.

Like other surgeons at NCH, Levitin was allowed to maintain privileges at other hospitals, and she in fact did so, but the "vast majority" of her practice was at NCH. *Id*. at ¶ 93. By 2009, 94% of CSC's and Levitin's practice revenues were earned at NCH. *Ibid*. NCH did not pay Levitin's salary, wages, or benefits, but it did pay disbursements to Levitin and CSC based on their participation in the NCH physician cooperative entity, and also to Levitin based on the capitated surgical program for HMO patients. *Id*. at ¶¶ 95-96.

Prior to NCH's revocation of her privileges on January 18, 2013, Levitin had distinguished herself as a doctor and surgeon and had earned an excellent reputation in the community. *Id*. at ¶¶ 2, 63. At all relevant times, she was the only female general surgeon and the only Russian-speaking general surgeon who was also Jewish. *Id*. at ¶¶ 63, 76-77. NCH attracts many female, Russian speaking, and elderly patients, and those patients have stated that they are more comfortable having their surgeries performed by Levitin. *Id*. at ¶ 3. Prior to the events at issue in this case, Plaintiffs' practice at NCH had steadily grown due to Levitin's professionalism, reputation, expertise, reliability, affability, sex, and ethnic and religious background. *Id*. at ¶ 4. Levitin received referrals from other physicians within and without the NCH community whose patients were to be admitted at NCH, and approximately 94% of CSC's revenues and at least 60% of Levitin's surgical practice consisted of patients that she treated and admitted to NCH or that were referred to her by NCH physicians. *Id*. at ¶ 5.

Beginning in or about 2008, Conway, the Chairman of the Surgical Audit Committee and the Chief of the General Surgery Section, began insulting, ridiculing, and yelling at Levitin,

engaging in heightened scrutiny of her surgeries, and threatening to sanction her if she did not accede to his personal demands as to how she handle emergency surgeries and treat her patients. *Id*. at ¶¶ 20-21, 109-110. Conway is at least six feet tall and Levitin is five feet six inches, and Conway would hover and tower over Levitin, subject her to intimidating and abusive behavior in the surgery area, and use offensive comments and a demanding, condescending tone of voice to ridicule and attack her professional abilities and competence. *Ibid*. Conway also accessed the private medical records of Levitin's patients to find grounds to second guess and question her professional competence and abilities. *Id*. at ¶¶ 21, 109-110. All of Conway's inappropriate behavior occurred in the surgery room suite and in and around patient floors and doctors' lounge areas at NCH, in the presence of nurses, medical staff, employees, and patients. *Id*. at ¶ 112. Conway singled Levitin out for belittling remarks, demeaning comments, and intimidating behavior based on her gender, ethnicity, and religion, and he treated her differently than he treated similarly situated male general surgeons. *Id*. at ¶ 111.

At all relevant times, NCH had in place a Disruptive Physician Policy approved and overseen by the MEC to ensure optimum patient care and to promote a safe, cooperative, and professional health care environment by preventing or eliminating conduct that disrupted the hospital's operation, negatively affected the ability of others to do their jobs, created a hostile work environment for hospital employees or medical staff members, interfered with an individual's ability to practice competently, or adversely affected the community's confidence in the hospital. *Id*. at ¶ 97. According to the policy, unacceptable conduct included verbal and physical attacks (including disruptive or offensive language and inappropriate nonverbal behavior or gestures) leveled at other medical staff members or hospital personnel that were beyond the bounds of professional conduct, and non-constructive criticism used in such a way as

to intimidate, undermine confidence, or belittle. *Id*. at ¶ 99. The policy recognized the rights of physicians and licensed providers to have certain personal and professional issues, including performance problems and concerns about competence, dealt with in a professional and confidential manner. *Id*. at ¶ 100. Under the terms of the policy, a single egregious incident or repeated incidents could initiate an investigative action, and corrective action could include written censure and/or reduction, suspension, or termination of privileges pending the investigative process. *Id*. at ¶ 98.

On or about December 24, 2008, Levitin sent a letter to the Medical Staff Office concerning Conway's verbal attacks. *Id*. at ¶ 114. On or about January 20, 2009, Dr. Cynthia Valukas (the then-President of NCH's Medical Staff), Smith, Levitin, and Conway met at NCH, and Smith and Valukas warned Conway to leave Levitin alone. *Id*. at ¶ 115. On or about July 13, 2009, Levitin wrote to Smith and Bruce Crowther (the President and CEO of NCH) to report continued unwelcome, disruptive, and harassing conduct by Conway. *Id*. at ¶ 116. Specifically, Levitin reported that on July 1, 2009, Conway falsely stated to one of her patients that Levitin had had two disastrous complications in the operating room and that the patient should not allow Levitin to operate on her, which led the patient to use Conway instead of Levitin for surgery. *Ibid*. NCH did not respond to that letter. *Ibid*. On or about August 6, 2009, Levitin's counsel wrote to Smith asking what action NCH would take to cause Conway to cease his behavior and requesting that NCH legal counsel become involved. *Id*. at ¶ 117. Levitin's counsel did not receive a response to that letter. *Ibid*. On or about September 2, 2009, Levitin's counsel again wrote to Smith requesting a response regarding the remediation of Conway's harassment. *Id*. at ¶ 118. On or about September 15, 2009, NCH (through Smith) acknowledged its awareness that Conway used an improper tone of voice with Levitin and assured Levitin's counsel that Conway

had been told in "very strong terms" not to be involved with her at all and that Smith had spoken to Conway's senior partner about controlling him. *Id*. at ¶¶ 119-120. Neither Smith nor NCH took any action against Conway pursuant to the Disruptive Physician Policy, and nor did they refer him for investigation; instead, NCH told Levitin to contact Soper, Conway's partner, if she had any further problems. *Id*. at ¶¶ 115, 119-20.

In October and November 2009, Conway and Soper, in their respective capacities as Chief of the General Surgery Section and Chief of the Department of Surgery, signed off on renewing Levitin's attending staff privileges, and the Credentials Committee approved Levitin's reappointment. *Id*. at ¶¶ 68-70. On January 5, 2010, the MEC and the Board approved Levitin's reappointment, and the same day the Vice President of Medical Affairs advised Levitin that her reappointment to NCH's Medical Staff as a voting attending staff member had been approved through January 31, 2012. *Id*. at ¶¶ 70-71.

However, on or about January 27, 2010, Soper submitted to the MEC a list of 31 surgical cases over six years to support a request that the MEC review Levitin's activities and initiate corrective action against her. *Id*. at ¶¶ 23, 72, 121, 124. The list of cases was provided by Conway, who at the time was Chair of the Surgical Audit Committee and the General Surgery Section, and Loren, who was Chair of the NSQIP. *Id*. at ¶¶ 23, 72, 121. Soper and Conway falsely alleged that there were "concerns" and "complaints" going back five years concerning Levitin's practice and that Levitin was an "outlier" in the NSQIP data base for deep vein thrombosis and wound infection rates. *Id*. at ¶¶ 25, 124. Soper and Conway did this not out of a concern for patient safety, but rather as retaliation for Levitin's complaints against Conway and in order to interfere with her practice, which competed with ASA's, Soper's, Loren's, and Conway's practices. *Id*. at ¶ 123.

The resulting peer review process extended from January 2010 to January 2012. *Id*. at ¶ 27. The process consisted of an outside review of Levitin's surgical cases going back over six years, an investigative committee in 2010, another investigative committee in 2011, and a nine-day hearing before NCH's five-member Judicial Review Committee ("JRC"), a committee recommended by the MEC and appointed by the Board to act as a hearing panel and render a decision. *Id*. at ¶ 125. No male surgeon was subjected to such a peer review process despite having engaged in similar and/or more egregious conduct, and no investigation was initiated as to Conway's conduct toward Levitin. *Id*. at ¶¶ 27, 129.

Due to Levitin's complaints of harassment and bias, the 2010 investigative committee hired an outside expert to review the cases attached to Soper's request for corrective action. *Id*. at ¶ 129. On June 23, 2010, the committee issued its report, which recommended that no adverse corrective action be taken against Levitin but that her cases be subjected to quarterly prospective review through January 2012 by physicians not associated with Conway or ASA. *Id*. at ¶ 130. On July 6, 2010, the MEC adopted the committee's report in substantial part, but rejected the recommendation that members of ASA not participate in prospective reviews of Levitin's cases. *Id*. at ¶ 131. From July 2010 to August 2011, Levitin continued to practice general surgery at NCH without incident. *Id*. at ¶ 132.

On August 11, 2011, a nurse filed an occurrence report against Levitin, alleging that she had begun an upper endoscopy before the patient was properly sedated. *Id*. at ¶¶ 133-34. On September 27, 2011, Dr. Francis Lamberta, the Medical Staff's President, asked the 2010 investigative committee to reconvene to review the August 2011 endoscopy. *Id*. at ¶ 135. However, on October 28, 2011, Levitin was notified that a new investigative committee,

including only one member from the 2010 committee, had been appointed to review the August 2011 endoscopy. *Id*. at ¶ 136.

On December 1, 2011, the 2011 investigative committee issued a report to the MEC recommending that corrective action be taken against Levitin, and Levitin filed objections to the report. *Id*. at ¶ 137. On December 16, 2011, the MEC, on which Soper sat, notified Levitin that it had voted to terminate her staff membership and clinical privileges at NCH. *Id*. at ¶¶ 73, 139. At that time, Soper was a member and Vice President of the MEC and Secretary/Treasurer of the Medical Staff, Loren was Vice Chief of General Surgery and Chief of NSQIP, and Mahon and Barnett were Chief and Vice Chief of the General Surgery Section, respectively. *Id*. at ¶ 139.

On December 20, 2011, Levitin requested a hearing pursuant to the NCH bylaws, and on January 30, 2012, she received a pre-hearing notice identifying the cases in question, a list of witnesses expected to testify, and the members of the JRC. *Id*. at ¶¶ 140-42. The JRC hearing commenced on April 26, 2012 and occurred over nine days, ending on July 31, 2012. *Id*. at ¶ 143. The MEC and Levitin called fifteen witnesses (including experts) and submitted over forty exhibits, and the MEC, NCH, Levitin, and their attorneys made closing submissions. *Id*. at ¶¶ 74, 125, 200. One NCH male surgeon stated during the hearing that he was "alarmed by what I see as several 'run of the mill' or typical clinical issues or complications many of us have had during our careers, that have prompted such draconian disciplinary measures. … I have reviewed cases over the years I would consider much more egregious where the response was more in line with education adjustments or 'following trends' than what I hear is happening." *Id*. at ¶ 127. Levitin's post-hearing brief documented the numerous conflicted individuals involved in the investigation and NCH's objectionable actions throughout the process. *Id*. at ¶ 155. Before the JRC rendered its final decision, NCH administrators and physicians learned that Levitin was one

of the primary applicants and investors in an ambulatory surgical center that NCH publicly opposed. *Id*. at ¶ 158. NCH administrators filed a formal objection to the ambulatory surgical center with Illinois regulators and expended considerable resources in opposing the facility's license application, arguing that the competition could damage NCH, which was already losing millions of dollars and laying off hundreds of employees. *Ibid*.

On October 8, 2012, the JRC issued a 24-page decision and report finding that: (1) Levitin is a well-trained surgeon and technically competent; (2) Levitin did not pose a danger to patient safety and welfare; (3) Levitin's privileges should not be reduced, restricted, suspended, revoked, or denied; (4) Levitin should not be assigned a proctor or required to obtain approvals before rendering care; (5) no report is or was required to be filed with the NPDB; (6) there was little or no prescreening of the 31 cases, some more than six years old, prior to their submission as grounds for corrective action; (7) the cases, standing alone or considered together, did not evince a pattern of a lack of professional practice; (8) MEC's belief that Levitin will not learn and improve in the future, and its contention that Levitin's defending herself before the JRC reflected adverse professional judgment, were unwarranted; (9) the concerns with Levitin's practice should have been handled informally and should never have reached the JRC; and (10) mentoring would have worked to resolve the concerns raised by the corrective action. *Id*. at ¶¶ 12, 74, 126, 159, 193-94, 196. The JRC also observed that the 2010 investigative committee had noted the harassment of Levitin by Soper and Conway and recommended that any retrospective reviews of Levitin's future surgeries be conducted by physicians not associated with them. *Id*. at ¶ 195.

On October 19, 2012, Wendy Rubas, the NCH Vice President and General Counsel, sent a letter to Levitin stating that either side could appeal the JRC's decision to the Quality

Committee and that the appealing party had to show that the JRC's decision was not supported by "substantial evidence" based on the "hearing record, including any external reviews and timely responses from the practitioner and any internal peer review committee." *Id*. at ¶¶ 160-61. On October 24, 2012, Levitin responded to Rubas, preemptively objecting to the MEC's right to appeal and to the use of a Quality Committee as an intermediate step to the Board. *Id*. at ¶¶ 162-64. On October 26, 2012, the MEC submitted its notice of appeal from the JRC's decision; in November 2012, the MEC and Levitin submitted their appeal briefs; and on November 19, 2012, the Quality Committee issued a one-page ruling that reversed the JRC's decision and adopted the MEC's recommendation to terminate Levitin's medical staff membership and privileges. *Id*. at ¶¶ 167-71. On November 20, 2012, the Board affirmed the Quality Committee's decision without indicating that it had reviewed the JRC's decision or the administrative record. *Id*. at ¶¶ 172, 174, 197.

On November 21, 2012, Levitin filed suit in state court seeking for a temporary restraining order and preliminary injunction. *Id*. at ¶ 175. On December 17, 2012, the state court entered a preliminary injunction enjoining NCH from reporting the termination of Levitin's privileges to the NPDB, reinstating Levitin's medical staff membership and clinical privileges at NCH, finding that NCH had violated its bylaws and the IHLA in allowing the MEC to appeal the JRC's decision, and ordering that the JRC's decision be given directly to the Board for consideration. *Id*. at ¶ 177. On December 21, 2012, Crowther submitted a memorandum to the Board scheduling a special meeting for January 12, 2013, at which the Board would consider the JRC's decision. *Id*. at ¶ 178. On January 11, 2013, Levitin submitted to the Board numerous letters of support from physicians associated with NCH, including one from Dr. James Kane, Jr., a general surgeon on staff at NCH, who volunteered to serve as Levitin's mentor and to work

with the Board to implement an appropriate monitoring and proctoring program. *Id*. at ¶¶ 179-80. On January 12, 2013, the Board voted once again to terminate Levitin's medical staff membership and clinical privileges based not on the evidence presented before the JRC or the JRC's findings, but rather on the MEC's accusations against Levitin, which either had been rejected by the JRC or had not been raised by the MEC at the outset of the JRC hearing. *Id*. at ¶¶ 181, 184, 197. The Board did not provide Levitin with an opportunity for another hearing in connection with its revocation decision, and, despite NCH's representation that members of the Quality Committee would be recused from the January 12 meeting, Soper was present. *Id*. at ¶¶ 181-82, 200.

On January 17, 2013, the state court entered an order dissolving the preliminary injunction but staying enforcement of the order until the following day; on or about January 18, 2013, Defendants terminated and revoked Levitin's clinical privileges and staff membership at NCH; and on or about January 21, 2013, Defendants filed an Adverse Action Report with the NPDB. *Id*. at ¶¶ 13-15, 19, 63, 75, 186, 192. On January 31, 2013, Levitin submitted a request to Crowther, Crowther's successor, and the Board's Chairman for a hearing pursuant to the bylaws regarding NCH's decision to revoke her privileges, but her request was denied. *Id*. at ¶ 187. On June 12, 2013, Levitin asked NCH to retract and void its report to the NPDB because it had not been properly filed and was based upon false and unfounded allegations that had been explicitly rejected by the JRC, but NCH refused. *Id*. at ¶ 193. At other times, NCH revoked, conditioned, and restricted the privileges of other Jewish, Russian, and Eastern European surgeons and physicians—including CSC surgeons Kokocharov and Roginsky and Drs. Shevelev, Kanev, Garibashvillie, and Kern—for acts and practices that, when performed by similarly situated non-Russian, non-Eastern European, and non-Jewish physicians, did not result

in any revocation, curtailment, or conditioning of their privileges.  *Id*. at ¶ 108.  NCH also used

its credentialing process to deny and curtail the scope of services that other female, Jewish,

Russian physicians were permitted to provide to patients admitted at NCH.  *Id*. at ¶ 29.

As a result of Defendants' conduct, Levitin's and CSC's practice revenues fell to

approximately 38% of their levels prior to 2010.  *Id*. at ¶ 93.  Levitin "has maintained staff and

clinical privileges at other hospitals, including the Condell, Alexian Brothers and Resurrection

hospital groups."  *Id*. at ¶¶ 50, 300.  The court takes judicial notice that Condell Hospital is

located in Libertyville, Illinois, *see* http://www.advocatehealth.com/condell (last visited Aug. 11,

2014); that Alexian Brothers has hospital facilities in Elk Grove Village and Hoffman Estates,

Illinois, *see* http://www.alexianbrothershealth.org/locations (last visited Aug. 11, 2014); and that

Resurrection has hospital facilities in the northwest section of Chicago, *see*

http://www.reshealth.org/locations/default.cfm (last visited Aug. 11, 2014).  The court also takes

judicial notice that NCH, which as noted above is located in Arlington Heights, is in the same

general vicinity (as close as about seven miles and as far as twenty miles) as the Condell,

Alexian Brothers, and Resurrection hospital facilities.

## Discussion

## I.     Immunity Under the Health Care Quality Improvement Act and the Illinois Hospital Licensing Act

The Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. 11101 *et seq*.,

provides that participants in "a professional review action" meeting certain standards specified in

§ 11112(a) "shall not be liable in damages under any law of the United States or of any State …

with respect to the action."  42 U.S.C. § 11111(a); *see Austin v. Am. Ass'n of Neurological*

*Surgeons*, 253 F.3d 967, 974 (7th Cir. 2001) ("the Act immunizes hospitals from liability for

disciplinary actions they take against staff physicians, provided only that the hospital is acting in

good faith").  Section 11112(a) requires that the professional review actions be "taken— (1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts."  42 U.S.C. § 11112(a).  The HCQIA's "reasonable belief" standard turns on objective reasonableness given the totality of the circumstances, and is satisfied if "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients."  *Poliner v. Tex. Health Sys.*, 537 F.3d 368, 378 (5th Cir. 2008) (internal quotation marks omitted); *see also Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 468 (6th Cir. 2003); *Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 32 (1st Cir. 2002); *Imperial v. Suburban Hosp. Ass'n*, 37 F.3d 1026, 1030 (4th Cir. 1994); *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1323 (11th Cir. 1994). Professional review actions are presumed to have met this standard, and immunity is presumed to apply unless the presumption is rebutted by a preponderance of the evidence.  *See* 42 U.S.C. § 11112(a).  HCQIA immunity does not turn on the good or bad faith of the reviewers or on whether their conclusions were in fact correct.  *See Poliner*, 537 F.3d at 378; *Brader v. Allegheny Gen. Hosp.*, 167 F.3d 832, 840 (3d Cir. 1999); *Imperial*, 37 F.3d at 1030.

The IHLA includes a similar immunity provision, which states that "no hospital … shall be liable for civil damages as a result of the acts, omissions, decisions, or any other conduct, except those involving wilful or wanton misconduct, of … any … committee or individual whose purpose … is internal quality control … or the improving or benefiting of patient care and

treatment." 210 ILCS 85/10.2. The IHLA defines "[w]ilful and wanton misconduct" as "a course of action that shows … an utter indifference to or conscious disregard for a person's own safety and the safety of others." *Ibid*.

Defendants contend that the HCQIA and IHLA protect them from damages liability because Levitin's peer review process "met all of the statutory requirements [of the HCQIA]" and served the purpose of internal quality control and improving patient care within the hospital. Doc. 16 at 10-13; *see also* Doc. 21 at 8, 14-16. Plaintiffs respond that the HCQIA does not apply because the review process was taken not "in the reasonable belief that the action was in the furtherance of quality health care," but rather to retaliate against Levitin for complaining about Conway's behavior, to penalize her as a female surgeon, and to drive Plaintiffs out of business. Doc. 20-1 at 10-11; *see also* Doc. 1 at ¶¶ 23, 27, 121, 123-24. Plaintiffs add that the IHLA does not apply because Defendants' rejection of the JRC's findings and conclusions, filing of a false NPDB report, and termination of Levitin's clinical privileges and medical staff membership constitute "wilful or wanton misconduct." Doc. 20-1 at 10-11; *see also* Doc. 1 at ¶ 193.

Plaintiffs' factual allegations, which are set forth at length in the Background section, and which are assumed true at this stage, provide plausible grounds (1) to doubt that Defendants acted under the reasonable belief that their actions were taken in the furtherance of quality health care and (2) to conclude that Defendants engaged in wilful and wanton misconduct. Although evidence adduced in discovery and presented on summary judgment or at trial may cast the case in a different light, Plaintiffs have pleaded facts that, if true, would deprive Defendants of immunity under the HCQIA and the IHLA. *See Mullapudi v. Mercy Hosp. & Med. Ctr.*, 2007 WL 4548293, at *9 (N.D. Ill. Dec. 17, 2007) (holding that "although the HCQUIA may provide immunity to the Defendants in this case, the [amended complaint's] allegations present factual

issues regarding the requirements of the HCQUIA," and that "although the IHLA … may warrant immunity if the Defendants' conduct does not amount to 'willful and wanton misconduct,' at this stage of the litigation, Plaintiff has sufficiently pled allegations which could support a finding of willful and wanton misconduct"); *Vakharia v. Swedish Covenant Hosp.*, 824 F. Supp. 769, 779-80 (N.D. Ill. 1993) ("The ASA defendants rely upon the HCQIA in their motion to dismiss, but the short answer is that plaintiff has alleged, on various grounds, that the ASA defendants are not within the immunity provided by that statute. … We conclude that plaintiff can proceed with her section 1 claim based upon her termination of privileges against the hospital [and other defendants].") (internal citation omitted).  Given this holding, there is no need to address Plaintiffs' alternative argument that Defendants failed to satisfy the notice and hearing requirements for immunity under the two statutes.

## II.     Federal Antitrust Claims (Counts I-IV)

Counts I-IV of the complaint allege restraint of trade, attempt to monopolize, conspiracy to monopolize, and monopoly in violation of the Sherman Act, 15 U.S.C. § 1 *et seq*.  Defendants argue that those claims should be dismissed because, among other reasons, Plaintiffs have failed to plead antitrust injury.  Doc. 16 at 14-19.  Defendants are correct, so the antitrust claims are dismissed on that ground.

Settled precedent holds that an antitrust complaint "must plausibly plead the existence of an antitrust injury; this requires factual allegations suggesting that the 'claimed injuries are of the type the antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation.'"  *Tamburo v. Dworkin*, 601 F.3d 693, 699 (7th Cir. 2010) (quoting *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006)); *see also Robert F. Booth Trust v. Crowley*, 687 F.3d 314, 317

(7th Cir. 2012); *Wigod v. Chi. Mercantile Exch.*, 981 F.2d 1510, 1515 (7th Cir. 1992); *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 364 (7th Cir. 1990). "In most instances, a plaintiff must demonstrate consumer injury … to assert antitrust violations." *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 433 F.3d 1024, 1031 (7th Cir. 2006). This means that the "injury must involve loss [that] comes from acts that reduce output or raise prices to consumers" in the relevant market. *James Cape & Sons, Co. v. PCC Constr. Co.*, 453 F.3d 396, 399 (7th Cir. 2006) (internal quotations omitted, alteration in original); *see also Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992); *Chi. Prof'l Sports L.P. v. Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992); *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1564 (7th Cir. 1991); *Ball Mem'l Hosp., Inc.* v. *Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986) (characterizing "higher prices or lower output" as "the principal vices proscribed by the antitrust laws").

The factual allegations underlying the federal antitrust claims concern NCH's decisions regarding who may hold privileges and practice at the hospital. As the Seventh Circuit has explained, a hospital "staffing decision does not *itself* constitute an antitrust injury," for "[i]f the law were otherwise, many a physician's workplace grievance with a hospital would be elevated to the status of an antitrust action." *BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area Hosp. Ass'n*, 36 F.3d 664, 669 (7th Cir. 1994) (emphasis added, internal quotation marks omitted). Accordingly, a hospital staffing decision can give rise to an antitrust injury only if "there is an impact on competition within the relevant market." *Ibid.*; *see also Kochert*, 463 F.3d at 717. In an effort to satisfy this requirement, Plaintiffs allege that Defendants misused the peer review process and revoked Levitin's privileges to eliminate Plaintiffs and other Jewish, Russian, and Eastern European general surgeons as competitors in the market for "general surgery services in

the community serviced by Northwest Community Hospital." Doc. 1 at ¶¶ 11, 24, 207; Doc. 20-1 at 18. Plaintiffs add that "[Defendants'] conduct increases the cost to the public of obtaining general surgical services and denies the public access to the only female general surgeon, who is also Jewish, Russian, and fluent in Russian in the area." Doc. 1 at ¶ 30.

These allegations are insufficient to plead antitrust injury. NCH is located in Arlington Heights, a northwest suburb of Chicago. Doc. 1 at ¶ 33. As the complaint itself alleges, Levitin continues to "maintain[] full staff and clinical privileges at various other hospitals, including the Condell, Alexian Brothers and Resurrection hospital groups." Doc. 1 at ¶ 50. And as noted above, those hospitals are located in the same geographic vicinity as NCH—Condell is in Libertyville, Alexian has facilities in Elk Grove Village and Hoffman Estates, and Resurrection is in northwest Chicago. It therefore is undisputed that general surgery services—by Levitin herself, no less—were and remain available at other hospitals near NCH, which means that any injury caused by Defendants' actions affected only Plaintiffs as competitors and not competition generally. *See 42nd Parallel N. v E Street Denim Co.*, 286 F.3d 401, 405-06 (7th Cir. 2002) (holding that "[a]ntitrust laws protect competition and not competitors"). It follows that Plaintiffs have not pleaded antitrust injury. *See Fisher v. Aurora Health Care, Inc.*, 558 F. App'x 653, 656 (7th Cir. 2014) ("[A]lthough Fisher is arguably a direct competitor, the causal connection between his alleged injury and the alleged antitrust violation is tenuous at best. Fisher presents no evidence that patients in the Oshkosh metropolitan area are deprived of independent physicians. His argument is especially tenuous given that he has staffing privileges at other hospitals and medical facilities in the area."); *Elliott v. United Ctr.*, 126 F.3d 1003, 1005 (7th Cir. 1997) (affirming the dismissal of antitrust claims where "both price and output of peanuts in any geographic area that would be meaningful under the antitrust laws (at least

Chicago, we presume) are totally unaffected by the United Center's policies"); *BCB Anesthesia Care, Ltd.*, 36 F.3d at 668 ("The complaint in this case alleges that Passavant is the only acute care general hospital in Jacksonville, but Jacksonville is only twenty-five miles or so from Springfield, the state capital. Nothing in the complaint suggests that patients are foreclosed from going elsewhere in the unlikely event that they are involved in pricing decisions. … The plaintiffs can practice at Passavant or elsewhere—they are not disabled from practicing wherever they choose.").

### III.     Title VII Hostile Work Environment Claim (Count V)

Count V of the complaint is a Title VII hostile work environment claim. Defendants advance three grounds for dismissing the claim. Doc. 16 at 25-29. None have merit.

First, Defendants argue that the Title VII claim should be dismissed because Levitin was not employed by NCH. Doc. 16 at 25-27; Doc. 21 at 25-30. Title VII makes it "an unlawful employment practice for an *employer* … to … discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Title VII defines "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f). If Levitin was not employed by NCH, her Title VII claim fails. *See Robinson v. Sappington*, 351 F.3d 317, 332 n.9 (7th Cir. 2003) ("It is only the employee's employer who may be held liable under Title VII."); *Mays v. BNSF Ry. Co.*, 974 F. Supp. 2d 1166, 1169 (N.D. Ill. 2013) (same).

The complaint does not explicitly allege that Levitin was an employee of NCH. However, the Seventh Circuit recognized in *Alexander v. Rush North Shore Medical Center*, 101 F.3d 487 (7th Cir. 1987), that "a physician who enjoys hospital staff privileges does, under certain factual situations, share an indirect employer-employee relationship with the hospital

sufficient to invoke Title VII protection." *Id*. at 492. *Alexander* holds that a five-factor test governs whether a plaintiff is or was the defendant's employee:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payments and benefits, and (5) the length of the job commitment and/or expectations.

*Ibid*. (internal quotation marks omitted). *Alexander* explained that "the employer's right to control is the most important [of the five factors] when determining whether an individual is an employee or an independent contractor," and that "if an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Id*. at 493 (internal quotation marks and citations omitted). In holding that the hospital was entitled to summary judgment on the physician's Title VII claim, *Alexander* reasoned that because the physician possessed "significant specialized skills," listed as his employer on income tax returns his "personal wholly-owned professional corporation[, which] was responsible for paying his malpractice insurance premiums, … benefits, and … taxes," "never received any compensation, paid vacation, private office space, or any other paid benefits" from the defendant hospital, "had the authority to exercise his own independent discretion concerning the care he delivered to his patients based on his professional judgment as to what was in their best interests," "was not required to admit his patients to [the defendant hospital]," and "was free to associate himself with other hospitals if he wished," it "seem[ed] clear that the manner in which [the plaintiff] rendered services to his patients was primarily within his sole control." *Id*. at 493.

Like the plaintiff in *Alexander*, Levitin is a skilled specialist (surgeon) employed by her professional corporation (CSC), was not required to admit her patients to NCH, and was free to

associate herself with other hospitals. Although Levitin alleges that NCH required her to treat other NCH patients and to be on "call," *Alexander* held that similar policies "do not … establish an employer-employee relationship because the details concerning performance of the work remained essentially within the control of the [plaintiff]." *Id.* at 493 (internal quotation marks omitted). However, Levitin alleges that NCH exercised far greater control over her work than the defendant hospital exercised in *Alexander*, including, for example, by controlling which facilities, equipment, instruments, and staff she could use in surgery; dictating the scope of her duties and responsibilities for her patients and controlling which general surgeries and procedures she was permitted to perform; determining the schedule for her surgeries; and prescribing the form, content, and deadlines of the documents that she was required to prepare for each patient. Doc. 1 at ¶¶ 82-85, 87-89, 91-92, 102-103; Doc. 20-1 at 27-28.

These factual allegations, which are deemed true at the pleading stage, provide plausible grounds to conclude that Levitin was NCH's employee under the *Alexander* standard. *See Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 228-32 (2d Cir. 2008) (holding on summary judgment that genuine factual disputes precluded holding as a matter of law that the plaintiff physician was not the defendant hospital's employee); *Rao v. St. Joseph Hosp. & Health Ctr.*, 2001 WL 1816733, at *12-14 (S.D. Ind. Dec. 20, 2001) (same). It therefore would be inappropriate to dismiss the Title VII claim on the ground that Levitin is not NCH's employee.

Second, Defendants argue that Plaintiffs fail to allege that the conduct in question was tied to Levitin's status in a protected group. Doc. 16 at 27-28; Doc. 21 at 30-32. To plead a hostile work environment claim, Levitin must allege: "(1) that her work environment was both objectively and subjectively offensive; (2) that the harassment was based on her membership in a protected class; (3) that the conduct was either severe or pervasive; and (4) that there is a basis

for employer liability." *Dear v. Shinseki*, 578 F.3d 605, 611 (7th Cir. 2009); *see also Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 383 (7th Cir. 2012). As to the second prong, the Seventh Circuit has held that the plaintiff must establish that the conduct was tied in "character *or* purpose" to the plaintiff's protected status. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004) (emphasis added). This means that the conduct here need not have been explicitly anti-Russian, anti-Semitic, or anti-woman; rather, it could have been facially neutral as to Levitin's national origin, religion, and gender, yet motivated by those characteristics. *See Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011) ("Although a plaintiff does not need to identify an explicitly racial dimension of the challenged conduct to sustain a Title VII claim, she must be able to attribute a racial 'character or purpose' to it."), *aff'd*, 133 S. Ct. 2434 (2013); *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999) ("[W]e underscore that Anderson's conduct need not have been explicitly sexual or racial in order to create a hostile environment .... The complained of conduct must have either a sexual or racial character *or purpose* to support a Title VII claim."); *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 704 (7th Cir. 2001) ("In order to support his Title VII claim, Shanoff may point to Riperton-Lewis's facially discriminatory remarks, as well as any of her remarks and behavior that may reasonably be construed as being motivated by her hostility to Shanoff's race or religion.").

It is against this backdrop that Defendants argue that the complaint "does not allege <u>facts</u> to 'plausibly show' that the treatment to which she claims she was subjected was *because of* her gender, race or ethnicity." Doc. 21 at 30. That argument is unpersuasive. Plaintiffs allege that "defendants created a double standard, whereby ... corrective action ... policies were used to harass, retaliate against and damage Plaintiffs, as the only female, Russian and Jewish general surgeon on staff ... while similar, the same, or more serious surgical events by male surgeons ...

who were also not Russian or Jewish, were swept under the carpet"; that "NCH revoked, conditioned, and restricted the privileges of other Jewish, Russian and Eastern European surgeons and physicians including but not limited to CSC surgeon[s]"; and that "Conway singled Levitin out as the sole female, Eastern European, Jewish physician for verbal attack and abuse, offensive, demeaning and belittling remarks, questioning and challenging Levitin's skill and judgment as a surgeon and falsely accusing her of having disastrous outcomes … which disruptive behavior and bullying treatment was different than her similarly situated male general surgeons." Doc. 1 at ¶¶ 10, 108, 111, 217, 219. Plaintiffs also allege that during the JRC hearing, a male surgeon expressed his alarm that Levitin's "run of the mill" clinical issues had prompted such drastic measures given that he had reviewed other, more egregious cases that had not prompted such corrective action. *Id.* at ¶ 127. Taken together, these allegations provide plausible grounds to conclude that the mistreatment of Levitin, while not explicitly anti-Russian, anti-Semitic, or anti-woman, was "motivated by … hostility" to her protected characteristics. *Shanoff*, 258 F.3d at 704.

Third, Defendants argue that Plaintiffs have failed to allege the third element of the hostile work environment claim, that the conduct in question was severe or pervasive. Doc. 16 at 28-29; Doc. 21 at 32. This element of Levitin's claim "is in the disjunctive—the conduct must be *either* severe *or* pervasive." *Vance*, 646 F.3d at 469. This means that "one extremely serious act of harassment could rise to an actionable level as could a series of less severe acts." *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013). A court addressing this element must "look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Russell v. Bd. of Trs. of Univ.*

*of Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001) (internal quotation marks omitted); *see also Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 (7th Cir. 2011). In so doing, the court must bear in mind that Title VII does not impose a "general civility code" in the workplace, and that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted); *see also McPherson v. City of Waukegan*, 379 F.3d 430, 438 (7th Cir. 2004).

Defendants argue that Plaintiffs' allegations "[a]t best … rise to the level of 'sporadic inappropriate and rude comments,' which are not sufficient to maintain a hostile work environment claim." Doc. 16 at 28. But Plaintiffs allege far more than sporadic inappropriate and rude comments. For example, they allege that Conway "would hover over [Levitin], and advance physically toward and tower over her," and that he would "us[e] offensive comments, a demanding condescending tone of voice, ridicule, and unsubstantiated attacks on her" in front of others. Doc. 1 at ¶ 21. They also allege that Conway's inappropriate behavior occurred in the surgery room suite and in and around patient floors and doctors' lounge areas at NCH, in the presence of nurses, medical staff, employees, and patients. *Id*. at ¶ 112. They further allege that Defendants' mistreatment of Levitin was ongoing and persistent, an allegation supported by the fact that Levitin complained to NCH about Conway in December 2008, July 2009, August 2009, and September 2009. *Id*. at ¶¶ 114-118. Although discovery may cast things in a different light, the complaint's allegations about Conway's relentless conduct, if true, would allow a reasonable jury to conclude that Levitin's work environment was "permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Alexander v.*

*Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (internal quotation marks omitted); *see also Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) ("a relentless pattern of lesser harassment that extends over a long period of time also violates [Title VII]"); *Zayadeen v. Abbott Molecular, Inc.*, 2013 WL 361726, at *11 (N.D. Ill. Jan. 30, 2013) ("A jury could reasonably conclude that routinely being so ridiculed, mostly in the presence of his co-workers and superiors, altered the conditions of Zayadeen's employment.").

**IV.     State Law Claims (Counts VI-XIV)**

Defendants make no substantive challenge to the state law claims; instead, they argue only that those claims should be dismissed without prejudice under 28 U.S.C. § 1367(c) in the event that all of the federal claims are dismissed.  Doc. 16 at 29.   Because the Title VII claim survives dismissal, and because the state law claims "form part of the same case or controversy under Article III" as the Title VII claim, 28 U.S.C. § 1367(a), the court has and will retain supplemental jurisdiction over the state law claims.

**Conclusion**

For these reasons, Defendants' motion to dismiss is granted in part and denied in part. The Title VII hostile work environment claim and state law claims may proceed, while the federal antitrust claims are dismissed.  The dismissal is without prejudice and with leave to replead; although there is good reason to doubt that Plaintiffs could ever adequately plead antitrust injury, the court will give them one opportunity to try if they would like.  *See Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) ("As a general matter, Rule 15 ordinarily requires that leave to amend be granted at least once when there is a potentially curable problem with the complaint or other pleading.").  If Plaintiffs wish to replead the federal antitrust claims, they must file an amended complaint by September 2, 2014.  If Plaintiffs do not file an amended

complaint, Defendants shall answer the surviving portions of the complaint by September 9, 2014.  If Plaintiffs do file an amended complaint that repleads the federal antitrust claims, Defendants shall answer or otherwise plead to the repleaded federal antitrust claims, and shall answer the other claims, by September 23, 2014.

August 12, 2014

_____

United States District Judge