UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| YELENA LEVITIN and CHICAGO SURGICAL CLINIC, | ) |
| | ) |
| | )   13 C 5553 |
| Plaintiffs, | ) |
| | )   Judge Gary Feinerman |
| vs. | ) |
| | ) |
| NORTHWEST COMMUNITY HOSPITAL, ADVANCED SURGICAL ASSOCIATES, ALAN LOREN, WILLIAM SOPER, and DANIEL CONWAY, | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

**M**EMORANDUM **O**PINION AND **O**RDER

Yelena Levitin and Chicago Surgical Center, Ltd. ("CSC") filed this suit against

Northwest Community Hospital ("NCH"), Advanced Surgical Associates ("ASA"), Alan Loren,

William Soper, and Daniel Conway, bringing federal antitrust claims, a hostile work

environment claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*,

and state law claims for breach of contract, tortious interference with existing and prospective

business relations, defamation, false light, deceptive business practices, and negligent

misrepresentation. Doc. 1. The court dismissed the antitrust claims under Federal Rule of Civil

Procedure 12(b)(6) but allowed the Title VII and state law claims to proceed. Docs. 37-38

(reported at 64 F. Supp. 3d 1107 (N.D. Ill. 2014)). The court then denied Defendants' Rule 12(c)

motion for judgment on the Title VII claim on statute of limitations grounds. Docs. 120-121

(reported at 2015 WL 3663688 (N.D. Ill. June 12, 2015)). A two-week jury trial is set for

October 24, 2016. Doc. 139.

Now before the court are Defendants' summary judgment motion, Doc. 165, and

Plaintiffs' motion for partial summary judgment on the question whether Defendants are entitled

to immunity under the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101 *et seq.*, and the Illinois Hospital Licensing Act ("IHLA"), 210 ILCS 85/1 *et seq.*, from liability on the state law claims, Doc. 236. Related to the summary judgment motions are Plaintiffs' two motions to strike, Docs. 237, 301; Defendants' motion to strike, Doc. 281; and Defendants' motions *in limine* to disqualify Plaintiffs' experts, Docs. 142, 145. For the following reasons, Defendants' summary judgment motion is granted in part as to the Title VII claim and denied as moot in part as to the state law claims; Plaintiffs' summary judgment motion is denied as moot; Plaintiffs' motions to strike are denied in part and denied as moot in part; and Defendants' motion to strike and motions *in limine* are denied as moot. Moreover, with the sole remaining federal claim resolved, the court relinquishes its jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c)(3).

## Background

As the court reaches the merits only of Defendants' summary judgment motion, the following facts are set forth as favorably to Plaintiffs as the record and Local Rule 56.1 permit. *See Great W. Cas. Ins. Co. v. Robbins*, __ F.3d __, 2016 WL 4366769, at *2 (7th Cir. Aug. 16, 2016); *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am.*, 805 F.3d 278, 281 (7th Cir. 2015). Because Plaintiffs incorporate much of their Local Rule 56.1(a)(3) statement in support of their summary judgment motion, Doc. 211 at 2-19, into their Local Rule 56.1(b)(3)(C) statement in opposition to Defendants' summary judgment motion, Doc. 241, and into their summary judgment opposition brief, Doc. 243, the Local Rule 56.1(a)(3) statement (and Defendants' responses) will be considered part of the summary judgment record.

With leave of court, Plaintiffs twice made corrections to their motion for partial summary judgment, in which their Local Rule 56.1(a)(3) statement was embedded. Docs. 208-211, 227, 235-36. Plaintiffs represented to the court that the second correction, Doc. 236, which was filed after Defendants had already filed their Local Rule 56.1(b)(3)(B) response to Plaintiffs' Local Rule 56.1(a)(3) statement, Doc. 232, would change only two typographical errors, both within the argument section of the brief; Plaintiffs did not seek leave to make any changes to the Local Rule 56.1(a)(3) statement. Doc. 227 at 9-10. The second corrected motion nevertheless makes several changes to the Local Rule 56.1(a)(3) statement. *Compare* Doc. 211 at ¶¶ 36, 45, 48, 58, *with* Doc. 236 at ¶¶ 36, 45, 48 (adding names), *and id.* at ¶ 58 (changing a date). Although none of those changes are relevant to the court's resolution of the summary judgment motions, the court will treat the Local Rule 56.1(a)(3) statement in Plaintiffs' first corrected motion, Doc. 211 at 2-19, as the operative version for purposes of this opinion.

### A.      Factual Background

#### 1.      The Parties

Levitin is a female, Jewish physician of Russian descent licensed to practice medicine in Illinois. Doc. 232 at ¶ 1; Doc. 240 at ¶ 1. She is employed by CSC, a private medical practice, which she owns and operates. Doc. 240 at ¶¶ 1, 6.

NCH is a hospital licensed to operate under Illinois law. *Id.* at ¶ 2. ASA is a medical practice comprised of general surgeons, including Soper, Conway, and Loren. Doc. 232 at ¶ 3; Doc. 240 at ¶ 4. ASA's principal place of business is located within the NCH facilities. Doc. 240 at ¶ 3. Soper served as the chair of NCH's Department of Surgery in 2010, and was a member of NCH's Board of Directors from 2011 to 2013, NCH's Quality Committee in 2012, and NCH's Medical Executive Committee ("MEC") from 2011 to 2013. Doc. 232 at ¶ 4. The

MEC is a standing committee responsible for surveilling the quality of medical care and the ethical conduct of NCH's medical staff.  *Id*. at ¶ 12; Doc. 218-2 at 10.  Loren was an MEC member and the Department of Surgery chair and vice chair at various points between 2005 and 2012.  Doc. 232 at ¶ 6.  Conway served as the chair of the Surgical Audit Committee ("SAC"), a peer review committee within NHC's Department of Surgery, from 2004 to 2010.  *Id*. at ¶¶ 5, 14; Doc. 221-4 at 9, pp. 40-41.

### 2. Termination of Levitin's NCH Staff Privileges

From 2000 through January 2013, Levitin maintained credentials and clinical privileges at NCH.  Doc. 240 at ¶ 73; Doc. 283 at ¶ 2.  Starting in 2008, over the course of several confrontations, Conway insulted and ridiculed Levitin's medical judgment and surgical skills in front of her colleagues and patients.  Doc. 283 at ¶ 31; Doc. 317 at ¶¶ 6-16.  On one occasion, Conway entered the operating room without Levitin's permission and made her uncomfortable by questioning her surgical findings.  Doc. 317 at ¶ 7.  Levitin complained about Conway, who was reprimanded and instructed to leave Levitin alone.  Doc. 283 at ¶¶ 32, 34.

In late 2009, Soper, who at the time was the chair of the Department of Surgery, received a complaint against Levitin from Allan Malmed, a radiologist at NCH.  Doc. 179 at ¶ 3; Doc. 192 at 3-4, pp. 163-65; Doc. 283 at ¶ 37.  Malmed expressed concern over Levitin's competence and judgment, asserting his view that some of her work was inconsistent with sound medical practice.  Doc. 192 at 4, p.165; Doc. 240 at ¶ 22; Doc. 240-6 at ¶¶ 8-9.  More specifically, Malmed complained that Levitin was conducting procedures that were not indicated by a patient's diagnostic findings.  Doc. 192 at 4, p. 165; Doc. 240-6 at ¶¶ 8-9.

Soper previously had received complaints about Levitin from two other general surgeons, Bob Glass and John Peters.  Doc. 192 at 7, p. 184; Doc. 240 at ¶ 22.  Glass refused to work with

Levitin because he believed she was incompetent and felt uncomfortable performing surgeries with her. Doc. 192 at 9, pp. 197-98. Peters felt similarly, although he stated only a preference not to operate with Levitin. *Id*. at 9, p. 199. A doctor named Milano, who at the time was the head of pathology, also had complained to Soper that Levitin was requesting inappropriate procedures. *Id*. at 11, pp. 213-14.

After receiving those complaints, Soper conducted a retrospective review of Levitin's cases back to 2004. Doc. 283 at ¶ 37. Soper informed Levitin that some of her colleagues had complained about her work and that, as a result, he would be proactively reviewing her cases. Doc. 317 at ¶ 23. Soper memorialized his conversation with Levitin in a contemporaneous memorandum:

> I had a phone discussion with Dr. Levitin today in regards to concerns of mine and multiple other medical people who have brought to my attention some concerns regarding some of her cases and cases of her partners with either complications that occurred during procedures or concerns for potential complications. I expressed my concerns that some of the potential problems might be avoidable and may reflect some issues with judgment and some of the issues may reflect some technical ability and technical judgment during procedures. I offered my assistance to be a resource person to bounce questions off of and also expressed my concerns that major problems would certainly have a bad impact on her practice as well as would be bad for the hospital and also reflect poorly on the rest of the department of surgery. I stated that I would be reviewing her activities and her partner's activities proactively with the hopes to prevent major problems in the future and encouraged her to evaluate her and her group's surgical activities based on their clinical experience and judgment and to hopefully avoid episodes that could evolve into major problems. She expressed a willingness to use me as a resource if needed and also that she would like to discuss any specific issues with me when the need arises. She also offered to send me some copies of articles in regard to some of the clinical judgment and activities that have involved their cases.

Doc. 320-31 at 4.

Levitin does not recall Soper offering his assistance in this way. Doc. 317 at ¶ 23.

Plaintiffs assert that, as part of his review, Soper intended to cancel any surgeries that Levitin

had scheduled that he deemed inappropriate. Doc. 283 at ¶ 37. That assertion is not supported by the cited evidence; rather, Soper testified that he would review Levitin's work and, if he noticed anything unusual, he would bring it to her attention for reconsideration. *Ibid*.; Doc. 320-29 at 18, p. 260. So that assertion by Plaintiffs is disregarded.

In January 2010, acting on Malmed's advice, Soper asked the MEC to review Levitin's cases. Doc. 179 at ¶ 10; Doc. 213-2 at 2. The request stated: "Over the past five years or so there has been some concerns raised about her practice of surgery by multiple different people here at Northwest Community. As Chairman of the Department of Surgery, I have received complaints from nursing, anesthesia, and other surgical colleagues in regards to her practices." *Ibid*. Soper's request set off a series of events, described immediately below, that culminated in NCH's Board of Directors revoking Levitin's medical staff membership and clinical privileges. Doc. 240 at ¶ 70.

After receiving Soper's request, the MEC convened an investigative committee, which concluded that Levitin had deviated from the standard of care in four out of the thirty-one cases it reviewed. Doc. 213-9 at 8; Doc. 232 at ¶ 22; Doc. 240 at ¶ 27. The investigative committee recommended that corrective action *not* be taken against Levitin, but it did recommend that her cases be subject to quarterly retrospective reviews. Doc. 213-9 at 8; Doc. 232 at ¶ 22; Doc. 240 at ¶ 27. The MEC largely adopted the investigative committee's findings. Doc. 232 at ¶ 23.

But in 2011, following an incident where Levitin's patient suffered a laryngospasm during an endoscopy, the MEC reconvened the investigative committee. Doc. 214-8 at 3; Doc. 232 at ¶¶ 27, 31; Doc. 240 at ¶ 33; Doc. 283 at ¶ 41. This time, the investigative committee recommended corrective action. Doc. 232 at ¶ 33; Doc. 240 at ¶ 36; Doc. 283 at ¶ 43. Based on that recommendation, the MEC terminated Levitin's medical staff privileges. Doc. 232 at ¶ 36;

Doc. 283 at ¶ 43. Levitin requested a hearing before the Judicial Review Committee ("JRC"), which concluded that the termination of her privileges was unwarranted. Doc. 171 at 24-26; Doc. 232 at ¶¶ 38-39; Doc. 240 at ¶¶ 41, 46; Doc. 280 at ¶ 46. The Quality Committee conducted another layer of review, overturning the JRC and reviving the MEC's termination recommendation. Doc. 232 at ¶ 43; Doc. 240 at ¶ 56. The final call belonged to the NCH Board, which adopted the Quality Committee's conclusions and determined that Levitin's staff privileges should be terminated. Doc. 240 at ¶ 60.

### 3. Levitin's Compensation and Benefits

The parties disagree as to how Levitin was compensated. According to Defendants, Levitin did not receive compensation from NCH; rather, she billed her patients directly, collecting her fees from them and from third-party payors. Doc. 168 at ¶ 21. On this point, Levitin testified as follows:

> Q. The billing of your services was done by who, Doctor?
>
> A. The billing for my services?
>
> Q. Yes. Your services as a surgeon.
>
> A. Is done through the—through the billing software, which is a part of the Chicago Surgical Clinic operations.
>
> Q. And you and Chicago Surgical Clinic collect fees directly from payors, correct?
>
> A. For the most part.
>
> Q. Patients as well?
>
> A. Patients as well, yes.

Doc. 319-18 at 11, p. 269. Plaintiffs dispute Defendants' assertion, but they do so only by identifying *other* payments that Levitin received, which are described in the next two paragraphs.

Plaintiffs identify nothing in the record that contradicts Levitin's testimony about the manner in which she billed her patients.

Plaintiffs assert that NCH compensated Levitin in two ways. Doc. 243 at 22. First, they maintain that Levitin received payments from NCH PHO, a limited liability corporation created for NCH's physician hospital organization ("PHO"). *Ibid*.; Doc. 241 at ¶ 5. A physician could become a member of NCH PHO only if she was on NCH's medical staff and then separately credentialed by the PHO. Doc. 283 at ¶ 5. The PHO had an HMO agreement with BlueCross/BlueShield, and patients who subscribed to a specific insurance plan could see physicians at NCH under the terms of that agreement. Doc. 320-17 at 19, pp. 82-85. Non-NCH doctors were considered "out of network," and plan participants treated by such doctors would bear the financial costs of those visits. *Id*. at 19, p. 85. Levitin "applied for years and years and years, and then finally … was granted the permission to participate in the [PHO] program." Doc. 319-18 at 11, p. 271.

In Levitin's words, if arrangements are "through the physician health organization, then you get paid by the physician health organization. You participate with the insurers through that health organization." *Id*. at 11, p. 270. As evidence of these payments, Plaintiffs provide two Form 1099-MISCs listing $4,141.58 and $3,948.74 in income, with CSC identified as the recipient on both, NCH as the payor on the former, and "Northwest Community Health Partners" as the payor on the latter. Doc. 241 at ¶ 5; Doc. 317-6 at 6, 8. Viewed in the light most favorable to Levitin, this is evidence that she derived *some* income from her participation in the PHO, which existed to provide in-network insurance benefits and was a corporate entity distinct from NCH; it is not evidence that the PHO was a significant source of income or that NCH

compensated her directly other than on behalf of the PHO, and it does not contradict Levitin's own testimony that she generally billed patients directly.

Second, Plaintiffs maintain that NCH compensated Levitin through her participation in NPC-Cyberknife, a joint venture between NCH and certain physicians that leased medical equipment to NCH. Doc. 241 at ¶ 4; Doc. 320-17 at 20, pp. 88-89. The profits earned by the venture were distributed on a *pro rata* basis to the hospital and the physicians, based on ownership shares. *Id.* at 21, pp. 90-91. This, too, describes an additional income stream that Levitin enjoyed; it does not contradict her testimony about her billing practices. Thus, the undisputed facts are that Levitin billed her patients or their insurers directly, and that she also derived limited income from participation in NCH PHO and NPC-Cyberknife.

The parties also disagree about whether NCH provided employment benefits to Levitin. Defendants assert that NCH did not provide Levitin with any such benefits, including health insurance, paid vacation, or private office space. Doc. 168 at ¶ 20. Defendants further assert that they did not pay income or Social Security tax; issue any W-2 tax forms; pay for Levitin's worker's compensation or malpractice insurance; or cover her professional organization dues or licensing fees. *Ibid.*

Levitin disputes Defendants' assertions, citing to the portion of her Local Rule 56.1(b)(3)(C) statement concerning the payments she received from NCH PHO and NPC-Cyberknife. Doc. 240 at ¶ 20 (citing Doc. 241 at ¶¶ 4-5). But that portion of her Local Rule 56.1(b)(3)(C) statement does not specifically address whether Levitin received the above-referenced employment benefits, and so her denial of Defendants' assertion is meritless. Levitin's denial is further undermined by her own testimony:

> Q. You were never issues a W-2 by NCH, were you?
>
> A. Never issued W-2? I—I don't think so.

Doc. 319-18 at 10, p. 265.  And, later:

> Q. Did NCH pay your malpractice insurance premiums?
>
> A. No, they did not.
>
> Q. Your professional organization dues?
>
> A. No, they did not.
>
> Q. Your licensing fees?
>
> A. No, they did not.
>
> Q. Your worker's compensation insurance?
>
> A. No, they did not.
>
> Q. Did they provide you, that is NCH, any employment benefits?
>
> A. Did they provide any employment benefits?  Not to the full extent, other than being able to use their facilities.  And they did offer a health insurance policy that the individual doctors could have participated, and they offered the malpractice insurance policy that individual doctors could have participated in.
>
> Q. You elected not to?
>
> A. I never got a chance.  I think those offers were made right before this whole process started, and I just never was able to take advantage of those offers.
>
> Q. NCH was not responsible for paying income or social security taxes on your behalf?
>
> A. No, they are not.

Doc. 319-18 at 10, pp. 266-67.  The court thus treats as admitted the fact that Levitin received none of the above-referenced employee benefits.

### 4.      NCH's Alleged Control Over Levitin

Levitin's arrangement with NCH was non-exclusive, as she contemporaneously maintained privileges at other hospitals.  Doc. 240 at ¶ 19.  Plaintiffs dispute this statement, *ibid*.

(citing Doc. 241 at ¶ 3), but only to clarify that the "other facilities where Levitin had privileges were much smaller," Doc. 241 at ¶ 3. That is not a denial and is deemed an admission.

Levitin possessed specialized skills and knowledge from years of education and training not obtained during her tenure, was responsible for her own continuing education, and had to pay for her own training and education seminars. Doc. 240 at ¶¶ 9-10. Plaintiffs dispute these facts, and they support their denial by citing six paragraphs of their Local Rule 56.1(b)(3)(C) statement. *Ibid*. (citing Doc. 241 at ¶¶ 7-11, 28). Five of those paragraphs do not address whether Levitin had specialized skills and training that she did not get from NCH or whether she paid for her own continuing education. Doc. 241 at ¶¶ 7-11. The other paragraph asserts that NCH budgeted funds for continuing medical education, but it does not specify how that money was used other than "to assist medical staff members to identify physical and mental health problems." *Id*. at ¶ 28. That is not sufficient to undermine Defendants' assertion that Levitin paid her own educational expenses out-of-pocket. Those facts are accordingly admitted.

Defendants assert that NCH did not require Levitin to keep particular hours and allowed her to schedule her own procedures. Doc. 168 at ¶¶ 14, 16. But Plaintiffs point out, with record support, that Levitin had "on call" requirements. Doc. 241 at ¶ 24. Plaintiffs also note, again with record support, that NCH policy allowed an elective surgery to be bumped if the operating room was needed for an emergency surgery and that NCH imposed certain temporary scheduling restrictions on doctors who showed up late for procedures. Doc. 241 at ¶ 21. Levitin was further constrained by the availability of the operating room because her desired surgery times often were already booked. Doc. 283 at ¶ 22.

Defendants assert that NCH "did not impose any requirement on Dr. Levitin that she handle certain types or volumes of cases." Doc. 168 at ¶ 14. Plaintiffs dispute this assertion,

Doc. 240 at ¶ 14, by citing one of Levitin's reappointment applications, which had a section titled "Volume Review" and a box for indicating whether an outside reference was needed "due to low/no volume," Doc. 213 at 4. Plaintiffs also point to MEC meeting minutes stating that NCH reviewed volume reports "in detail" during the reappointment review process, at least for certain low-volume physicians, but that the information need not be included in packets reviewed by the MEC. Doc. 320-10 at 4. Viewing the facts in the light most favorable to Plaintiffs, this evidence suggests that there was no formal volume requirement, but that patient volume was a factor considered in reappointment.

NCH required Levitin to generate reports detailing the services she provided to patients; those reports were necessary for NCH's licensure requirements, accreditation, regulatory oversight, and insurance compensation. Doc. 240 at ¶ 15. Plaintiffs dispute the necessity of the reports, citing two paragraphs of her Local Rule 56.1(b)(3)(C) statement. *Ibid.* (citing Doc. 241 at ¶¶ 26-27). But those paragraphs do not undermine or contradict that fact; rather, they specify the nature of NCH's reporting requirements and the sanctions that could be imposed for failing to comply. Doc. 241 at ¶¶ 26-27. The fact accordingly is admitted.

NCH supplied the tools that physicians used during surgery. Doc. 240 at ¶ 17; Doc. 283 at ¶¶ 19-20. Physicians were generally limited to the set of tools NCH made available to them, but could request that NCH purchase specialized surgical instruments or materials. Doc. 283 at ¶ 20; Doc. 319-18 at 13, p. 279. Surgeons also could request specific support staff during surgeries, but NCH ultimately assigned surgical assistants based on availability. Doc. 240 at ¶ 18; Doc. 283 at ¶ 22; Doc. 319-18 at 14, pp. 281-82. Levitin could use her own non-NCH surgical assistants if they were credentialed and pre-approved by NCH. Doc. 283 at ¶ 23.

Defendants assert that "NCH did not supervise, direct, … or control the care that Levitin provided to her patients or her surgical decisionmaking," Doc. 168 at ¶ 11; that Levitin "exercised independent decisionmaking and her own professional judgment," *id*. at ¶ 12; that NCH did not pre-approve her surgeries or direct her consultation or diagnoses of patients, *id*. at ¶ 13; and that NCH permitted her to perform "whichever general surgeries and procedures she chose, as long as they corresponded with her privileges," *ibid*. Plaintiffs dispute these assertions. Doc. 240 at ¶¶ 11-13.

First, Plaintiffs submit that NCH controlled Levitin through its corporate bylaws and credentialing process, which "imposed restrictions and limitations on the medical staff's responsibility and authority over their patients." Doc. 241 at ¶ 7. The bylaws required each department chief to "[m]aintain continuing surveillance of the professional performance of all individuals having clinical privileges in the department." Doc. 217-15 at 17; Doc. 283 at ¶ 17. The bylaws also obliged NCH's Board and officers to "adopt policies and procedures to assure that the hospital's operations and the medical staff's conduct complied with federal and state laws," and provided that medical staff members could have their re-appointment applications denied or be subject to other disciplinary action "should they fail to comply or should there be a pattern of noncompliance." Doc. 283 at ¶ 8; *see also* Doc. 217-15 at 21. The bylaws stated, however, that "[e]ach Medical Staff member shall have primary responsibility and appropriate authority for his/her patients subject to such limitations as are contained in these Bylaws and in the Bylaws, Rules, and Regulations of the Medical Staff." Doc. 217-15 at 14.

Plaintiffs next submit that NCH controlled Levitin through the Department of Surgery's rules and regulations. Doc. 241 at ¶ 9. Those rules created the SAC, which was "responsible for monitoring quality of care within the department." Doc. 283 at ¶ 16; Doc. 317-4 at 5, § 18.

Plaintiffs characterize the rules as specific and mechanical—mandating, for instance, that "[a]ny tissue removed during a surgery had to be sent to NCH's pathology department." Doc. 241 at ¶ 27. That is wrong; the rules actually state that "[a]ll tissue removed at the operation shall be sent to the pathology department (*when* appropriate) *where* such examinations as may be considered *necessary* to arrive at a diagnosis will be performed." Doc. 317-4 at 4, § 7 (emphasis added).

Plaintiffs also say that the "Department prepared a list of a surgeon's permitted procedures and provided it to them. The privilege to perform procedures on the list would be extended to an individual surgeon after they completed certain steps," which involved obtaining written approval. Doc. 241 at ¶ 18. That is misleading; the rules actually state that only atypical procedures require that sort of express, surgeon-specific approval: "[T]he usual and customary procedures performed by board certified or board eligible specialists … will be made available to the individual surgeon. The privilege of performing procedures *not* included on the list will be extended [after obtaining written approval]." Doc. 317-4 at 3, § 4 (emphasis added). The rules further provide that surgical procedures "shall be performed only on consent of the patient or his/her legal representative, except in emergencies," and that "[a]ll operations performed shall be described to the patient or his/her legal representative by the operating surgeon." Doc. 317-4 at 4, § 5.

The upshot of this evidence, viewed in the light most favorable to Plaintiffs, is that Levitin had primary authority and fairly wide latitude to determine how best to treat her patients, but that she also had to follow certain procedures and had to operate within outer bounds prescribed by NCH's rules and bylaws.

**B. Motion to Strike**

Plaintiffs move to strike nearly every paragraph in every declaration cited by Defendants in their Local Rule 56.1(a)(3) statement. Doc. 237. The court resolves that motion only to the extent it touches upon matters pertinent to the ground on which Defendants' summary judgment motion is granted.

**1. Michael Hartke Declaration**

Michael Hartke joined NCH in 2010 as executive vice president of Clinic, Regional Services, and Information Technology. Doc. 174 at ¶ 2. In that role, Hartke "oversaw employed physician entities, including the NCH Medical Group, and the physicians within the entities, meaning those that act in the capacity of NCH employees." *Id*. at ¶ 3. In May 2013, he became NCH's chief operating officer ("COO") and executive vice president. *Id*. at ¶ 1.

Plaintiffs argue that Hartke lacks the personal knowledge required by Federal Rule of Evidence 602 to speak to Levitin's business relationship with NCH because he did not become COO until May 2013 and the events in question preceded that date. Doc. 240-2 at ¶¶ 1-3. That objection is meritless; although Hartke was promoted to COO in 2013, he joined NCH in 2010. Plaintiffs also argue that Hartke lacks personal knowledge because his pre-2013 position did not expose him to any relevant matters, meaning that his averments rest on inadmissible hearsay. Doc. 240-2 at ¶ 2. However, Hartke avers that he was familiar with the different types of relationships that NCH had with physicians practicing there. Doc. 174 at ¶ 4.

Hartke avers the following regarding those relationships. NCH had different arrangements physicians practicing there. *Id*. at ¶ 5. NCH could enter into employment agreements with physicians, or it could grant clinical privileges to independent members of the NCH medical staff, with those independent members retaining the right to hold privileges at

other hospitals. *Ibid*. Physicians who signed employment agreements received from NCH a salary and other benefits, and were subject to rules, regulations, and policies specific to employees. *Id*. at ¶ 6. Levitin was classified as an independent member and did not have an employment agreement with NCH. *Id*. at ¶¶ 8-9. Hartke details the specifics of Levitin's arrangement with NCH, many of which are discussed above. *Id*. at ¶¶ 10-24.

Plaintiffs raise dozens of meritless objections to Hartke's averments, including that: (1) Hartke lacks personal knowledge; (2) his averments lack foundation and are conclusory, incomplete, speculative, argumentative, and irrelevant; (3) he is not a designated expert witness and therefore cannot speak to the matters he addresses; (4) the declaration fails to cite to admissible evidence; (5) his averments violate the Best Evidence Rule because he fails to provide supporting documentation; (6) the declaration fails to define the terms "paycheck," "employee benefits," "independent member," "position," "other employees of the hospital," "years of education," and "specialized skills and knowledge," among others; (7) his averments contradict Levitin's deposition testimony; and (8) he assumes facts not in evidence. Doc. 240-2. These objections are meritless, and border on frivolous. To take one example, that a declaration does not cite *other* record evidence and contradicts somebody else's testimony provides no basis to strike the declaration.

Only two of Plaintiffs' objections warrant discussion. First, Plaintiffs complain that Hartke improperly asserts a legal conclusion in describing the "employment agreements" that NCH enters into with some physicians. Doc. 240-2 at ¶ 5. The court agrees that Hartke may not aver on the legal question of who is an employee and who is an independent contractor; that determination is reserved for this court. However, Hartke may aver that there is an agreement that NCH staff refer to as an "employment agreement" and that Levitin did not enter into any

such agreement. Second, Plaintiffs object that "independent member" is not a classification of medical personnel at NCH. *Id*. at ¶ 8. The sole basis for that objection is that NCH's bylaws reference no such classification. *Ibid*. But the absence of this term from the bylaws is not evidence that no such classification exists.

### 2. Allyson Jacobson Declaration

Allyson Jacobson is the medical director of the NCH Breast Program. Doc. 175 at ¶ 1. From 2007 through 2013, Jacobson was an independent member of NCH's medical staff with clinical and surgical privileges. *Id*. at ¶¶ 4-5. In August 2014, Jacobson became an "employed surgeon" at NCH. *Id*. at ¶ 6. At that time, she became subject to rules and regulations that had not been imposed on her when she was an independent member; among other things, she could no longer practice at other hospitals, and the income she generated belonged to NCH. *Ibid*. Moreover, when Jacobson was an independent member, she directed and controlled her own surgeries and procedures, could employ her own surgical assistants, and took on as many or as few cases as she chose. *Id*. at ¶¶ 10-11, 20. But in her new position as an employed surgeon, Jacobson became subject to NCH's productivity expectations, had to use NCH's surgical assistants, received a salary and benefits package, and was required to obtain specific certifications. *Id*. at ¶¶ 17-18, 20-21.

Plaintiffs move to strike Jacobson's declaration on several grounds. Doc. 240-4. Again, only two warrant discussion. First, Plaintiffs argue the declaration is irrelevant because Jacobson became an NCH "employee," as Jacobson uses the term, only after Levitin had lost her privileges. *Id*. at ¶ 1. That may be true, but Jacobson's averments are still probative of the different arrangements that NCH has with physicians; Plaintiffs' point to no evidence that those arrangements materially changed after Levitin lost her privileges. And, in any event, Jacobsen's

averments clearly *are* probative of the relationship between NCH and independent members dating back to 2007, a time period that overlaps with Levitin's practice at NCH.

Second, Plaintiffs state that the declaration violates the Best Evidence Rule because Jacobson discusses the terms of her agreement with NCH. The Best Evidence Rule provides that an "original writing, recording, or photograph is required in order to prove its content unless [the Federal Rules of Evidence] or a federal statute provides otherwise." Fed. R. Evid. 1002. But "[i]f a witness's testimony is based on his first-hand knowledge of an event as opposed to his knowledge of the document, … then Rule 1002 does not apply." *Waterloo Furniture Components, Ltd. v. Haworth, Inc.*, 467 F.3d 641, 648-49 (7th Cir. 2006). Here, Jacobson's averments concern how she was paid and which constraints NCH imposed on her practice, all without reference to any written contract. Her knowledge of those matters is based on her personal experience, and therefore her declaration does not violate the Best Evidence Rule.

### 3. Alexandra Roginsky Tsesis Affidavit

Alexandra Roginsky Tsesis is a physician who maintained clinical privileges at NCH and other hospitals. Doc. 184 at ¶ 3. Tsesis avers, among other things, that she never received a paycheck or employee benefits from NCH; that NCH did not direct or control the care she provided; and that she scheduled her own surgeries. *Id.* at ¶¶ 5-7. Plaintiffs move to strike Tsesis's declaration for reasons identical or substantially similar to those asserted as to Jacobson, none of which are persuasive. Doc. 240-7.

### 4. Allan Malmed Declaration

Allan Malmed works as a radiologist at Northwest Radiology Associates, which has an exclusive contract to provide radiology services to NCH. Doc. 179 at ¶ 3. Malmed avers that, as Levitin's colleague, he observed that her cases "were often not well prepared" and that she

sometimes performed procedures without first obtaining the proper radiological imaging. *Id*. at ¶¶ 7-9. As noted, he discussed these concerns with Soper and advised him to formally report the matter to the MEC. *Id*. at ¶ 10. Plaintiffs move to strike Malmed's declaration on various grounds, including that his averments are not corroborated by, or are contrary to, other record evidence. Doc. 240-6. For the reasons previously given, that is no reason to strike a declaration.

In sum, as to the portions of the four declarations cited above, Plaintiffs' motion to strike is denied. The motion otherwise is denied as moot, as are the parties' two other motions to strike.

## Discussion

### I.     Title VII Claim

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff "must prove the existence of an employment relationship in order to maintain a Title VII action." *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th Cir. 1991). "Independent contractors are not protected by Title VII." *Ibid*. If NCH was not Levitin's employer, her Title VII claim fails. *See Robinson v. Sappington*, 351 F.3d 317, 332 n.9 (7th Cir. 2003) ("It is only the employee's employer who may be held liable under Title VII."); *Mays v. BNSF Ry. Co.*, 974 F. Supp. 2d 1166, 1169 (N.D. Ill. 2013) ("Only an employer can be held liable under Title VII ….") (internal quotation marks omitted).

"In determining whether a business relationship is one of employee-employer, courts look to the economic realities of the relationship and the degree of control the employer

exercises over the alleged employee." *Knight*, 950 F.2d at 380 (internal quotation marks omitted). That determination turns on five factors:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 438 (7th Cir. 1996). "Of [the] several factors to be considered, the employer's right to control is the most important …." *Knight*, 950 F.2d at 378. "If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Ost*, 88 F.3d at 439.

The Seventh Circuit recognized in *Alexander v. Rush North Shore Medical Center*, 101 F.3d 487 (7th Cir. 1996), "that a physician who enjoys hospital staff privileges does, under certain factual situations, share an indirect employer-employee relationship with the hospital sufficient to invoke Title VII protection." *Id.* at 492. *Alexander* nonetheless held that the plaintiff physician's business arrangement with the hospital in that case did not qualify as an employment relationship, reasoning as follows:

> Dr. Alexander did not supply his own equipment or assistants, but he did possess significant specialized skills; he listed his employer on income tax returns as Central Anesthesiologists, Ltd., his personal wholly-owned professional corporation that was responsible for paying his malpractice insurance premiums, employment benefits, and income and social security taxes; he was responsible for billing his patients and he collected his fees directly from them; he never received any compensation, paid vacation, private office space, or any other paid benefits from Rush North Shore [the hospital]; he had the authority to exercise his own independent discretion concerning the care he delivered to his patients based on his professional judgment as to what was in their best interests; he was not required to admit his patients to Rush North Shore; and he was free to associate himself with other hospitals if he wished to do so. As in *Ost*, it seems clear that

the manner in which Dr. Alexander rendered services to his patients was primarily within his sole control.

*Id*. at 493.

The plaintiff physician in *Alexander* argued that he was an employee "because he was required to spend a specified amount of time per week 'on call' and because, by virtue of the nature of being an anesthesiologist, most of his operating room patients were assigned to him on a daily basis by the anesthesiology section head." *Ibid*. The Seventh Circuit rejected that argument, comparing Alexander's circumstances to those of the plaintiff in *Ost*. *Ibid*. In *Ost*, the Seventh Circuit held that the plaintiff was an independent contractor even though the limousine company with which he was affiliated "determined its drivers' starting times, required them to call in when they signed off duty, assigned the drivers' morning passengers, required that the drivers' vehicles be made available during certain times, set the rates the drivers charged, and determined which drivers would receive which customers." *Ibid*. (citing *Ost*, 88 F.3d at 438). Just as those constraints in *Ost* did not "establish an employer-employee relationship because the details concerning performance of the work remained essentially within the control of the driver," the plaintiff physician's on-call requirements and patient assignments in *Alexander* did not render him an employee of the hospital. *Ibid*.

When Defendants' Rule 12(b)(6) motion was denied, the court rejected their argument that it was clear from the face of the complaint that Levitin was not an NCH employee for Title VII purposes. 64 F. Supp. 3d at 1123-24. The court reasoned that "Levitin *allege[d]* that NCH exercised far greater control over her work than the defendant hospital exercised in *Alexander*, including, for example, by controlling which facilities, equipment, instruments, and staff she could use in surgery; dictating the scope of her duties and responsibilities for her patients and controlling which general surgeries and procedures she was permitted to perform; determining

the schedule for her surgeries; and prescribing the form, content, and deadlines of the documents that she was required to prepare for each patient." *Id*. at 1124 (emphasis added). On summary judgment, however, a plaintiff may not simply allege; rather, she must adduce evidence to back up her allegations. And on the summary judgment record here, no reasonable factfinder could conclude that Levitin was an NCH employee within the meaning of Title VII.

The record shows that Levitin's arrangement with NCH was strikingly similar to the arrangement in *Alexander*. Levitin possesses specialized skills acquired prior to her joining NCH; she was employed by her own medical practice, CSC; NCH did not provide her with employment benefits such as vacation or health insurance; NCH did not pay her Social Security taxes, malpractice insurance premiums, or professional and licensing dues; she billed her patients (or their insurance companies) directly; she had the primary authority to direct her patients' treatment, albeit within certain bounds set by the hospital's rules and bylaws; and she maintained privileges at other hospitals. In some ways, Levitin had even more control over her work than the plaintiff in *Alexander*—for instance, Levitin could request which surgical assistants to work with, and was even able to use her own non-NCH surgical assistants if she sought approval.

A close examination of the five above-referenced factors confirms that Levitin was not NCH's employee.

*1. Extent of Employer's Control*. Defendants are correct that Levitin largely controlled the means and manner of her delivery of patient services. Levitin herself testified that she ultimately decided how to treat her patients. Doc. 188 at 17, p. 273 ("I decide what to do as a surgeon."); *id*. at 17, p. 276 ("I decided about the actions that I take on my part as a surgeon."); *id*. at 18, p. 277 ("the proper surgical approach is my responsibility"). Levitin also maintained

privileges at other hospitals and remained employed by CSC during her NCH affiliation. Plaintiffs retort that NCH asserted control over Levitin, but their arguments are unpersuasive.

First, Plaintiffs point to the hospital's bylaws, which directed department chairs to "[m]aintain continuing surveillance of the professional performance of all individuals having clinical privileges in the department." Doc. 217-15 at 17; Doc. 241 at ¶ 17; Doc. 243 at 18. It is true that NCH monitored the treatment outcomes of Levitin's patients. What matters under governing precedent, however, is whether the employer controls "not only … the result to be achieved, but also … the details by which that result is achieved." *Ost*, 88 F.3d at 439. And as to those details, the bylaws made clear that "[e]ach Medical Staff member shall have primary responsibility and appropriate authority for his/her patients." Doc. 217-15 at 14.

Second, Plaintiffs focus on the various ways that NCH formally supervised and limited Levitin's practice: NCH required written approval if Levitin planned a surgery outside the scope of her privileges; the SAC monitored the quality of care in Levitin's department; and higher-ups peer-reviewed her and began to monitor which surgeries she scheduled. Doc. 243 at 17-20; Doc. 317-4 at 3, § 4. None of this indicates NCH's control for purposes of determining whether Levitin was an NCH employee under Title VII.

Medicine is a highly regulated field, and hospitals like NCH are legally required to adopt measures to ensure that physicians practicing there are ethically compliant and conduct only procedures for which they are credentialed. As the Fourth Circuit explained in *Cilecek v. Inova Health System Services*, 115 F.3d 256 (4th Cir. 1997), this mandated oversight function provides the baseline against which a hospital's control over physicians must be measured. *See id.* at 261-62. As here, the plaintiff physician in *Cilecek* "was required to abide by hospital rules and regulations for the treatment of patients, which regulated his work at the hospitals in substantial

detail." *Id*. at 261. Those rules and regulations, however, "relate[d] to the professional standard for providing health care to patients …. If the hospitals did not insist on such details in the performance of professional services by doctors at their facilities, they would be exposing themselves to recognized professional liability." *Id*. at 262. The Fourth Circuit reasoned that, while the "doctor must have direct control to make decisions for providing medical care, … the hospital must assert a degree of conflicting control over every doctor's work—whether an employee, an independent contractor, or a doctor merely with privileges—to discharge its own professional responsibility to patients." *Id*. at 260. Given this backdrop, the Fourth Circuit held that the hospital's regulations were "not … a reliable indicator" that the physician was the hospital's employee for Title VII purposes. *Id*. at 262. Likewise, in *Wojewski v. Rapid City Regional Hospital, Inc.*, 450 F.3d 338 (8th Cir. 2006), which interpreted the Americans with Disabilities Act's analogous requirement of an employer-employee relationship, the Eighth Circuit held that the plaintiff physician, who worked under the supervision of a monitoring physician at the hospital, was not an employee because the hospital "could take reasonable steps to ensure patient safety and avoid professional liability while not attempting to control the manner in which Dr. Wojewski performed operations." *Id*. at 344.

This reasoning applies with equal force here. The fact that NCH required Levitin to obtain permission before performing surgeries outside the scope of her privileges, for instance, was simply a consequence of the credentialing process. Nor did the existence of audit or review mechanisms mean that NCH asserted control over her in a manner meaningful to the Title VII analysis. The pertinent question is whether Levitin had control over the details of her work— that is, whether she had discretion to decide how best to treat her patients. *See Alexander*, 101 F.3d at 493 (holding that a doctor who "had the authority to exercise his own independent

discretion concerning the care he delivered to his patients based on his professional judgment as to what was in their best interests" was not an employee because "the manner in which [he] rendered services to his patients was primarily within his sole control"); *Ost*, 88 F.3d at 438-39 (holding that limousine drivers were not employees because "the details concerning performance of the work remained essentially within the control of the driver"). The answer is indisputably yes. Although NCH's bylaws and rules established certain boundaries delineating what Levitin could and could not do, they nevertheless granted her primary responsibility for her patients' care, and she was pre-approved to perform procedures typical of a physician with her credentials.

Plaintiffs' brief argues that "[a]t various times, NCH told [Levitin] … what tests to obtain …." Doc. 243 at 18. But there is no citation for this proposition, and an independent review of the summary judgment record reveals no evidence to support it. The only two points that tangentially touch on the subject are Plaintiffs' assertions that (1) department rules required Levitin to send all tissue samples to pathology, Doc. 241 at ¶ 27, and (2) NCH found fault with various aspects of her practice during the peer review process, Doc. 211 at ¶ 19. The first assertion is simply not true, as department rules stated that "tissue removed at the operation shall be sent to the pathology department (when appropriate) where such examinations as may be considered necessary … will be performed"—which granted discretion to the surgeon. Doc. 317-4 at 4, § 7. As to the second, the only evidence that the peer reviews found fault with her work is her deposition testimony concerning a particular case in which reviewers concluded that she should have obtained preoperative imaging but did not. Doc. 188 at 7-9, pp. 203-210. But as to that case, Levitin testified that after the committee's finding, she ordered preoperative imaging in similar circumstances because she believed it to be the correct diagnostic approach, not because she lacked discretion whether to do so. *Id*. at 9, p. 209. Moreover, there is nothing

to indicate that the committee's actions in that case went beyond the ordinary oversight that a hospital must exercise over medical procedures performed at its facilities—oversight that the Eighth Circuit in *Wojewski* and the Fourth Circuit in *Cilecek* held did not establish control for Title VII purposes. *See Wojewski*, 450 F.3d at 344; *Cilecek*, 115 F.3d at 261-62.

Plaintiffs rely heavily on *Salamon v. Our Lady of Victory Hospital*, 514 F.3d 217 (2d Cir. 2008), to support their view that NCH exercised control over Levitin. Doc. 243 at 17-20. In *Salamon*, the district court dismissed the plaintiff physician's Title VII claim against a hospital upon concluding that she was an independent contractor, not an employee, on the ground that she "had ultimate control over the GI diagnoses, services and treatment plans that the provided to her patients." *Id*. at 228. The Second Circuit reversed. Like the Fourth and Eighth Circuits, the Second Circuit recognized that "hospital policies that merely reflect professional and governmental regulatory standards may not typically impose the kind of control that marks an employment relationship." *Id*. at 229. But the Second Circuit concluded, on the factual record before it, that the hospital's control over the plaintiff went beyond merely adhering to professional and regulatory standards; the hospital "did not merely review the quality of [the plaintiff's] patient treatment outcomes but went further, by mandating performance of certain procedures … and the timing of others … , directing which medications she should prescribe." *Ibid*. That distinguishes *Salamon* from this case, where the record does not support a finding that Defendants directed Levitin to perform certain procedures or otherwise controlled how she treated her patients, and where NCH constrained Levitin in scheduling her procedures only insofar as doing so was necessary to ration limited operating room resources among multiple surgeons. And given that this case is on all fours with *Alexander*, *Salamon*, an out-of-circuit case, cannot mandate a different outcome.

Plaintiffs next argue that NCH controlled Levitin through Conway's bullying and intimidation. Doc. 243 at 18. By interfering with her patient relationships, the argument goes, Conway micromanaged Levitin's practice. *Ibid.* Relatedly, Plaintiffs maintain that NCH's peer review practices extended beyond "those mandated by professional and governmental regulatory standards" given that she was singled out for additional scrutiny that, she asserts, was retaliation for her complaints about Conway. Doc. 243 at 19. These arguments are unpersuasive. For Title VII purposes, the question whether Levitin is an NCH employee is logically anterior to the question whether NCH discriminated against her—for if she was not an employee, then Title VII does not apply, and if Title VII does not apply, then NCH's peer review practices and Conway's bullying, even if motivated by discriminatory animus, do not violate Title VII.

Finally, as additional evidence that NCH controlled the details of Levitin's work, Plaintiffs point to her operating room scheduling difficulties, her on-call requirements, the assignment of some on-call patients to her, and the paperwork that NCH required her to complete. But just as the plaintiff's on-call requirements and patient assignments in *Alexander* and the plaintiff's schedule requirements in *Ost*—both of which provided less flexibility than the constraints imposed on Levitin—did not render the plaintiffs in those cases employees, neither do scheduling constraints render Levitin an NCH employee here. Levitin's recordkeeping obligations were necessary for NCH's licensure requirements, accreditation, regulatory oversight, and insurance compensation, and the need to ensure compliance with state and federal regulations was the driving force behind NCH's rules and procedures. Doc. 240 at ¶ 15; Doc. 283 at ¶ 8. In any event, the fact that NCH required Levitin to record the services she provided to patients at NCH does not constitute control for Title VII purposes. *See Ashkenazi v. S. Broward Hosp. Dist.*, 607 F. App'x 958, 964 (11th Cir. 2015) ("[T]he record-keeping tasks about

which Dr. Ashkenazi complains are administrative tasks required by the [defendant] that in no way interfered with or controlled the manner or means by which he performed his job.").

In sum, even viewing the record in the light most favorable to Plaintiffs, NCH did not exercise the degree of control over Levitin that would point towards her being an NCH employee, given that "the manner in which [she] rendered services to [her] patients was primarily within [her] sole control." *Alexander*, 101 F.3d at 493; *see also Ashkenazi*, 607 F. App'x at 963-65 (holding that the plaintiff surgeon was not controlled by the defendant hospital even though the hospital required him to have proctors present during some surgeries and prohibited him from performing limb salvage surgeries on elderly patients); *Shah v. Deaconess Hosp.*, 355 F.3d 496, 500 (6th Cir. 2004) (holding that the plaintiff physician was not an employee of the defendant hospital, even though he was required to abide by the applicable standard of care, because the hospital's enforcement mechanism took place "after-the-fact, through the peer review process," and "[n]othing in the record suggests that [the hospital] has the right to interfere with [the plaintiff's] medical discretion or otherwise control the manner and means of his performance as a surgeon"); *Diggs v. Harris Hosp.-Methodist, Inc.*, 847 F.2d 270, 273 (5th Cir. 1988) ("While the hospital supplies the tools, staff and equipment utilized by Diggs in delivering medical care at the hospital, and while it imposes standards upon those permitted to hold staff privileges, the hospital does not direct the manner or means by which Diggs renders medical care."); *McPherson v. HCA-HealthOne, LLC*, 202 F. Supp. 2d 1156, 1167 (D. Colo. 2002) ("[T]he fact that the Medical Center set professional standards for doctors to meet, and conditioned staff privileges upon compliance with these standards, does not alter the status of doctors from that of independent contractors to one of employees.").

*2. Nature of Work and Skills Required.*  There is no dispute that Levitin's work as a general surgeon required specialized skills that she obtained prior to obtaining privileges at NCH.  Levitin argues, however, that NCH's continuing medical education requirements made NCH responsible for developing her professional skills.  Doc. 243 at 21.  But while NCH may have set the bar for staff members' continuing medical education, Levitin bore the responsibility of obtaining continuing education credits and had to pay for them herself.  This factor weighs against Levitin being an employee.  *See Diggs*, 847 F.2d at 273 (holding that a physician with staff privileges was not an employee in part because the hospital did not pay her professional dues or licensing expenses); *Abbott v. Vill. of Westmont*, 2003 WL 22071492, at *5 (N.D. Ill. Sept. 5, 2003) (holding that this factor weighed against finding an employment relationship where the defendant did not pay for the plaintiff's continuing education); *Clark v. Marietta Surgical Ctr., Inc.*, 1999 WL 1043772, at *7 (N.D. Ga. Mar. 18, 1999) (holding that an anesthesiologist was not an employee of a hospital, in part because her "licensing and professional fees were … paid through her personal corporation rather than by [the hospital]").

*3. Responsibility for Costs of Operation.*  NCH indisputably owns, operates, and maintains the facilities and equipment that Levitin used.  This factor weighs in favor of finding an employment relationship.

*4. Method of Compensation.*  Levitin did not receive a salary or employment benefits from NCH; in her own words, she "for the most part" directly billed and collected from her patients through CSC.  Doc. 319-18 at 11, p. 269.  Levitin did receive limited income through her membership in the NCH PHO.  But the record shows that the PHO operated as an in-network insurance plan for certain patients and was a corporate entity separate from NCH.  For the same reasons, Levitin's distributions from her Cyberknife investment cannot reasonably be considered

as compensation from NCH.  Levitin's participation in NCH PHO and Cyberknife are best understood as separate arrangements that did not provide salary or compensation from NCH.

Plaintiffs' own evidence reinforces that conclusion.  Although the record shows that NCH made one payment to Levitin on the PHO's behalf, the amounts of the PHO-related payments—roughly $4,000 per year—plainly were a small fraction of her earnings.  And even if the payments did stem from work performed directly for NCH itself, the fact that NCH's payments to Levitin were reported on a Form 1099 cuts *against* Plaintiffs' position that she was an employee for Title VII purposes.  *See Jones v. A.W. Holdings LLC*, 484 F. App'x 44, 47 (7th Cir. 2012) (in holding that the plaintiff was not an employee, noting that, "[i]mportantly, [the plaintiff] received her entire pay as 'nonemployee compensation,' reported on IRS Form 1099"); *Taylor v. ADS, Inc.*, 327 F.3d 579, 581 (7th Cir. 2003) (in finding no employment relationship, noting that the defendant's payments to the plaintiff "were reported on a Form 1099 as independent contractor payments, not on a W-2").  This factor weighs against finding an employment relationship.

*5. Length of Job Commitment*.  Levitin was required to renew her NCH privileges periodically, and she was free to (and did) associate with other hospitals.  The noncommittal and non-exclusive nature of Levitin's position at NCH weighs against finding an employment relationship.  *See Alexander*, 101 F.3d at 493 (holding that a physician was not an employee in part because "he was free to associate himself with other hospitals if he wished to do so"); *Shah*, 355 F.3d at 500 (holding that a physician was not an employee in part because he "contracts freely with other hospitals"); *Cilecek*, 115 F.3d at 262 (holding that, despite the plaintiff's "enduring relationship" with the defendant hospital, he was not an employee in part because he "at various times … substantially curtailed his hours at [the hospital's] facilities in order to work

at other hospitals" and his arrangement "did not restrict his ability to make these adjustments nor did it prohibit him from working at unrelated facilities").

In sum, four of the five factors weigh against finding an employment relationship here—including the most important factor, control.  *See Knight*, 950 F.2d at 378.  And the only factor that cuts the other way, NCH's provision of Levitin's facilities and equipment, is not dispositive standing alone.  *See Alexander*, 101 F.3d at 493 (holding that a physician was not an employee even though he "did not supply his own equipment or assistants").  Consideration of the five factors, then, shows that Levitin was not an NCH employee.

Having viewed the record in the light most favorable to Plaintiffs, having compared Levitin's circumstances with those of the plaintiff physician in *Alexander*, and having independently analyzed the five relevant factors, the court concludes as a matter of law that Levitin was not an NCH employee.  *See Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 805 (7th Cir. 1999) (holding that the plaintiff physician was not an employee of the defendant hospital even when her situation "was not identical with that of *Alexander* in all respects," in particular that she was prohibited from associating with other hospitals).  It follows that Defendants are entitled to summary judgment on Plaintiffs' Title VII claim.

## II.    State Law Claims

With summary judgment granted to Defendants on the Title VII claim, Plaintiffs' remaining claims all arise under state law.  This court has jurisdiction over those claims not under 28 U.S.C. § 1332(a), given the presence of Illinois citizens on both sides of the case, but rather under 28 U.S.C. § 1367(a), the supplemental jurisdiction statute.  Section 1367(c)(3), however, provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if … the district court has dismissed all claims over which it

has original jurisdiction." 28 U.S.C. § 1367(c)(3). "As a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pendent state claims." *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007); *see also Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) ("[W]hen the federal claims are dismissed before trial, there is a presumption that the court will relinquish jurisdiction over any remaining state law claims."). This general rule has three exceptions: "when the refiling of the state claims is barred by the statute of limitations; where substantial judicial resources have already been expended on the state claims; and when it is clearly apparent how the state claim is to be decided." *Williams*, 509 F.3d at 404; *see also RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 480 (7th Cir. 2012).

None of the exceptions apply here. First, if this court relinquishes supplemental jurisdiction over the state law claims, Illinois law would give Plaintiffs one year to refile those claims in state court if the limitations period for those claims expired while the case was pending here. *See Sharp v. Electronics Corp. v. Metropolitan Life Ins. Co.*, 578 F.3d 505, 515 (7th Cir. 2009) (citing 735 ILCS 5/13-217); *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (same); *Timberlake v. Illini Hosp.*, 676 N.E.2d 634, 636-37 (Ill. 1997) (same); *Hileman v. Maze*, 2014 IL App (5th) 130233-U, ¶ 15, 2014 WL 1259111, at *2-3 (Ill. App. Mar. 25, 2014) (same and citing cases). Second, even though discovery has concluded, substantial federal judicial resources have not yet been committed to the state law claims. *See Davis*, 534 F.3d at 654 ("[T]he district court disposed of the federal claims on summary judgment, and so 'substantial judicial resources' have not yet been committed to the case."). And, third, because the court has not analyzed the state law claims and the parties' arguments regarding the immunity doctrines invoked by Defendants, it is not readily apparent how the state law claims will be resolved.

(Although one of the immunity doctrines arises from the HCQIA, a federal statute, it is invoked solely as a defense, Doc. 64 at 91, ¶ 5, and thus does not support federal jurisdiction on its own. *See Crosby v. Cooper B-Line, Inc.*, 725 F.3d 795, 800 (7th Cir. 2013) ("Ordinarily, the basis for federal-question jurisdiction must be apparent from the face of the plaintiff's well-pleaded complaint.") (citing *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149 (1908)); *Hughes v. United Air Lines, Inc.*, 634 F.3d 391, 393, 395 (7th Cir. 2011) (holding that, where the defendant invoked the federal Railway Labor Act as a defense against a state law claim, the litigation had to be remanded to the state court for lack of federal question jurisdiction).)

Given all this, relinquishing jurisdiction over the state law claims is the appropriate course under § 1367(c)(3). *See Dietchweiler*, 827 F.3d at 631; *RWJ Mgmt. Co.*, 672 F.3d at 479-80; *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1251-53 (7th Cir. 1994).

### Conclusion

Because Levitin was not NCH's employee, Defendants' summary judgment motion is granted as to the Title VII claim. And because the court relinquishes jurisdiction over the state law claims, Defendants' summary judgment motion is denied as moot as to those claims. Plaintiffs' motion for partial summary judgment, which pertains exclusively to the state law claims, is denied as moot as well. Plaintiffs' motions to strike are denied in part and denied as moot in part, Defendants' motion to strike is denied as moot, and Defendants' motions *in limine* are denied as moot.

September 28, 2016

_____
United States District Judge